Robert C. Weaver, Jr., OSB #801350
E-Mail: rweaver@gsblaw.com
Paul H. Trinchero, OSB #014397
E-Mail: ptrinchero@gsblaw.com
GARVEY SCHUBERT BARER
121 SW Morrison Street
Eleventh Floor
Portland, Oregon 97204-3141
Telephone: (503) 228-3939
Facsimile: (503) 226-0259

*Liaison Counsel for the Class*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KEVIN MURPHY, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>PRECISION CASTPARTS CORP., MARK DONEGAN, and SHAWN R. HAGEL,<br><br>Defendants. | Case No. 3:16-cv-00521<br><br>**CLASS ACTION**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS


I. INTRODUCTION ..........2

II. JURISDICTION AND VENUE ..........7

III. THE PARTIES ..........7

A. Lead Plaintiffs ..........7

B. Defendants ..........8

1. Corporate Defendant ..........8

2. Individual Defendants ..........9

IV. FACTUAL ALLEGATIONS ..........10

A. Company Background and Growth Strategy ..........10

B. Before the Class Period Begins, Precision Announces Fiscal Year 2016 Earnings-Per-Share Target ..........11

C. Unbeknownst to Investors, Precision Resorts to "Pulling In" Strategies to Create the Appearance of Sustainable Growth ..........13

D. During the Class Period, Precision Begins To Lose its Ability to "Pull In" ..........18

E. Precision Reports Strong Aerospace Growth and Downplays Market Share Concerns Without Disclosing its Reliance on Unsustainable Pull Through Sales ..........20

F. Rolls-Royce Announces Plan To Cut Costs and Reduce Inventory ..........21

G. Precision Reports Weakening Earnings But Falsely Assures Investors It is the Result of Temporary Issues ..........23

H. Precision Continues To Link Earnings Misses to Short Term Inventory Destocking ..........25

I. Defendant Donegan Exercises Stock Options and Sells Shares For a Substantial Profit Just Weeks Before the Truth is Revealed ..........30

J. The Company Again Attributes Earnings Misses to Temporary Destocking ..........30

K. The Straw that Broke the Camel's Back ....................32

L. Investors Finally Learn That Temporary Destocking Was Not To Blame For Precision's Poor Sales Figures and That Precision Was Actually Losing Business ....................33

M. Defendants Belatedly Confirm that They Misstated and Omitted Material Facts ....................35

N. Precision is Acquired by Berkshire Hathaway ....................36

V. ADDITIONAL ALLEGATIONS OF SCIENTER ....................38

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ....................41

A. Fourth Quarter Fiscal 2013 & Year-end Fiscal 2013 Results ....................41

B. First Quarter Fiscal 2014 Results ....................52

C. Citi Global Industrials Conference ....................62

D. Second Quarter Fiscal 2014 Results ....................64

E. Credit Suisse Global Industrials Conference ....................73

F. Third Quarter Fiscal 2014 Results ....................76

G. Fourth Quarter Fiscal 2014 & Full Year Fiscal 2014 Results ....................82

VII. THE TRUTH BEGINS TO EMERGE ....................87

A. First Quarter Fiscal 2015 Results ....................87

B. Second Quarter Fiscal 2015 Results ....................92

C. Credit Suisse Global Industrials Conference ....................98

VIII. THE FULL TRUTH IS REVEALED & OTHER POST-CLASS PERIOD EVENTS ....................98

IX. LOSS CAUSATION ....................106

X. PRESUMPTION OF RELIANCE ....................108

XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ....................109

XII. CLASS ACTION ALLEGATIONS ....................111

XIII. CAUSES OF ACTION ....................113

COUNT I FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5 PROMULGATED THEREUNDER (Against Defendants Precision, Donegan, and Hagel) ....................113

COUNT II FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT (Against Defendants Donegan and Hagel) ....................117

XIV. PRAYER FOR RELIEF ....................118

XV. JURY TRIAL DEMANDED ....................119

Lead Plaintiffs AMF Pensionsförsäkring AB and the Oklahoma Firefighters Pension and Retirement System, as defined herein, by their undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Securities and Exchange Commission (the "SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all others similarly situated who purchased or otherwise acquired the publicly traded securities of Precision Castparts Corp. ("Precision," "PCC," or the "Company") between May 9, 2013 and January 15, 2015, inclusive (the "Class Period").

Lead Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief are based on, among other things, the independent investigation of Court-appointed Co-Lead Counsel Kessler Topaz Meltzer & Check LLP and Labaton Sucharow LLP. This investigation included, among other things, a review and analysis of: (i) public filings by Precision with the SEC; (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) economic analyses of securities movement and pricing data; (v) transcripts of investor calls with Precision senior management; (vi) consultations with relevant experts and consultants; (vii) interviews with former employees of Precision and with current and former employees of Precision's customers; and (viii) other publicly available material and data identified herein. Co-Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting the allegations contained herein are known only to the Defendants (as defined herein) or are exclusively within their custody or control. Lead Plaintiffs believe that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. In the years preceding its January 2016 acquisition by Berkshire Hathaway, Inc. ("Berkshire Hathaway"), Precision, an aviation parts manufacturing conglomerate, had relied on a steady stream of acquisitions to drive its growth. By 2012, however, these new acquisitions were dwindling. It became imperative for the Company to demonstrate that it could pivot to achieve sustainable growth based on the demand of "legacy" customers.

2. While the Company had historically refused to provide earnings guidance to investors, in January 2013, as the market began to raise concerns regarding the Company's ability to grow organically, it took the unusual step of providing investors with a concrete earnings target that reflected an expected three-year increase in earnings per share ("EPS") of nearly 100%. The Company also assured investors that it was on track to achieve its predicted EPS growth for fiscal year 2016.

3. The Company's prediction seemed to be bearing fruit when, in mid-2013, Precision reported what appeared to be solid organic growth, which refers to growth by increased output, expanded customer base, or increased demand and sales, rather than by acquisition. However, beginning in July 2013, Precision began reporting lower-than-anticipated earnings to the market, which it attributed in part to "modest destocking by some of our engine customers," which included Rolls-Royce Limited ("Rolls-Royce"), a key Precision customer. Inventory destocking refers to the practice of reducing inventory on hand relative to production. That is, in destocking, a manufacturing company reduces the amount of inventory it keeps on hand to support its manufacturing process.

4. Precision sought to allay concerns by representing that the inventory reduction by its customers was merely temporary and not representative of any long-term declines in demand for its products. As such, Precision assured investors that the destocking would end within the calendar year, and would have no impact on the Company's ability to meet its fiscal year 2016 targets.

5. Once this key customer had adjusted its inventory levels, Precision explained, the customer's demand for Precision products would quickly return to historic levels.

6. This explanation of the earnings misses was reassuring to investors, because short-term inventory destocking did not signal to the market any weakness in long-term demand or sales prospects and, importantly, the Company reaffirmed its rosy 2016 earnings targets.

7. Given these repeated assurances of the short-term nature of the downturn in the Company's business and Defendants' continued reaffirmation of the fiscal 2016 earnings guidance, investors and analysts were surprised when, in July and October of 2014, Precision again reported earnings misses. Nevertheless, Defendants continued to reassure investors that the misses were the result in part of temporary destocking and not a reduction in demand. In fact, even as late as December 3, 2014, Defendants affirmed that Precision was on track to meet its fiscal 2016 targets.

8. However, in January 2015, when the Company again announced disappointing financial results—and again explicitly attributed the problem, at least in part, to further aerospace destocking at Rolls-Royce—analysts finally concluded that what had been described as a temporary inventory management issue at one of Precision's customers was apparently a long-term reduction in demand for the Company's products. In response to these disclosures, analysts

also concluded that, contrary to the Company's repeated assertions throughout the Class Period, Precision's fiscal 2016 target was not attainable, and openly questioned the credibility of Precision's management. The Company's stock price was punished as a result, falling more than nine percent in a single day, and erasing approximately $2.86 billion in market capital.

9. Less than a week later, the Company held a conference call on which its executives admitted that they had omitted material information in their communications with investors and, in particular, failed to previously update its 2016 guidance even though "things [had] changed" since 2013.

10. This was not the only way the Company had deceived its investors. In fact, the Company's reports of solid organic growth, its claims about earnings increasing through fiscal year 2016, and its explanations for its surprising earnings misses had been materially misleading.

11. Unbeknownst to investors, prior to and during the Class Period, the Company's sales targets were being achieved not because of an increase in demand for its products, but because Precision had embarked on a variety of unsustainable strategies intended to boost its own short-term sales numbers and create the illusion of sustainable growth. In truth, the Company was actually losing market share to its competitors, in part because its competitors had become more technologically advanced than Precision.

12. This conduct included frantic quarter-end efforts to "pull in" sales, that is, to persuade customers to purchase product long in advance of their actual needs. If Precision could convince a customer to accept a year's worth of product in a single quarter, the Company could immediately book that entire year's worth of sales and meet its quarterly sales goals—but only at the expense of the quarters to follow. This practice benefitted near-term sales figures only at the

expense of the quarters to follow, and created a massive hole in future quarters where those sales would otherwise have been made. Precision's practices also gave the appearance of sustainable growth even though the demand for its product had not grown. What Precision represented as organic growth was in fact the result of nothing more than a change in the timing of sales.

13. These practices, unknown to the public, created a disastrous spiral: the more the Company "pulled in" sales by various means in one quarter, the harder it would be for it to meet targets in the next quarter, requiring ever more extraordinary means to persuade customers to take on inventory in excess of their actual current needs.

14. Carrying inventory much in excess of short-term needs is, of course, not a sustainable business model for Precision's customers, as it creates an economic and reporting burden for companies. This is because there are a number of costs associated with carrying inventory, such as the opportunity cost of the money used to purchase the inventory, the cost of warehousing and handling the inventory, and the cost of deterioration or obsolescence, among others.

15. When new, more customer-centric competitors entered the market during the Class Period, Precision's customers were less inclined to acquiesce to Precision's quarterly target-driven efforts to push its products, and the Company's fragile house of cards began to fall apart.

16. In mid-2013, Rolls-Royce announced a dramatic change in its inventory management practices, including a commitment to carrying less inventory. This policy change squarely collided with the undisclosed "pulling in" practices upon which Precision had depended in the past. Now the Company would have to sell to Rolls-Royce smaller quantities of inventory

more closely tied to this key customer's current demand—permanently reducing sales to this crucial customer to a level lower than what Precision had enjoyed historically when it was able to "pull in" sales. These declines were compounded by the loss of business during the Class Period to more technologically sophisticated rivals that had begun to compete with Precision.

17. During the Class Period, when Defendants attributed Precision's disappointing earnings results to short-term inventory destocking, they knew, or recklessly ignored, the fact that demand from Rolls-Royce would never recover to levels Precision had maintained in the past. While the Company attributed its earnings misses to short-term destocking spawned by Rolls-Royce's inventory reduction, it failed to disclose to investors the ***permanent*** damage Rolls-Royce's change in inventory management policy would inflict upon Precision's sales, as it would no longer be able to rely on "pull in" revenue from one of its largest customers.

18. Indeed, once Rolls-Royce's short term effort to work through its glut of inventory was over, it was not followed by a return to historic demand.

19. In fact, in response to public statements by the Company that its earnings misses were due to continuing temporary inventory destocking at Rolls-Royce, a senior Rolls-Royce executive called a top-level Precision manager about the Company's claims, asking "***what the hell are you talking about?***"

20. Revelations concerning the long-term nature of Precision's business losses, and the blow to the credibility of the Company's management, took a terrible toll on Precision investors, who saw the Company's stock fall from a Class Period high of $275.09 per share on June 9, 2014 to $199.63 per share on January 16, 2015, the day after the Class Period ended.

## II. JURISDICTION AND VENUE

21. The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

22. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

24. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III. THE PARTIES

### A. Lead Plaintiffs

25. Lead Plaintiff AMF Pensionsförsäkring AB ("AMF") is one of the largest pension companies in Sweden. AMF manages the AMF family of mutual funds, as well as separate pension, private client, and fixed income portfolios. AMF was established in 1973 as the asset management branch of the Stockholm-based AMF insurance group, and manages approximately $63 billion in assets on behalf of more than four million pension customers. AMF purchased Precision common stock at artificially inflated prices during the Class Period and was damaged

as a result of the conduct alleged herein. On July 13, 2016, this Court appointed AMF as Lead Plaintiff for this litigation.

26. Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters"), established in 1981 and headquartered in Oklahoma City, Oklahoma, provides retirement benefits and other specified benefits for qualified firefighters and their beneficiaries. Oklahoma Firefighters manages more than $2 billion in assets, on behalf of more than 19,000 beneficiaries. Oklahoma Firefighters is administered by a 13-member board, which acts as a fiduciary for the investment of Oklahoma Firefighters' assets. Oklahoma Firefighters purchased Precision common stock at artificially inflated prices during the Class Period and was damaged as a result of the conduct alleged herein. On July 13, 2016, this Court appointed Oklahoma Firefighters as Lead Plaintiff for this litigation.

**B. <u>Defendants</u>**

**1. <u>Corporate Defendant</u>**

27. Defendant Precision, a manufacturer of complex metal components primarily marketed to industrial and aerospace customers, is a Delaware corporation with its principal executive offices located at 4650 S.W. Macadam Ave., Suite 400, Portland, Oregon. The Company's stock was listed on the New York Stock Exchange (the "NYSE") under the ticker symbol "PCP," until the Company was privately acquired on or around January 29, 2016 by Berkshire Hathaway.

28. The Company operates in three principal business segments: (1) Investment Cast Products; (2) Forged Products; and (3) Airframe Products.

**2. Individual Defendants**

29. Defendant Mark Donegan has served as the Chairman and Chief Executive Officer ("CEO") of Precision since 1992. During the Class Period, Donegan reviewed, approved, and signed Precision's false and misleading SEC filings. Donegan also reviewed and approved false and misleading press releases and Form 8-Ks issued by Precision during the Class Period. Donegan also participated in conference calls with securities analysts, during which Precision's false and misleading statements filed with the SEC and included in press releases were presented and discussed. Donegan personally made statements on these conference calls about customer inventory destocking, including stating to investors that the destocking was temporary and providing a specific time by which destocking would purportedly end. Donegan also repeatedly stated that the Company was on track to meet its fiscal year 2016 EPS targets.

30. Defendant Shawn Hagel has served as the Executive Vice President and Chief Financial Officer of Precision since 1997. During the Class Period, Hagel reviewed, approved, and signed Precision's false and misleading SEC filings. Hagel also reviewed and approved false and misleading press releases and Form 8-Ks issued by Precision during the Class Period. Hagel also participated in conference calls with securities analysts, during which Precision's false and misleading statements filed with the SEC and included in press releases were presented and discussed.

31. Defendants Donegan and Hagel are collectively referred to as the "Individual Defendants" and, together with Precision, as the "Defendants." The Individual Defendants directly participated in the management of Precision's operations, including its accounting and reporting functions, had the ability to and did control Precision's financial reporting, and were

privy to confidential information concerning Precision and its business, operations and financial statements, as alleged herein. They were also involved in drafting, reviewing, publishing and/or disseminating the false and misleading financial statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued, and approved or ratified these misstatements in violation of the federal securities laws.

## IV. FACTUAL ALLEGATIONS

### A. Company Background and Growth Strategy

32. Since its founding in 1953, Precision grew to become the market leader in manufacturing large, complex structural investment castings, airfoil castings, forged components, aerostructures and highly engineered, critical fasteners for general and industrial customers. Precision's aerospace customers include General Electric Corporation ("GE"), The Boeing Company ("Boeing"), Airbus SAS ("Airbus"), Pratt & Whitney, and Rolls-Royce. The Company relies on the aerospace market for 70 percent of its overall sales.

33. Precision discloses in its SEC filings that Rolls-Royce is one of the Company's "key customers." Precision supplies Rolls-Royce with, among other things, components for Rolls-Royce's Trent 1000 turbofan engine, which powers the Boeing 787 Dreamliner, and the Trent XWB, which powers the Airbus A350 XWB.

34. Precision became the dominant player in the aerospace market as a result of its aggressive acquisition strategy, which it employed to gain market share and enter new end markets. Between 2009 and 2012, Precision acquired over 15 different companies, including Carlton Forge Works in 2009 and TIMET in 2012. Precision's acquisitions contributed in large part to a large increase in profits and growth. For example, from fiscal year 2010 to fiscal year

2013, the Company increased its net income ***nearly 65 percent***—from $922 million to a $1.429 billion.[1]

**B. Before the Class Period Begins, Precision Announces Fiscal Year 2016 Earnings-Per-Share Target**

35. By 2012, as opportunities for new acquisitions that could drive growth for the Company had dwindled, Precision's earnings began to fall below consensus market estimates. In order to appease investors and analysts, Precision had to demonstrate that it could produce sustainable long-term growth without acquiring new companies.

36. The Company flagged this pivot in its growth strategy during a January 24, 2013 earnings conference call on which Precision, a company that had not typically issued EPS guidance, provided a target EPS of $15.50 to $16.50 for fiscal year 2016. As part of this January 24, 2013 announcement to investors, Precision provided investors with a slide titled "PCC's FY2016 Roadmap," which indicated that it expected to achieve its $15.50-$16.50 EPS target solely through organic growth:

[1] During the Class Period, Precision's fiscal year was not the same as the calendar year. The Company's fiscal year during the Class Period was as follows: first-quarter fiscal 2014 began on April 1, 2013 and ended on June 30, 2013; second-quarter fiscal 2014 began on July 1, 2014 and ended on September 29, 2013; third-quarter fiscal 2014 began on September 30, 2013 and ended on December 29, 2013; fourth-quarter and full-year fiscal 2014 began on December 30, 2013 and ended on March 30, 2014; first-quarter fiscal 2015 began on March 31, 2014 and ended on June 29, 2014; second-quarter fiscal 2015 began on June 30, 2014 and ended on September 28, 2014; third-quarter fiscal 2015 began on September 29, 2014 and ended on December 28, 2014; fourth-quarter and full year fiscal 2015 began on December 29, 2014 and ended on March 29, 2015.




37. Precision reiterated in the slide presentation that future mergers and acquisitions did not factor into this guidance, and instead provided "opportunities for results ***greater*** than $15.50-$16.50 per share for FY16."[2] In addition, Donegan assured analysts during a January 24, 2013 conference call that any future acquisitions would simply be "additive" to this guidance, stating that they would be "over and above" the earnings generated through organic growth.

38. Defendant Donegan further assured investors that he understood the components of the earnings target and knew exactly what level of sales Precision needed to generate to reach this target, responding to the question of "is there conceptually a sales level that gets you there?" by stating "Do I know what it is? Yes."

39. Analysts and investors responded positively to Precision's EPS guidance and became heavily focused on the Company's ability to hit this target. Analysts at RBC Capital

[2] All emphasis is added unless otherwise noted.

Markets, for example, stated in a report published the same day as the Company's announcement that "[m]anagement has long been averse to giving any financial guidance, and so it is a big step to see [Precision] providing an FY16 EPS target of $15.50-16.50."

40. Likewise, a KeyBanc analyst noted that the Company's "[w]eak quarterly results were ***clearly overshadowed by management's FY16 earnings outlook***."

41. After Precision offered this 2016 EPS guidance on January 24, 2013, meeting the target became of paramount importance to both the Company and the market. Naturally, then, the market became increasingly focused on each and every aspect of Precision's business that could call into question the Company's ability to meet this guidance. The market's focus on the 2016 EPS target was sustained throughout the Class Period. As detailed below, the Company continued to reaffirm this stated guidance, despite knowing that its inability to continue pulling in sales would have a long-term impact on the Company's profitability.

### C. Unbeknownst to Investors, Precision Resorts to "Pulling In" Strategies to Create the Appearance of Sustainable Growth

42. In fact, unbeknownst to investors and contrary to the Company's representations that it could achieve sustained EPS growth without reliance on acquisitions, Precision was not experiencing increasing sustainable demand from its customers. Anxious to meet its targets, Precision resorted to various unsustainable means of increasing sales to meet earnings targets and to convince investors that it had sustainable organic growth in order to justify its aggressive 2016 EPS target. In this respect, Precision's sales volume came to turn not on the current manufacturing needs of its customers like Rolls-Royce, but on its ability to persuade customers to purchase enough product for the Company to meet its internal quarterly targets. The Company referred to this practice of pushing to meet its internal quotas as "charging the cliff."

43. In order to meet internal quarterly targets that exceeded demand, Precision would "pull in" future sales of its products. "Pulling in" sales means to bring sales that would normally happen at some point in the future closer to today. The way Precision did this was by inducing customers to accept early delivery of more product than these customers actually needed ***at the time***, so Precision could hit its own quarterly sales targets. If successful, this strategy would allow the Company to report higher sales in the current quarter, thereby allowing it to meet or even exceed market expectations while creating the illusion that the Company's organic sales were growing sustainably. But in truth, the long-term demand for the Company's product remained flat.

44. Precision was able to execute this strategy for a time. While this did help the Company meet its quarterly targets and conveyed the appearance of sustainable growth to the market, it created numerous risks to the Company's future profitability that were not disclosed to investors. For example, it put proportionately more pressure on subsequent quarters, because future sales had already been "pulled in," and so the Company had to keep generating progressively higher numbers to make up for it. For example, if Precision persuaded a customer to pull in the sales of 15 units scheduled for the second quarter into the first quarter of its fiscal year, Precision created a 15 unit "hole" that would need to be filled in the remaining quarters (oftentimes by resorting to the same pull in strategy in those subsequent quarters).

45. What is more, because Precision often had to persuade customers with discounts and extended payment terms to get them to accept early delivery of product that they did not yet actually need, Precision sacrificed margins for revenue upfront. This also meant that the sales Precision pulled in each quarter did not translate into a sustainable increase in earnings. This

short-term, quarterly driven focus would catch up with Precision when customers started to refuse to accept early delivery of more product than they currently needed.

46. Lastly, because this strategy was heavily dependent upon the willingness of Precision's customers to accept additional product, it created the severe risk that, if the customers ever became unwilling to take on additional inventory, Precision would experience a permanent decline in sales and earnings—*i.e.*, sales and earnings would fall off the "cliff" that Precision was "charging."

47. Precision's practice of "pulling in" sales was confirmed by Confidential Witness One ("CW1"), who was Executive Vice President of Precision from 2009 to October 2014, reporting directly to Defendant Donegan. CW1 explained that once Precision stopped acquiring companies regularly, the Company's ability to drive earnings suffered. This led to a focus on pulling in sales and meeting quarterly targets. According to CW1, the Company searched for whatever they could "pull in" at the end of every quarter and would offer significant discounts to make the current quarter. CW1 described the amount of pull-ins that were done across the business as "unbelievable." According to CW1, the goal was to make the quarter at any cost and the Company did not worry about what this meant for the next quarter. Precision knew, CW1 explained, that the customers did not yet need the product but still persuaded the customers to accept it early. According to CW1, the practice of pulling in sales would work until customers stopped agreeing to accept early delivery.

48. Precision's efforts to pull in sales each quarter led to extraordinary pressure to hit quarterly targets. CW1 explained that Precision was an organization based on fear. According to CW1, pressure was Defendant Donegan's main tool and his focus was always on hitting the

quarter at any cost. Indeed, Defendant Donegan's mantra was deliver the day, deliver the week, deliver the quarter. Eventually, CW1 explained, employees got to a point where they could just no longer keep up, and, because the pressure on people was tremendous, employee turnover became alarming. This lead to a belief internally that Precision was a "house of cards."

49. CW1's account of Donegan's micromanagement of Precision (down to the plant level), and the intense pressure he put on managers to hit quarterly numbers at any cost, is corroborated by an August 3, 2016 Bloomberg profile of Donegan titled "Warren Buffett Made a Big Bet On an 'In-Your-Face' CEO." Relying on 15 current and former Precision employees, including some in senior management, the article revealed that Donegan would scream, curse, and even physically threaten his subordinates during quarterly reviews, and that as a result of the intense pressure, managers would go to "great lengths" to hit the Company's quarterly targets. The article also notes that every quarter, Donegan received "the same set of 26 charts" from each Precision factory "that highlighted things like productivity, earnings, market share and fixed costs per employee," and that Donegan "spends about 1,000 hours a year on his jet so he can keep tabs on his business."

50. Other confidential witnesses also confirmed that Precision "pulled-in" sales and persuaded customers to accept early delivery of more product than they then-currently needed. Confidential Witness Two ("CW2"), who worked as a senior-level employee in Precision's Corporate Planning, Purchasing, and Procurement department and who interacted with Defendant Donegan prior to, during, and after the Class Period, confirmed that Precision worked with its customers, including Rolls-Royce, to accept early delivery of product because the

Company was driven to meet its own quarterly numbers. CW2, using a term widely used inside the Company, referred to this practice as "charging the cliff."

51. As noted above, while this practice allowed Precision to meet its own short-term sales forecasts, it was highly dependent on the acquiescence of its customers. CW2 explained that employees at Precision were instructed to focus all efforts during the last three weeks of a quarter on pulling in sales and shipping out all product to customers. Precision would do this by working with customers and coming up with ways to induce them to accept early delivery. Indeed, CW2 stated, "we would give them credit wherever we thought they would accept it . . . and just to get the product out the door." As CW2 also explained, Precision's philosophy was "absolutely do whatever you had to do to hit a quarter." As investors would later come to understand, "do[ing] whatever you had to do" to meet short-term targets oftentimes meant sacrificing future sales and profitability, reducing profit margins, and jeopardizing relationships with top customers.

52. Confidential Witness Three ("CW3"), who was a Supply Chain Director at SPS Technologies, a Precision subsidiary, from July 2013 to December 2014, explained that Precision routinely shipped product early to its customers in order to ensure the Company met its corporate numbers. According to CW3 this amounted to "ship at all costs," no matter what discount had to be given. CW3 also explained that Defendant Donegan "very heavily led" the command to prematurely ship product.

53. Because Precision was able to induce customers to buy the amount of product Precision needed to meet its own numbers, the Company's manufacturing was relatively insensitive to its customers' actual needs. Confidential Witness Four ("CW4"), who worked as a

Sales Manager at Precision in the Investment Casting Division from June 2014 until August 2014, explained that Precision dictated delivery rates with its customers, and was able to get customers to accept product regardless of whether or not they needed it at the time. Indeed, CW4 confirmed Precision's practice of "pulling in" sales, including sales to Rolls-Royce, at the end of a quarter and that the Company would produce and sell product to Rolls-Royce and other customers not based on customer's then-existing demand but instead to meet Precision's own internal forecasts. CW4 performed an analysis into the Company's financial results in prior quarters, including the quarter ending June 30, 2014, that confirmed the unsustainability of this practice. CW4 performed this analysis as part of a "fire drill" that resulted from Precision's sales and revenue misses—*i.e.*, sales and revenues below Precision's forecast. CW4 presented those findings at a meeting in July 2014 at the Company's headquarters, before Precision disclosed its first quarter 2015 results. According to CW4, after CW4 presented those findings, CW4 was no longer included in any additional meetings, nor was CW4 allowed to interact with anyone above CW4's own level within the Company, and was let go shortly thereafter.

### D. <u>During the Class Period, Precision Begins To Lose its Ability to "Pull In"</u>

54. Unbeknownst to investors, during the Class Period, Precision's ability to pull in sales and induce customers to accept early delivery of product began to lessen dramatically. As customers became less willing to accept more product than they actually needed, weakness began to develop in the Company's reported sales.

55. One of the most significant reasons Precision lost the ability to "charge the cliff" and pull in sales at quarter-end was that customers became less willing to incur the costs associated with accepting early shipment of more product than they currently needed. CW1

confirmed that, beginning in 2013, CW1 began seeing changes in Precision's market share as customers stopped wanting to take end-of-quarter early shipments of product. As customers became more concerned with lowering the amount of inventory they carried, they began to have less desire to accept unnecessary product from Precision.

56. Another reason Precision's customers became less willing to work with the Company to help it pull in sales was because Precision now faced increased competition. This meant that Precision's customers became less reliant on the Company as a sole source supplier, and so had less reason to agree to accept early delivery of more product than they then-currently needed, a practice in Precision's interest but often not their own. Precision began to lose business to competitors because the Company failed to invest in new technology and research and development. As customer demands shifted, Precision was simply unable to supply the new parts.

57. This development was a special concern with respect to new production programs, which call for products that are more difficult to manufacture. Because Precision had not invested in developing new technologies and capabilities, it had increasing trouble competing for new business. For instance, by 2008, Rolls-Royce had developed a new engine, the Trent XWB. A component of that engine is the Intermediate Compressor Case. Rolls-Royce considered two competing offers for the Intermediate Compressor Case: a fabricated, light-weight design from Volvo Aero Corporation ("Volvo Aero"), and the conventional casted technology from Precision. Rolls-Royce ultimately chose Volvo Aero's more advanced, light-weight design.

58. Confidential witnesses confirm that Precision steadily lost business during the Class Period. CW1, for example, explained that Precision's unique positioning in the aerospace market gradually eroded over time, as Precision faced increased competition and lost the ability to be the sole source supplier to aerospace original equipment manufacturers ("OEMs"). The reason for the loss of business is that other competitors have developed capabilities that once only Precision had, including the ability to create customized engine components for OEMs. CW1 said that Precision's customers welcomed this development because they now have alternative supply options and greater leverage in their negotiations with Precision.

**E. Precision Reports Strong Aerospace Growth and Downplays Market Share Concerns Without Disclosing its Reliance on Unsustainable Pull In Sales**

59. During the Class Period, Precision repeatedly boasted that its organic growth was strong without telling investors that this purported growth was actually being manufactured by its unsustainable pull in strategy rather than increased demand. For example, on May 9, 2013, the first day of the Class Period, Precision issued a press release announcing its fourth-quarter fiscal 2013 financial results, which beat analysts' estimates and reflected robust aerospace performance at the Company. On an earnings conference call held that same day, Defendant Donegan reported that overall aerospace sales grew by roughly 32 percent, with organic growth increasing by four percent, and explained that "organic [growth was] moving in the right direction," without disclosing that a material portion of that growth resulted from an unsustainable practice of pulling in sales.

60. On that same call, Donegan was explicitly asked about the Company's visibility into its market share across segments and whether the Company was at that point experiencing a

loss of business to competitors. In response, Defendant Donegan stated that he "do[es not] worry about" a loss of market share.

61. Just days later, on May 30, 2013, Defendant Hagel exercised options to purchase 18,750 shares of Precision common stock at a price of $57.77 per share and immediately sold them for $215.47 per share, recognizing an instant profit of $2,956,875.

**F. <u>Rolls-Royce Announces Plan To Cut Costs and Reduce Inventory</u>**

62. Efforts at Rolls-Royce to permanently rationalize and reduce its inventory positions resulted in material and permanent declines in its demand for the Company's products.

63. On June 18, 2013, at the Paris Air Show, Rolls-Royce announced plans to improve the profitability of its passenger jet-engine business, which had been trailing its competitors. In 2012, for instance, Rolls-Royce's civil aerospace unit recorded an operating margin of only 11.3 percent, compared with 18.7 percent at GE's aviation business.

64. As part of its plan to improve profitability and cut costs, Rolls-Royce announced that it was engaging in inventory policy changes that would cut its inventory in half. At the Paris Air Show, Rolls-Royce President of Aerospace, Tony Wood, stated:

> [B]y far the biggest opportunity in our business on cash is inventory. We're carrying today around three billion pounds of inventory at the group level… So there's around about a one and a half billion pound opportunity in our balance sheet today, over time to start to address inventory and a half a turn improvement off around about 400 million pounds.

Wood also specifically indicated that the Boeing 787 program—a program for which Precision supplied Rolls-Royce with parts—provided a strong inventory reduction opportunity:

> We're running a tighter ship these days and absolutely my message to the team and my intent is that we continue to both lean out and sustain that performance. Trent 1000 going into the 787, less mature, earlier stage of its production programme, ramping up quickly now, 100% on time to due day. And it's been

> there for the last nine months, one of the most challenging programmes in terms of trying to work with the customer on maturing that aircraft. But the drum beat of the business, managing flow, managing inventory, getting that customer focus in.

65. In discussing Rolls-Royce's changes to inventory management, as well as how Rolls-Royce previously managed inventory, Wood added:

> So we are gradually turning the dials up on our management of inventory. The aero organisation helps in terms of looking at the alignment and the plan that drives inventory across the business. We've got much better visibility across the value stream. And particularly we're taking a lot of action on looking at buffers. . . . ***But across our business the way we were organised previously we were optimising and making buffer decisions around different elements in the value chain rather than looking at it from demand signal right the way through to the supply chain***. That is throwing off lots of opportunities to look at a better leaning out of that supply chain which will deliver cash.

66. Rolls-Royce's announcement made clear that it was adopting a "lean management" approach to inventory. Lean inventory policies such as the one adopted by Rolls-Royce are one means by which companies reduce expenses. Carrying high amounts of inventory long in advance of when it is needed is expensive. Inventory is a large piece of a company's expense load, as it has substantial carrying costs. A lean approach to inventory management would, of course, be inimical to Precision's practice of "pulling in" sales and inducing customers to carry inventory long in advance of their needs.

67. While such a policy would be economically beneficial for Rolls-Royce, it represented a drastic change for Precision, which relied upon Rolls-Royce's willingness to carry high levels of inventory to accommodate Precision's efforts to hit quarterly numbers. Rolls-Royce's announcement therefore signaled to Precision the death knell for its pull in strategy, and necessarily resulted in a permanent—not temporary—downturn in its business with Rolls-Royce.

### G. Precision Reports Weakening Earnings But <u>Falsely Assures Investors It is the Result of Temporary Issues</u>

68. While Rolls-Royce's new inventory policy had an immediate impact on Precision's sales, Defendants falsely assured the market that this was merely a temporary and immaterial issue that had no effect on the Company's ability to meet its 2016 EPS target. For example, on July 25, 2013, Precision issued a press release announcing its first-quarter fiscal 2014 financial results, which missed consensus estimates on revenues and EPS. On an earnings conference call held that same day, Defendant Donegan reported that aerospace sales grew by 30 percent from the prior year, but that organic aerospace sales were flat, due, in part, to "de-stocking by some of [the Company's] engine customers." Defendant Donegan assured investors that the destocking activity was temporary and that demand would return to historic levels in the near future: "Our base sales were flat. . . . We have seen some modest de-stocking by some of our engine customers but it is important to note the demand is there, the contracts are there, the schedules are there. It is simply ***an inventory realignment*** that we experienced and the demand does show back in the future."

69. This was the first mention during the Class Period that Precision's sales were harmed by engine customer destocking. Yet these statements were misleading because they failed to disclose the more permanent consequence of Rolls-Royce's inventory reduction plan—that Precision could no longer masquerade pull in sales from Rolls-Royce as sustainable organic growth.

70. On that same conference call, JPMorgan Chase & Co. ("JP Morgan") analyst Joe Nadol asked for more specifics on the anticipated impact of engine customer destocking. In response, Defendant Donegan again explained that "a couple" of engine customers were

employing an "inventory reduction in this calendar year," but he represented that demand would remain stable and actually increase in the Company's fourth-quarter 2014: "We do see the demand sitting in our Q4."

71. These statements by Defendant Donegan were misrepresentations of current fact, not future events. Given Precision's reliance on unsustainable pull in sales, what Precision had experienced was not merely a temporary decline in demand because of a customer destocking inventory. Instead, the sales miss was but the first evidence internally that Precision could no longer benefit from the unsustainable practices it was relying upon to drive its purportedly organic sales growth.

72. In fact, by the time Donegan had made these statements, Rolls-Royce had already shifted from accepting more product than it currently needed to buying from Precision only what it needed to maintain a lean inventory. This permanently harmed the Company's ability to hit its targets because it could no longer rely on Rolls-Royce to help pull in sales. By assuring investors that destocking was short-term and that demand would return to historic levels, Defendant Donegan misrepresented to investors that overall demand for Precision's products remained stable when it was not.

73. In addition to his statements regarding destocking and in response to a question regarding whether the Company had sufficient organic growth capacity to meet its fiscal 2016 EPS target, Donegan assured the market that it did and that it was "on th[e] slope" (*i.e.*, was growing at a rate that would allow it to meet its target). He also assured investors that the sales "number [that] gets me to my [20]16 [EPS target] is stuck on people's foreheads." In other words, it was at the forefront of everyone's mind at the Company.

74. Investors relied on Defendant Donegan's representations that the revenue downturn was the result of a temporary phenomenon affecting inventory, and that the Company was on track to meet its 2016 EPS target. Indeed, several analysts reported that the Company expected destocking to soon end and demand to return over the next few quarters. For example, analysts at RBC Capital Markets explained in a report published on July 25, 2013 that "[Precision] expects the engine customer destocking to be a negative impact for 2-3 quarters." Likewise, analysts at KeyBanc reported that "[m]anagement did indicate that it believes the destocking trend is ***a short-term*** dynamic and revenues should rebound later this year ***as current orders signify an uptick in demand***." Additionally, Defendants' statements gave assurances to analysts, such as RBC, which noted that the "company also reiterated that the framework behind the FY16 EPS 'snap shot' target of $15.50-16.50 is still in place."

75. Although Precision did not initially specify which engine OEMs were destocking, analysts at Cowen suggested in an August 2013 report that destocking was likely most pronounced at Rolls-Royce, in connection with the Boeing 787 engines.

### H. Precision Continues To Link Earnings Misses to Short Term Inventory Destocking

76. Over the next several months, Precision continued to experience revenue shortfalls, but falsely assured investors that they were the result of temporary destocking and that demand would return to historic levels in the near future. On September 17, 2013, for instance, at the Citi Global Industrials Conference, Citi analyst Jason Gursky asked Defendant Donegan for an update on engine customer destocking and when Precision expected demand to return. In response, Donegan now explained that destocking would end "as we go into [fourth-quarter

fiscal 2014], [first-quarter fiscal 2015]," after which Precision would experience an increase in demand.

77. Donegan confirmed this again on October 24, 2013, when Precision issued a press release announcing its second-quarter fiscal 2014 financial results. On an earnings conference call held that same day, Defendant Donegan explained that the Company continued to experience engine customer destocking, but reiterated that demand would return, again assuring investors that Precision was not losing market share. Defendant Donegan also affirmed that the Company was still on track to meet its EPS guidance. David Strauss, a UBS analyst, asked whether "these results were just one data point on the long road toward your $16 target. Just curious, were the results actually ahead of your internal plan?" Defendant Donegan explained that "we have a line. If I go from where we were and blow my way out to that 2016 timeframe, I get a line. So ***we hover around that line***."

78. In the wake of such statements, Rolls-Royce began to field calls from analysts with questions about the temporary destocking Donegan had referred to. This prompted a Rolls-Royce procurement executive to call CW1, one of Donegan's lieutenants, saying ***"You did not tell us about destocking, what is destocking? What the hell are you talking about?"***

79. Confidential witness statements confirm that Precision was actually suffering weakened demand for its products, and that the Company simply used the term "destocking" as a catchall for general "softness" it was seeing in demand. CW1 admitted that the Company was struggling to understand this softness, ***and simply characterized the decline as "destocking."*** Indeed, according to CW1, it was understood internally that the Company's demand problems

could not possibly be the result of destocking. ***CW1 explained that what Donegan kept claiming was destocking was actually market share loss.***

80. CW1 further explained that the reason Precision began to suffer weakened demand for its products was because, by 2013, customers, including Rolls-Royce, stopped accepting end-of-quarter early shipments. While Precision had previously been able to ship product prematurely to customers in order to meet its own internal revenue figures, this changed once Rolls-Royce began to better manage its inventory and cut costs. According to CW1, the inability to pull in sales also got lumped into the use of the term "destocking."

81. Investors, however, continued to rely on the Company's misrepresentations. Indeed, following the October 24, 2013 conference call, analysts reported that while customer destocking continued, demand would return on schedule. For example, analysts at Wells Fargo explained that the "engine customer destocking that hurt [first-quarter 2014] results remained unchanged in [second-quarter 2014] and this volume is still expected to return in [fourth-quarter 2014]." Likewise analysts at KeyBanc reported that "management indicated that the engine destocking trend that surfaced last quarter has remained stable, and accordingly, remains on track to normalize in early [calendar-year 2014]."

82. In the wake of the Company's misrepresentations and while Precision's common stock price was artificially inflated as a result of Defendants' fraud, Defendant Hagel engaged in additional suspicious stock transactions. Specifically, on November 27, 2013, Defendant Hagel exercised options to purchase 25,000 shares at $101.41 per share, and immediately sold those shares at $259.93 per share, recognizing an instant profit of $3,963,000. Prior to this option exercise, Defendant Hagel directly owned just 19,899 shares of Precision common stock.

83. As 2013 progressed, Precision continued to assure investors that destocking was temporary and that demand would soon return. On December 3, 2013, at the Credit Suisse Global Industrials Conference, Precision indicated, for the first time, that destocking was specific to one engine customer. Specifically, Defendant Donegan explained that "one of the engine guys" had ordered an excessive amount of inventory from Precision to remain "protected" against fluctuations in demand for the Boeing 787 program, but that "it is now starting to balance itself out . . . ." Defendant Donegan added, "it has been more of . . . rather than destocking, a lot of times means you fall off. It has been more of a holding at a flat level, and not taking a step up. But I think that step up does start coming in, the middle of next year."

84. Once again, Defendant Donegan affirmed the soundness of the Company's long-term guidance and dismissed concerns that destocking could impact the Company's ability to achieve the organic growth necessary to reach its EPS target. Robert Spingarn, a Credit Suisse analyst, asked "about the sequential EBIT growth of 3.5%, roughly, to get to your targets" and whether "those numbers are going to fluctuate to some extent and market demand is going to play a role." Donegan stated: "[O]ur mindset is going to be linear. You are going to see different movements. . . . ***[W]e did not get the acceleration from – because of the destocking. You know what? We pull the other levers***."

85. Weeks later, on January 23, 2014, Precision issued a press release announcing its third-quarter fiscal 2014 financial results, which fell short of analysts' expectations. On an earnings conference call held that same day, Precision continued to explain that destocking was temporary and that demand would return in the next quarter, as the Company had previously represented.

86. Specifically, Wells Fargo analyst Sam Pearlstein sought an update on destocking and asked whether "we [can] expect[] the March quarter to have a pretty sizeable step up in terms of the top line, just based on what you have said throughout the year?" In response, Defendant Donegan stated, "do we expect to see growth in [the fourth-quarter fiscal 2014] and [the first-quarter fiscal 2015]? Yes . . . ." Donegan added:

> [Fourth-quarter fiscal 2014] has in it embedded growth. It has it in it because there are demands coming from our customers, it has it in it because we pick up three more manufacturing days. It has it in it because we have been carrying some inventory, and it has it in it, because certainly, of . . . this [third-quarter fiscal 2014] dynamic we got into.

87. Defendant Donegan also rejected the notion there had been any negative developments in the assumptions underlying Precision's 2016 EPS target, stating that "nothing has gone negative from that standpoint" and affirming that the 2016 EPS "framework is still intact."

88. On May 1, 2014, Dennis Oats, the CEO of Universal Stainless & Alloy Products, Inc. ("Universal")—a competitor of Precision—stated on Universal's first-quarter 2014 earnings conference call that it would no longer be affected by inventory issues, stating:

> [D]estocking has largely ended. And I think that's been validated in the first quarter, that the destocking has been ending. So at a minimum, our customers are buying to their needs. Some of them have begun to restock a little bit, because they're anticipating some stronger demand as we go through the rest of this year.

89. On May 8, 2014, Precision issued a press release announcing its fourth-quarter fiscal 2014 financial results, which exceeded analysts' estimates. The press release did not discuss destocking. Some analysts assumed this meant that, as the Company represented, destocking had ended. For example, analysts at Cowen explained in a May 8, 2014 report that the Company "didn't specifically reference the 787 program at Forged, but the general nature of

the 'rate increases' comment may mean that the engine de-stocking has abated in this segment, although it is not clear that this was the case through the March Q . . . ."

### I. Defendant Donegan Exercises Stock Options and Sells Shares For a Substantial Profit Just Weeks Before the Truth is Revealed

90. While Precision's stock price was inflated as a result of Defendants' fraud and just weeks before investors began to learn the truth about the Company's demand problems, Defendant Donegan exercised options on Precision's shares and sold them for a substantial profit.

91. Specifically, between May 13, 2014 and May 14, 2014, Defendant Donegan exercised options to purchase 89,752 shares of Precision common stock (nearly 40 percent of the 226,258 shares he owned at the time) at a price of $101.41, for a total of $9,101,750. Defendant Donegan immediately sold those shares at prices between $253.03 and $254.76, for a total of $22,858,867, and thus instantly recognized a profit of $13,757,117.

### J. The Company Again Attributes Earnings Misses to Temporary Destocking

92. Despite assurances to investors that destocking was ending, Precision surprised investors by continuing to blame customer destocking for its disappointing financial results during its fiscal 2015. At the same time, however, the Company continued to assure investors that this destocking was temporary and affirmed its 2016 EPS guidance, but did not reveal that the Company was actually losing the ability to persuade customers into taking more product than they needed at the time, as well as losing business to competitors.

93. On July 24, 2014, Precision issued a press release announcing its first-quarter fiscal 2015 financial results, which missed analysts' earnings estimates. On an earnings conference call held that same day, Defendant Donegan for the first time stated that the

destocking activity was occurring specifically at Rolls-Royce. After confirming that Rolls-Royce was still destocking, Donegan assured investors that it was temporary, stating that "we do definitely see that coming to an end." Despite the disappointing financial results, Precision remained adamant on the call that destocking was "starting to go away" and that demand was on the horizon. Donegan also "reaffirm[ed] the [2016 EPS] target" and assured investors that "the framework is in place" to meet the target.

94. On news of this earnings miss, Precision's stock price fell 5.5 percent, from $250.03 per share at prior close to close on July 24, 2014 at $236.21 per share.

95. Precision continued to blame destocking for its poor earnings results as the year progressed. On October 23, 2014, Precision issued a press release announcing its second-quarter fiscal 2015 financial results, which again missed analysts' earnings estimates. On an earnings conference call held that same day, the Company again attributed its disappointing earnings results in part to "destocking primarily by a single engine customer," which the Company explained, "negatively impacted Forged Products' growth overall by 2.5 percentage points."

96. Analysts questioned Defendant Donegan on the continued impact of destocking and asked how much longer the Company anticipated it to be an issue. In response, Defendant Donegan continued to assure investors that "there is no change" to the Company's 2016 EPS targets, and that destocking was temporary and that demand would soon return:

> I would agree with you that we have been talking about it for a long time. I would tell you that right now the schedules that we have on us says that it ends and starts to recover in our Q4 and fully recovers in Q1. We have orders on us that say that. And at this point in time that all I can go for.
>
> But I would agree with you. It has been a redo with this customer probably two to three times it has been. I do believe that it is getting to the point that it cannot be

> reduced anymore. So I guess I'd say that my confidence at this point in time is higher that it will, in fact, stick to the current schedules than it has in the past.

97. On news of this earnings miss, Precision's stock price fell 0.95 percent, from prior close of $226.20 per share to close at $224.06 per share.

**K. <u>The Straw that Broke the Camel's Back</u>**

98. The extent of the serious and long-term decline in the Company's business was revealed on January 15, 2015, when Precision issued a press release that preannounced missed third-quarter fiscal 2015 sales and earnings. The Company continued to blame "further aerospace engine destocking at a single customer" for the disappointing financial results. Specifically, the press release stated:

> Precision Castparts Corp. (NYSE: PCP) announced today that lower demand in oil & gas end markets, ***further aerospace engine destocking at a single customer***, year-end customer inventory management actions, and an extended equipment upgrade negatively impacted the company's third quarter fiscal year 2015 sales and earnings. The combination of these factors leads the company to expect that third quarter sales will be in the range of $2.42 billion to $2.47 billion and earnings per share (EPS) from continuing operations (attributable to PCC) in the range of $3.05 to $3.10 (diluted).
>
> Late in the third quarter of fiscal 2015, the company saw demand deteriorate from its oil & gas distribution customers. Additionally, previously discussed destocking at a single commercial aerospace customer and calendar year-end customer inventory management actions had a greater impact on the third quarter than had been anticipated. Also, a key asset had an unexpected extended recovery following an upgrade. These factors most meaningfully affected Forged Products' results, and Airframe Products was affected to a lesser degree by customers' year-end inventory management actions.
>
> "Despite these challenges, the momentum in our aerospace business continues, and we have already begun to deliver the inventory deferred in the third quarter and expect to realize those sales in the fourth quarter," said Mark Donegan, Chairman and Chief Executive Officer of Precision Castparts Corp. "The equipment that was upgraded is now up and running and fully functional. Looking forward, PCC has strong technical expertise in the oil & gas markets and is pursuing new awards; however, those markets are clearly full of uncertainties at

> the moment. Regardless of these challenges, we are positioned for growth across our markets and expect to leverage that growth effectively over the long term."

99. On this news, Precision's stock price declined from prior close of $219.72 per share to $199.63 per share at close on January 16, 2015, or 9.1 percent.

### L. Investors Finally Learn That Temporary Destocking Was Not To Blame For Precision's Poor Sales Figures and That Precision Was Actually Losing Business

100. Analysts immediately began to realize that the "temporary destocking" that had long been cited by the Company was not the actual cause of Precision's poor financial results. Instead, the market belatedly learned that Precision was losing business from both Rolls-Royce and other customers, and that the Company's "organic growth" may have been illusory. For example, in a report titled "So Much for Visibility," Credit Suisse expressed "surprise" and, ultimately, disbelief at the Company's continued insistence that its financial woes were due to temporary destocking and further predicted that the recent miss "may be the last straw on the proverbial back of the camel for some":

> Another surprise is continued destocking (the absence of ordering) from a single aero engine customer (likely Rolls) that was supposed to be improving (coming to an end during FQ4 and abating entirely by FQ1), another point that was reaffirmed at our conference. ***Based on yesterday's announcement, it's clear to us that is not the case, and we still wonder if there is some share loss here***.
>
> ***Investors were already struggling with PCP's earnings reliability over the past several quarters, so last night's news may be the last straw on the proverbial back of the camel for some.*** They might now conclude that this management team, which claims to have fairly good visibility, if not a keen sense of timing, is really dealing with a shorter cycle business that we thought.

101. JP Morgan also issued a report on January 16, 2015 that questioned the Company's representations about the causes of its recent earnings misses:

> Disappointing organic growth has been the key issue behind EPS missing consensus now in eight of the past 11 quarters. There are a number of reasons why organic growth has not matched the level that PCP's end-market exposures imply, ***but we have had trouble understanding the full extent of the shortfall, and this miss should increase concerns about whether there is a larger problem – we have wondered about share loss, but management insists this is not the case – and stoke further doubts about the company's ability to grow consistently***.

102. Additionally, analysts understood that, contrary to Defendants' prior representations, the Company's 2016 EPS target was in jeopardy. For example, in lowering its price target from $276 to $242 and lowering its rating from "Buy" to "Hold," a Canaccord analyst noted that: "We believe these issues also will impact the prior $16.00 in EPS in fiscal 2016 guidance the company had provided, creating an additional overhang." Similarly, Cowen & Co. issued a report on January 16 stating: "On the 1/22 earnings call, we expect PCP to quantitatively reset, or at a minimum, qualitatively talk down its F16 EPS target of $15.50-$16.50 before cash deployment." A Deutsche Bank analyst report issued the same day also noted that Precision's 2016 targets "seem even less achievable to us than they did previously."

103. In a January 20, 2015 report, JP Morgan further questioned whether destocking was the actual cause of the Company's poor earnings results, or whether something more significant was to blame:

> The lower than anticipated sales to a single customer widely believed to be Rolls-Royce was an issue yet again this quarter, and [Precision] continues to classify it as destocking. After speaking with the company, we believe that sales to [Rolls-Royce] declined sequentially and may have declined more y/y than they did last quarter. ***This issue has been persistent and management forecasts that it will recede have been premature. [Precision] insists it is not losing share, as it has LTAs that stipulate market share on specific part numbers, but we wonder if perhaps [Rolls-Royce] is fulfilling its commitments in a way that has led to share transfer from [Precision] to Firth Rixson/Alcoa over the course of the LTAs and as Firth's new Georgia plant has expanded its operations.***

### M. Defendants Belatedly Confirm that They <u>Misstated and Omitted Material Facts</u>

104. On January 22, 2015, Precision belatedly confirmed what the market had concluded a week earlier—that its fiscal 2016 targets were no longer achievable. During a conference call held for analysts and investors that same day, Defendant Donegan and Jay Khetani, Precision's Vice President of Investor Relations, also announced that Precision was revamping the way in which it communicated to investors and admitted that investors had not been timely provided with material information that called into question the Company's ability to meet its stated 2016 EPS targets. For example, in describing Precision's new framework, Khetani stated:

> I think A, it's a one-year time frame with a set of sensitivities and assumptions stated, ***which you didn't have insight into our original FY16 discussion. We also went two years without updating, so things changed during that time frame***. Clearly, as we talk each quarter to you going forward, we will essentially update for changes that occur there. ***I think the entire structure of what we're doing going forward will look nothing like how we've handled it in the past.***

105. During the call, analysts expressed consternation over the fact that these EPS estimates "were still reiterated within the last six months." In response, Donegan stated that he "accept[ed] the responsibility wholeheartedly" for Precision's communications failures during the Class Period.

106. Also during the call, Defendant Donegan admitted that Precision actually had no visibility into when what they called customer destocking activity would end, stating that he was "hesitant to tell [investors] it is at the end," and that he is "***assuming*** that a single customer who has been de-stocking continues that activity."

107. In a January 23, 2015 analyst report, JP Morgan pointed to further "datapoints" suggesting that Rolls-Royce was in fact directing business to Precision's competitors:

> Management continues to characterize lower sales to one particular aero engine customer, widely believed to be Rolls-Royce, as destocking, and this remains a significant headwind even after two years. The latest shift downward came during last quarter and management has indicated that there are incremental sequential headwinds in Q4 and the schedule for calendar 2015 was recently lowered, so this issue should persist well into a third year. Management remains adamant that PCP is not losing share, citing that declines on parts where they are clearly the sole source are consistent with those where there is competition. This may be the case but ***we have a hard time getting past the fact that the competitive landscape looks tougher and there are many other data points that strongly suggest that Rolls is directing business elsewhere***.

108. Analysts' assessment that Precision was losing Rolls-Royce's business to competitors was reinforced on January 28, 2015, when Precision competitor Universal reported its fourth-quarter 2014 earnings results. On the related earnings conference call, Universal CEO Dennis Oates maintained that any destocking he had seen in the industry had long been over, and explained:

> [W]e are not seeing any [destocking], in our view ***destocking [ ] basically ceased a year ago*** and we've seen continuous good activity there. . . . Our targets have all been met. Where we've had agreements and had some estimations of what our sales should be in 2014- I think we published for example on Rolls-Royce that we would expect to see $4 million to $6 million of incremental revenue from Rolls in 2014, and I believe we're $4.3 million, so we're in at our low end of the range. But fundamentally we're within the bracket that we felt we would get.

### N. Precision is Acquired by Berkshire Hathaway

109. In July 2015, Defendants Donegan and Hagel met with Berkshire Hathaway Chairman and CEO, Warren E. Buffet, to discuss the Company's performance. Berkshire Hathaway became a Precision stockholder in 2012. The day after the July 2015 meeting, Defendant Donegan was informed that Mr. Buffet was interested in acquiring the Company.

110. Merger negotiations followed, and, on August 10, 2015, Precision and Berkshire Hathaway issued a joint press release announcing that they had entered into a definitive merger agreement, whereby Berkshire Hathaway would acquire each share of Precision stock for $235.00 per share in cash.

111. On October 22, 2015, Precision issued a press release in which it announced its second-quarter fiscal 2016 earnings, which again missed consensus estimates. In light of the pending transaction with Berkshire Hathaway, the Company announced that it would not hold a conference call and would not be issuing updates to its annual guidance. The October 22, 2015 earnings announcement was Precision's last earnings announcement before it was acquired by Berkshire Hathaway.

112. On January 29, 2016, Berkshire Hathaway's acquisition of Precision closed. Because Precision is now a wholly owned subsidiary of Berkshire Hathaway, the Company no longer issues its own earnings results, and Berkshire Hathaway does not report Precision's numbers separately. As a result, investors no longer have visibility into Precision's revenues.

113. Precision's loss of market share was also confirmed on July 11, 2016, when Alcoa announced its second-quarter 2016 earnings results. On an earnings conference call held that same day, Alcoa CEO Klaus-Christian Kleinfeld was asked how the competitive dynamic has changed since Precision became a private company. In response, Kleinfeld stated: "I mean you've seen how successful we have been in gaining more share. We have strengthened our position substantially."

## V. ADDITIONAL ALLEGATIONS OF SCIENTER

114. Numerous additional facts give rise to the strong inference of scienter that, throughout the Class Period, Defendants Donegan and Hagel knew or were severely reckless in disregarding that (i) the negative impact of Rolls-Royce's inventory reduction was not temporary, (ii) Precision was losing business and suffering weakened demand for its products, and (iii) the Company's practice of "pulling in" sales was not sustainable.

115. First, confidential witnesses confirm that Defendant Donegan knew or should have known that the Company was experiencing weakened demand for its products and that this softness was not the result of temporary inventory destocking. CW1, who worked closely with Donegan, explained that it was known internally that destocking was not to blame for Precision's poor sales figures and that Donegan used the term "destocking" as a catchall for general ***"softness" the Company was seeing in demand.*** Moreover, Rolls-Royce itself informed CW1, an Executive Vice President of Precision and one of Donegan's lieutenants, that they did not understand the Company's public statements, saying ***"You did not tell us about destocking, what is destocking? What the hell are you talking about?"***

116. Further, even if Defendant Donegan did not know that Precision was losing business to competitors, he was at the very least reckless in representing that he knew the decline in sales was temporary and that the Company was not, instead, losing market share on a permanent basis. According to CW1, the Company did not have any actual forecasts to back up that the softness in demand would soon end, nor did the Company perform an analysis to determine if, rather, it was losing market share. Instead, CW1 explained, Precision would just wing it and hope it worked out.

117. Second, confidential witness statements confirm that Defendant Donegan was not only aware that Precision shipped to customers more product than these customers actually then currently needed, but that Defendant Donegan directed this conduct. CW1 confirmed that Donegan instructed that Precision "charge the cliff" and ship product at the end of a quarter to hit internal targets. According to CW1, Defendant Donegan's main goal was to hit quarterly numbers at any cost, which meant that he was heavily involved in pressuring employees to hit quarterly targets. Indeed, CW1—who described Precision as an organization based on fear—explained that pressure was Defendant Donegan's main tool. Eventually, CW1 explained, employees got to a point where they could just no longer keep up, and, because the pressure on people was tremendous, employee turnover became alarming.

118. In addition, CW2 confirmed that Precision employees were instructed to push product on customers, knowing that they could induce customers to take the product, so that the Company would meet its quarterly sales figures. Indeed, according to CW3, Defendant Donegan "very heavily led" the command to ship product to customers prematurely. Because Donegan was aware that the Company was prematurely shipping product to customers, he knew that the Company's sales figures would never return to historic levels once customers began to stop accepting early delivery, which is precisely what happened during the Class Period. As a result, Donegan knew, despite his public statements to the contrary, that the slowdown in demand for Precision's products was not temporary and was instead a permanent change to how customers would do business with the Company going forward.

119. Third, Defendants Donegan's and Hagel's knowledge of weakened demand for Precision's aerospace products, specifically with respect to Rolls-Royce, can be inferred because

these facts are critical to Precision's core operations. Not only does Precision rely on the aerospace market for 70 percent of its total sales, but the Company itself refers to Rolls-Royce as one of its "key customers." Knowledge of Rolls-Royce's weakening demand for Precision products and of Precision's loss of business can therefore be inferred. What is more, Defendant Donegan's own public statements confirm that Precision executives regularly monitored the Company's market position. On the first day of the Class Period, Defendant Donegan stated as follows on an earnings conference call to discuss the Company's fourth-quarter fiscal 2013 financial results: "the day I took this business, I owned every decision that was ever made . . . ***we look at all the market shares across all assets*** . . . "

120. Fourth, during the Class Period, the Individual Defendants reviewed, approved, and signed Precision's false and misleading SEC filings and certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 therein (the "SOX Certifications"). These SOX Certifications purported to confirm the accuracy of the financial statements and stated that the Company had designed effective internal controls that "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." The SOX Certifications also confirmed that the information in the Company's SEC filings "fairly present in all material respects the financial condition, results of operations and cash flows of the" Company. Because, as detailed herein, the Company's financial statements issued during the Class Period contained false and misleading statements, the SOX Certifications signed by the Individual Defendants were materially false and misleading.

121. Fifth, Defendants Donegan and Hagel engaged in suspicious stock transactions at times when Precision's common stock price was artificially inflated due to the fraudulent misconduct alleged herein. Specifically, between May 13, 2014 and May 14, 2014, Defendant Donegan exercised options to purchase 89,752 shares of Precision common stock (nearly 40 percent of the 226,258 shares he owned at the time) at a price of $101.41, for a total of $9,101,750. Defendant Donegan immediately sold those shares at prices between $253.03 and $254.76 per share, for a total of $22,858,867, and thus instantly recognized a profit of $13,757,117. Similarly, on May 30, 2013, Defendant Hagel exercised options to purchase 18,750 shares of Precision common stock at a price of $57.77 per share, and immediately sold them for $215.47 per share, recognizing an instant profit of $2,956,875. Further, on November 27, 2013, Defendant Hagel exercised options to purchase 25,000 shares at $101.41 per share, and immediately sold those shares at $259.93 per share, recognizing an instant profit of $3,963,000. Prior to this option exercise, Defendant Hagel directly owned just 19,899 shares of Precision common stock. Importantly, all of these options were not set to expire until late-2018 or late-2019, demonstrating that Defendants Donegan and Hagel did not need to exercise them when they did and further supporting the suspicious timing of these stock transactions.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A. Fourth Quarter Fiscal 2013 & Year-end Fiscal 2013 Results

122. On May 9, 2013, the first day of the Class Period, Precision issued a press release announcing its fourth-quarter fiscal 2013 ("4Q13") financial results—*i.e.*, its results for the quarter ended March 31, 2013. In that press release, Defendants reported record sales of $2.44 billion and EPS of $2.82 from continuing operations and touted Precision's growth prospects,

including 4Q13 results and trends that would allow Precision to achieve organic growth and meet the EPS target of $15.50 to $16.50 in EPS by fiscal year 2016, which Donegan touted during Precision's January 24, 2013 earnings call concerning Precision's third-quarter fiscal 2013 results. For example, that press release quotes Donagan as stating:

> ***In our fourth quarter, we started to realize the solid benefits of a long term plan for continued profitable growth . . . . Our fourth quarter performance is only an initial data point on a long continuum for improved sales and earnings performance in the future.***
>
> * * *
>
> ***The fourth quarter also showed how well positioned our base businesses are for further upside***. . . . Commercial OEM build rates are solid, with additional acceleration as the 787 program moves from five aircraft per month to 10 by the end of the calendar year, and the 737 rate steps up again in early 2014.
>
> * * *
>
> We continue to expect a steady and sustained improvement across our operations for the foreseeable future. The long term prospects for Precision Castparts are truly exciting.

123. On the same day, the Company hosted a conference call to discuss its 4Q13 results. During the call, similar to its May 9, 2013 press release, Defendants promised improving organic growth, including EPS of $15.50 to $16.50 by fiscal 2016, market share, and performance predicated on the robust aerospace performance and trends that it was simultaneously touting. Donegan stated in his opening remarks:

> ***Looking forward, soon we see benefit on the 787 and the 737 rate increases and this is going to be a key driver throughout all of our segments.*** We've talked about it. We are very well-positioned on the new engine programs. If I look at what has to occur on the back half in the next year, we have a very aggressive schedule that we have to be able to deliver initial development hardware and then subsequent test engines and then in the back half of next year start moving into some base rate production.

* * *

> On Forged, from aerospace. . . . we have significant upside available to us over the next 24 to 36 months.

* * *

> We have to support, again, as similar to the Investment Cast, the rate increases on the 787 and the 737, and we also have a strong position on the re-engining.
>
> So we're going to have to pull that development through over the course of the next 12 to 16 months.

124. The market viewed forecasted aircraft build rates, particularly Boeing 787 build rates, as proxies for evaluating the Company's ability to grow organically and achieve EPS of $15.50 to $16.50 by fiscal 2016. As such, analysts sought clarification from Defendants concerning the forecasted Boeing 787 build rates and their impact on Precision's ability to reach its EPS target. During the call, Citigroup analyst Jason Gursky, following up on Donegan's statements regarding the 787 build rates and how they would impact Precision's growth, inquired as to the timing on "the 787 and when you think you will be at a rate of 10 aircraft a month internally at Precision Castparts." Donegan explained:

> So if I look at the 787, there seems to be kind of a window based on the inventory levels. But I would say that certainly as we go from Q4, our fiscal Q4, somewhere in there I would expect to be at that rate of 10. I know that the commitment from Boeing is to get there and I think we will continue to move that way, but again, there is a balancing of the inventory they have on hand and how that rolls through to us. But I think that by the time we would kind of get into that Q4 would be at those type of rates.

125. In response to a UBS analyst's questions regarding EPS targets for fiscal 2016 and whether the growth is "skewed in one year relative to another," Donegan reiterated that the Company was on track to meet its $15.50 to $16.50 EPS target for fiscal 2016, explaining:

> [W]hat we've tried to do [with our EPS target of $15.50 to $16.50 by fiscal year 2016] is tell you that what we do is we think of the business, we think of that number, we think of the opportunities in pieces. And what I mean by that is if I get a business where growth isn't growing at mid- or mid- to high-single digits, you know what, I should expect to see a better performance out of the operations.
>
> * * *
>
> ***What I would say is that we tend to be pretty linear thinking type of people. So I think that you will kind of move around that, but I don't think we are going to set ourselves up to have some giant run towards the end, that's just not our mentality.*** So what I drive this business to is if the organic growth slows I'd better see a lot more operationally. If the organic growth picks up and I get these platforms coming in, I'm going to drive the living hell out of you to make sure that you may not be getting as much but you'd better be getting subsequent drop-through on the volume drop-through we get. ***Again, I would say in total we tend to be more linear in thinking and I wouldn't – my mentality wouldn't allow me to say I'm going to be marginal, marginal, and then make this huge run towards the end.***

126. Analysts further probed Donegan's basis for reiterating the Company's EPS target of $15.50 to $16.50 in EPS by fiscal 2016 and how it would be impacted by forecasted 787 build rate increases. For example, Donegan and a Credit Suisse Analyst engaged in the following back and forth:

> [Robert Spingarn (Credit Suisse analyst):] I'd like to go back to the long-term question . . . with your trajectory toward your guidance. I'm going to throw out a couple of numbers. Hopefully you can help me here. To get from here to there, and I'm taking the midpoint of the guidance you've given, so $16 in fiscal 2016. It's about a 3.5% sequential earnings growth rate from here to there by quarter. But it seems to me, not so much that it's back end loaded, but maybe it's a little front end loaded with the combination of the Timet synergies in the near term, next several quarters, and the 787 doubling in rate. ***So is it truly linear or is it front end loaded with back end conservatism?***
>
> [Donegan:] Well, I think it's a valid question. I think that directionally your math is very appropriate.
>
> * * *

> ***I do think that your comments are – have merit and I do think you see ups and downs and when you get something like a 787 kicking in or whatever it is, it may move it up above that.*** And when you get a stall in a Q2 because of outages and European shutdowns it may go a little below that. ***So I think that your comment is fairly valid.***

127. Donegan also assured investors that organic growth would improve in the near term in response to a JP Morgan analyst's questions about when organic growth will reaccelerate at least back into the mid-single digits, given that organic growth was "kind of flattish this quarter and pretty flattish for the year." Specifically, Donegan stated:

> If I look at it, if you kind of say what we say, where you got the 787 rates coming through, you've got the 737 rates coming through, I think you start getting to the back half of this year is when I think you start seeing kind of those type of [organic growth] numbers that you were asking about.

128. The JP Morgan analyst further inquired as to whether organic growth would improve in the near term, and Donegan assured investors that it would, as follows:

> [Joe Nadol (JP Morgan analyst):] When I look at sort of the year-on-year or what your [organic] growth rates were a year ago – You were pretty much up or down 2% every quarter this past year. Prior year was higher than that. ***I know you don't want to over promise, but do you see things [organic growth] picking up a little more near term?***
>
> [Donegan:] There's nothing wrong with your logic. Again, when you start saying – it tends to be when you start saying into the mid [mid-single digit organic growth] kind of surrounding the mid, you need to get that 787, but I would agree with you that if you start looking at the comps ***you should start to see organic moving in the right direction***. I would agree with that.

129. During the call, Donegan assured investors that Precision's customers were not switching away from Precision now that it owns TIMET and downplayed concerns regarding market share loss. He explained: "[T]he day I took this business, I owned every decision that was ever made. . . . So do I look and say, again, X, Y, Z companies going to leave, what do we do? I think what the answer is with the growth we have this page called 23 that we look at all the

market shares across all assets. I just say put up page 23. So no, I don't worry about that at this point in time."

130. The statements contained in ¶¶122-129 were materially false and misleading when made because Defendants misrepresented and failed to disclose the following, as further detailed and alleged herein:

(a) Precision, in order to meet its internal quarterly sales goals, had been engaging in the unsustainable and short-sighted practice of pulling in sales to its aerospace customers, such as Rolls-Royce, inducing them to take on more inventory than they required or that was necessitated by current and/or forecasted aircraft build rates;

(b) Precision's forecasts and outlook, including its ability to grow organically and meet its fiscal 2016 EPS target (*i.e.*, \$15.50 to \$16.50 of EPS by fiscal 2016), were contingent on the Company's continued ability to use these undisclosed, aggressive pull in sales practices, particularly in dealings with at least one of its key customers, *i.e.*, Rolls-Royce;

(c) Precision, at least partly due to the practice mentioned in (a), already was experiencing, or would in the immediate future experience, the permanent negative impact of at least one key aerospace customer's—Rolls-Royce's—inventory reduction initiatives, foreclosing Precision from relying on pull in sales to Rolls-Royce to meet its targets, and Precision's reliance on pulling through sales above and beyond customer needs would inevitably leave its key customers with a glut of inventory, thereby creating the material risk that Precision's future sales and earnings would decline;

(d) The market-based forecasts and outlook that Precision touted to the market during the Class Period were materially misleading, in that they failed to account for the fact that

undisclosed Company practices to boost quarter-end sales, such as pulling in, meant that these metrics did not reflect what the Company would actually be able to sell in upcoming quarters;

(e) Rolls-Royce's inventory reduction or rationalization initiatives, or destocking, which Precision would soon cite as a headwind to Precision's financial results during the period between April 1, 2013 through June 30, 2013, would negatively impact Precision's ability to achieve the organic growth and EPS target that Defendants assured investors would occur;

(f) The Company was already losing market share and Rolls-Royce's business to competitors, for reasons including because it was not maintaining competitive advantages that it had previously enjoyed and depended on to maintain and obtain business from its aerospace customers;

(g) In light of (a)-(f), anticipated increases in aircraft build rates, such as the 787, Defendants touted as growth drivers would not translate or lead to improved performance, including organic growth, or allow Precision to meet its EPS guidance;

(h) As a result of the foregoing, the Defendants' positive statements about PCC's business, operations, and prospects, including its fiscal 2016 EPS target, lacked a reasonable basis.

131. On May 30, 2013, Precision filed with the SEC its Annual Report on Form 10-K for the fiscal year ended March 31, 2013, which was signed by Donegan and Hagel, among others. The Company's Form 10-K reaffirmed the financial results and outlook announced in the May 8, 2013 press release.

132. That Form 10-K also disclosed that "Rolls Royce…[is] considered [a] key customer[], and the loss of [its] business could have a material adverse effect on our financial results[,]" and "[d]espite intense competition. . . . [s]everal factors, including longstanding customer relationships, technical expertise, state-of-the-art facilities and dedicated employees, aid us in maintaining our competitive advantages."

133. In the Business Overview provided in Management's Discussion and Analysis of Financial Condition and Results of Operations, Defendants again forecasted increased aerospace sales given industry data forecasting increased Boeing and Airbus aircraft deliveries. Specifically, the Defendants stated:

> With regard to growth in the commercial aircraft industry, based on data from *The Airline Monitor* as of February 2013, Boeing and Airbus aircraft deliveries are expected to moderately increase through calendar year 2013 as compared to 2012. Due to manufacturing lead times and scheduled build rates, our production volumes are approximately six months ahead of aircraft deliveries. ***The Airline Monitor is projecting further growth in aircraft deliveries in calendar year 2014, and therefore we anticipate that our aerospace sales will continue to increase in fiscal 2014.***[3]

134. The Annual Report further added:

- ***"The Investment Cast Products segment anticipates growing aerospace sales driven by the increases in aerospace base program***

[3] *The Airline Monitor* is a subscription service that provides Aircraft Forecast and Engine Forecast Data, based on "an intense evaluation of developments in the economy, aviation regulation, retirements, current orders and of the manufacturers' future plans." *The Airline Monitor*, Aircraft Data, http://www.airlinemonitor.com/aircraftdata.php (accessed: Sept. 14, 2016). "Twice a year in July and January, *The Airline Monitor* provides an independent aircraft production forecast for the next twenty years." *Id.* "Each August, *The Airline Monitor* provides an independent engine production forecast for the next twenty years based on the current Aircraft Production Forecast . . . [and] estimates each engine manufacturer's share of future aircraft orders…" *The Airline Monitor*, Aircraft Data, http://www.airlinemonitor.com/enginedata.php (accessed: Sept. 14, 2016).

***build rates, as well as by 787 production, which will continue to be a strong contributor to segment sales."***

- "Forged Products' sales to the aerospace and power markets are derived primarily from the same large engine customers [such as Rolls-Royce] served by the Investment Cast Products segment… ***The Forged Products segment is positioned for further aerospace growth in fiscal 2013 as base commercial aircraft and Boeing 787 production schedules continue to increase."***

135. That Form 10-K also disclosed purported risk factors, including the following:

- ***Our business is dependent on a small number of direct and indirect customers.***

  A substantial portion of our business is conducted with a relatively small number of large direct and indirect customers, including General Electric Company, United Technologies Corporation, Rolls-Royce plc, Airbus and The Boeing Company. . . . ***A financial hardship experienced by any one of these key customers, the loss of any of them or a reduction in or substantial delay of orders from any of them could have a material adverse effect on our business***.

- ***Our business depends, in part, on the success of new commercial and military aircraft programs.***

  The success of our business will depend, in part, on the success of new commercial and military aircraft programs including the Boeing 787, Boeing 747-8, Airbus A350, Airbus A380 and F-35 programs. We are currently under contract to supply components for a number of new commercial, general aviation and military aircraft programs. ***Cancellation, reductions or delays of orders or contracts by our customers on any of these programs, or regulatory or certification-related groundings or other delays to any of these new aircraft programs, could have a material adverse effect on our business***.

136. The statements contained in ¶¶131-135 were materially false and misleading when made because Defendants misrepresented or failed to disclose the following, as further detailed and alleged herein:

(a) Precision, in order to meet its internal quarterly sales goals, had been engaging in the unsustainable and short-sighted practice of pulling in sales to its aerospace customers, such as Rolls-Royce, inducing them to take on more inventory than they required or that was necessitated by current and/or forecasted aircraft build rates;

(b) Precision's forecasts and outlook, including its ability to grow organically and meet its fiscal 2016 EPS target (*i.e.*, $15.50 to $16.50 of EPS by fiscal 2016), were contingent on the Company's continued ability to use these undisclosed, aggressive pull in sales practices, particularly in dealings with at least one of its key customers, *i.e.*, Rolls-Royce;

(c) Precision, at least partly due to the practice mentioned in (a), already was experiencing, or would in the immediate future experience, the permanent negative impact of at least one key aerospace customer's—Rolls-Royce's—inventory reduction initiatives, foreclosing Precision from relying on pull in sales to Rolls-Royce to meet its targets, and Precision's reliance on pulling through sales above and beyond customer needs would inevitably leave its key customers with a glut of inventory, thereby creating the material risk that Precision's future sales and earnings would decline;

(d) The market-based forecasts and outlook that Precision touted to the market during the Class Period were materially misleading, in that they failed to account for the fact that undisclosed Company practices to boost quarter-end sales, such as pulling in, meant that these metrics did not reflect what the Company would actually be able to sell in upcoming quarters;

(e) Rolls-Royce's inventory reduction or rationalization initiatives, or destocking, which Precision would soon cite as a headwind to Precision's financial results during the period between April 1, 2013 through June 30, 2013, would negatively impact Precision's

ability to achieve the organic growth and EPS target that Defendants assured investors would occur;

(f) The Company was already losing market share and Rolls-Royce's business to competitors, for reasons including because it was not maintaining competitive advantages that it had previously enjoyed and depended on to maintain and obtain business from its aerospace customers;

(g) In light of (a)-(f), anticipated increases in aircraft build rates, such as the 787, Defendants touted as growth drivers would not translate or lead to improved performance, including organic growth, or allow Precision to meet its EPS guidance;

(h) As a result of the foregoing, the Defendants' positive statements about PCC's business, operations, and prospects, including its fiscal 2016 EPS target, lacked a reasonable basis.

137. The risk disclosures alleged above at ¶135 also created a materially false and misleading impression of the true strength of, and specific risks to, PCC and its important Rolls-Royce business, because they omitted any disclosure of the specific risks to PCC from (a) its loss of market share, weakening competitive position, and "softness" in demand, (b) PCC's reliance on the practice of providing Rolls-Royce and other customers with more inventory than was required or dictated by aircraft build rates, (c) PCC's customer's inevitable, indefinite inventory reduction that would result from this practice and negatively impact PCC's performance, and (d) PCC's practice of forecasting, and touting forecasts, based on publicly available anticipated industry-wide demand—*i.e.*, commercial airplane (*e.g.*, Boeing 787) build/delivery rates—rather than the actual demand of Precision's customers, such as Rolls-Royce, in light of previously

pulled in sales and the extent to which Rolls-Royce's inventory realignment would preclude PCC from further relying on such pull in sales practices. The Annual Report's description of the risks to the Company's business as potential and non-specific events that might hypothetically occur in the future gave investors a false and misleading assurance that PCC was not engaging in practices that were driving, or would necessarily prompt, at least one of its key customers, Rolls-Royce, to permanently shift business away from PCC and indefinitely reduce inventory purchased from PCC, thereby rendering the disclosed risks a then-concealed reality.

138. The Annual Report was also materially false and misleading because it failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations, as required by Item 303 of Regulation S-K. For example, the Company failed to disclose its increasing reliance on pull in sales to meet earnings and growth targets, and that its inability to rely upon this practice in future quarters could lead to a material decline in its sales, revenues and income. Likewise, the Company failed to disclose that its anticipated future sales growth was dependent upon its continuation of this unsustainable practice. As alleged further herein, PCC has conceded that it failed to disclose changed circumstances that Defendants were aware of and that materially impacted its ability to reach its fiscal 2016 EPS target, as well as its liquidity, net sales, revenues and income from continuing operations.

**B. <u>First Quarter Fiscal 2014 Results</u>**

139. On July 25, 2013, the Company issued a press release announcing its first-quarter fiscal 2014 ("1Q14") financial results—*i.e.*, its results for the quarter ended June 30, 2013. In

that press release, Defendants reported record EPS of $2.88 from continuing operations, and touted Precision's growth prospects, including 1Q14 results and trends that purportedly would allow Precision to achieve the organic growth and fiscal 2016 EPS target it promised. For example, that release disclosed: "***Like Investment Cast Products, the [Forged Products] segment supported commercial aircraft production at levels consistent with aircraft build rates and will benefit from similar upside opportunities as commercial OEMs ramp production, and new aircraft and engine development programs progress***."

140. That release also quoted Donegan as stating the following:

> We are achieving strong earnings growth on stable commercial aircraft schedules, gaining share on new airframe and engine development programs…
>
> ***Looking ahead, we have secured solid positions on all major production and development commercial aircraft programs, and our casting and forging operations will ramp up or level out as the OEM schedules dictate***…
>
> ***Beginning in the back half of calendar 2014, many of our operations will be ramping up to handle increased volumes, as the new aircraft and engine development programs roll out***.

141. During the Company's July 25, 2013 earnings call, Donegan for the first time cited "***modest destocking***" by some of PCC's engine customers leading to reduced current demand, but downplayed these issues by assuring investors that they were temporary, that long-term demand had not declined, and that organic growth was poised to improve.

142. For example, with respect to PCC's aerospace business, Donegan reported in his opening remarks that the business was growing and would continue to grow, notwithstanding temporary "modest" destocking and demand reductions by some of its key engine customers, such as Rolls-Royce. Specifically, he stated:

> [W]e had overall growth of 30% versus last year….Our base sales were flat….***We have seen some modest de-stocking by some of our engine customers but it is important to note the demand is there, the contracts are there, the schedules are there. It is simply an inventory realignment that we experienced and the demand does show back in the future.***
>
> * * *
>
> ***Looking forward [in the Investment Cast Segment], again we've established that new current levels on the base business a future demand, we have to handle as the rate increase is still intact. We have to step up to the 787 and the 737 increases. And we are very well-positioned on the new engines, both the LEAP and the Geared Turbofan.*** We have very aggressive schedules that we have to support into fiscal year '15 and then rapid ramp-up following that two years. So our share gain, the positions, the demand is going to be a certainly challenging but puts us in a very solid position on the re-engining.
>
> * * *
>
> Forging has also won a very solid position on the LEAP and the Geared Turbofan. They face the same aggressive demands as Castings on both the development and the production ramps as we enter into next year.
>
> * * *
>
> Looking forward, in Investment Cast Products in aerospace we are well-positioned for the rate increases of the 787 and the 737. We have very strong penetration, as we said in the LEAP and the Geared Turbofan. We have to support that aggressive development in our late '14 and through '15…
>
> * * *
>
> ***In Forged, . . . . [t]he OEM dynamics in aerospace are very similar both in terms of matching current rates and having the support the growth of the two engines, as Investment Cast.***

143. Analysts sought clarification from Defendants on the scope, timing, and impact of the destocking issue that Donegan mentioned in his opening remarks, given the potential for it to restrict PCC's organic growth and prevent it from reaching its EPS target. For example, Donegan and concerned analysts engaged in the following back and forth in which Donegan downplayed

concerns and rejected the notion that destocking could impact Precision's revenues for 12 to 18 months:

> [Joe Nadol (JPMorgan Chase & Co. analyst):] Mark, the de-stocking you're talking about that you're seeing, is it multiple customers or is it one major engine customer? What do you think is behind this? Is it after market related on their end or what's driving it? And then you say it might last a couple quarters, two or three quarters. ***Typically these things tend to last a little longer than that. I would say 12 to 18 months, if it's a real de-stocking cycle. What gives you the sense that is really only couple quarters?***
>
> [Donegan:] ***Maybe de-stocking is not the proper terminology. It is at a couple engine primes and it appears to be a inventory reduction in this calendar year.***
>
> ***And why say that is, we do see the demand sitting in our Q4 [i.e the quarter ended March 31, 2014]. So if I look at what it wants to do, it wants to remain stable and then it wants to jump up in Q4.***
>
> ***Our challenge will be to go back and say we can't jump up in that manner. It has to be spread out. So do I think it's anything longer than that? No, I do not. It appears to be just an inventory, or whatever reasons, in very specific time frame that does want to re-accelerate going into next calendar year.*** So does appear to be a yearly number, not some general spares or follow-up. It does appear to be an inventory objective.
>
> [Joe Nadol (JPMorgan Chase & Co. analyst):] When you look at that part numbers and the types of parts, it seems like you have visibilities at the other end of it that would schedule filling up in the fourth quarter, your fourth quarter. Do you get the sense that it's one or two types of engines? Or is this really broad-based?
>
> [Donegan:] I'd say that it's falling into a couple different categories. On the material side obviously we don't – if I look at the Canon, that's going in to some of the engine primes. I don't know exactly what engines it's going into, but it's not a broad swept across everything. It is more of a specific realignment in two or three engine types. So it's not like an overall reduction of X percent. It does appear to be very specific.
>
> The other thing I would add to that too, is it's not dragging out of us. The metal side did for a quarter, but that recovers back almost this quarter.
>
> ***It really is just that growth that we're seeing wants to reside in Q4 and Q1.*** Take a step up, we're just trying to claw and pull back into this particular period. Like I

said, it appears to be an inventory-related on a very specific target on a couple programs.

* * *

***[The destocking/inventory reduction is] actually on new [engine] programs. So I think that on some of the new platforms there has been so many starts and stops, starts and stops, that I think we're seeing that inventory realignment there. It is not the older programs. So from our vantage point it's not the retirement. It is the newer platforms***.

144. Analysts also questioned whether the Company would still experience organic revenue growth, what organic growth would occur over the next year, and whether PCC would meets its fiscal 2016 EPS target, particularly given Donegan's indication that there would be a few more quarters of aerospace engine destocking. Donegan assured investors that growth will "***gain a lot of steam***" in the next couple of quarters, and that the Company was on track to meet its 2016 guidance. He also rejected that the "destocking" could actually represent a longer-term decline in demand, stating that "***I don't think it will be worse at all because … we've seen what the [destocking] customer wants.***" For example, the following exchange occurred:

[Noah Poponak (Goldman Sachs analyst)]: Mark, I wondered if you might be willing to, at least attempt to, quantify what you think total Company organic revenue growth is going to look like for the full year. Because it sounds like a few more quarters of this aerospace engine de-stock, a few more quarters of IGT not really changing, a little bit more impact from the press. And it's negative in the first quarter. It sounds like, all-in it's going to be difficult for it to be much different than flat for fiscal '14. And then, if I could take you out a little further into the future, if that is true, ***in order to get into your previously-stated longer-term fiscal '16 target the '15-'16 organic [growth] looks like it needs to really step up into the low double-digits or even mid teens to get into that. Is that really the more L-shaped pass that we're looking at here, or am I missing something?***

[Donegan:] [I]t becomes somewhat difficult, the way I think of it, going out to the '16 number is either with more volume, performance. I've got to get a drum beat of what I need to put through quarter over quarter over quarter, in terms of EBIT dollars. ***If I look at Q1, we're pretty much on that drum beat.*** It becomes difficult because there are many moving pieces.

***Now let me answer the two- or three-quarter – I think that we are – what I'd like to see it be, 1.5.*** My goal is, I can't, I'm going to struggle to step up in the manner at which they want it to do. ***So again, the fact that it looks like it isn't inventory goal, the demand is there.*** And they want to step back up in my Q4. Obviously I'm going try to pull it back.

So let's say metals are a constant. Let me I can answer the question from that standpoint. ***Metals are a constant. Then I would expect to see that organic growth come our Q4, to start to pick up from that standpoint as it comes through. But I do not look at this a, I only get it one way.*** Again, I look at it as, I get to generate EBIT dollars at a rate over the next two years and three quarters, either through operational improvement, more volume, organic growth, new product introduction, new engines. It doesn't matter to me where I get it from. I have to get it. ***And if I look at where we were in Q1 from Q4, we're on that slope. We are on that slope***.

*    *    *

Does it make your job any easier? No, it doesn't because you – I understand. I understand you're trying to find the A plus B equals C. I have A, B, C, D, E, F, I get all these dynamics that I get to incorporate into mine. So I really focus on that EBIT dollar improvement, is kind of the way I think of it. Quarter over quarter over quarter. I relate that in every quarterly review... ***Either organically or performance, that's what I'm expecting***.

*    *    *

[Noah Poponak (Goldman Sachs analyst)]: It does sound like, without quantifying it, directionally the next couple quarters, excluding metal price movements, are closer to flat organically, with a step up in 4Q and continuing into '15.

[Donegan:] Yes, I would say that, when you get into these inventory movements, there tends to be some unpredictability. I'd say CYC today, ***next couple quarters you are probably right, and then it wants to gain a lot of steam***. Again, it moves. When you get these – it's not as though it's necessarily the market doing anything, the end market, but it can be more volatile. ***I don't think it will be worse at all because I think that we've seen what the customer wants***. Sometimes it can be the opposite effect. So that's kind of what I would feel at this point in time.

145. The statements contained in ¶¶139-144 were materially false and misleading when made because Defendants misrepresented and failed to disclose the following, as further detailed and alleged herein:

(a) PCC, in order to meet its internal quarterly sales goals, had been engaging in the unsustainable practice of pulling in sales to its aerospace customers, such as Rolls-Royce, inducing them to take on more inventory than they required or that was necessitated by current and/or forecasted aircraft build rates;

(b) PCC's forecasts and outlook, including its ability to grow organically and meet its fiscal 2016 EPS target (*i.e.*, $15.50 to $16.50 of EPS by fiscal 2016), were contingent on the Company's continued ability to use these undisclosed, aggressive pull in sales practices, particularly in dealings with at least one of its key customers, *i.e.*, Rolls-Royce;

(c) PCC, at least partly due to the practice mentioned in (a), already was experiencing the permanent negative impact of at least one key aerospace customer's—Rolls-Royce's—inventory reduction initiatives, foreclosing PCC from relying on pull in sales to Rolls-Royce to meet its targets; and, rather than being a short-term issue, the inventory reduction or rationalization initiatives announced by at least one of PCC's key customers—Rolls-Royce—was having a long-term negative impact on PCC's demand by foreclosing PCC from relying on pull in sales to Rolls-Royce to achieve organic growth and meet the 2016 EPS targets it continually re-affirmed;

(d) The market-based forecasts and outlook that Precision touted to the market during the Class Period were materially misleading, in that they failed to account for the fact that

undisclosed Company practices to boost quarter-end sales, such as pulling in, meant that these metrics did not reflect what the Company would actually be able to sell in upcoming quarters;

(e) Rolls-Royce's inventory reduction or rationalization initiatives, or purported destocking, was negatively impacting, and would continue to curtail, the organic growth and EPS target that Defendants assured investors would occur;

(f) The Company was already losing market share and Rolls-Royce's business to competitors, for reasons including because it was not maintaining competitive advantages that it had previously enjoyed and depended on to maintain and obtain business from its aerospace customers, and because its practice of pulling in sales was eroding its customer relationships;

(g) In light of (a)-(f), anticipated increases in aircraft build rates, such as the 787, Defendants touted as growth drivers would not translate or lead to improved performance, including organic growth, or allow PCC to meet its EPS guidance;

(h) As a result of the foregoing, the Defendants' positive statements about PCC's business, operations, and prospects, including its fiscal 2016 EPS target, lacked a reasonable basis.

146. On August 8, 2013, PCC filed with the SEC its Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2013, which was signed by Hagel. The Company's Form 10-K reaffirmed the financial results and outlook announced in the July 25, 2013 press release and earnings call.

147. For example, the 1Q14 Form 10-Q disclosed, similar to the Company's Annual Report (dated May 30, 2013), that "***The Airline Monitor is projecting further growth in aircraft***

***deliveries in calendar year 2014, and therefore we anticipate that our aerospace sales will increase in the latter quarters of fiscal 2014.*** ” That Form 10-Q also disclosed:

- ***“The Investment Cast Products segment is solidly positioned to benefit when build rates accelerate on key platforms, and new aircraft and engine development programs advance, however, nearterm aerospace sales growth may be moderated by continued engine customer destocking.”***
- ***“Similar to the Investment Cast Products segment, [the Forged Products segment] aerospace OEM business continues to be aligned with current commercial aircraft production rates…[and] is positioned for further aerospace growth when commercial OEM production ramps, and new aircraft and engine development programs advance.”***

148. The statements contained in ¶¶146-147 were materially false and misleading when made for the reasons discussed above, at ¶145.

149. The 1Q14 Form 10-Q included risk disclosures materially similar to those set forth above at ¶135 (*i.e.*, the risk disclosures appearing in PCC's Form 10-K, dated May 30, 2013). While the risk disclosures now also refer to the Airbus A320neo as a new commercial aircraft program on which PCC's success will partly depend, it is completely silent as to risks stemming from Rolls-Royce's inventory reduction and rationalization initiatives and destocking. More specifically, these purported risk disclosures are completely silent as to risks stemming from PCC's undisclosed use of, and dependence on, unsustainable and aggressive pull-through sales practices and the risk that Rolls-Royce's inventory reduction and rationalization initiatives and destocking had been preventing, and would indefinitely (if not permanently) prevent PCC from pulling in sales to Rolls-Royce needed to achieve organic growth and PCC's fiscal 2016 EPS target.

150. The risk disclosures alleged above at ¶149 also created a materially false and misleading impression of the true strength of, and specific risks to, PCC and its important Rolls-Royce business, because they omitted any disclosure of the specific risks to PCC from (a) its loss of market share, weakening competitive position, and "softness" in demand, (b) PCC's reliance on the practice of providing Rolls-Royce and other customers with more inventory than was required or dictated by aircraft build rates, (c) PCC's customer's inevitable, indefinite inventory reduction that would result from this practice and negatively impact PCC's performance, and (d) PCC's practice of forecasting, and touting forecasts, based on publicly available anticipated industry-wide demand—*i.e.*, commercial airplane (*e.g.*, Boeing 787) build/delivery rates—rather than the actual demand of Precision's customers, such as Rolls-Royce, in light of previously pulled in sales and the extent to which Rolls-Royce's inventory realignment would preclude PCC from further relying on such pull in sales practices. The 1Q14 Form 10-Q's description of the risks to the Company's business as potential and non-specific events that might hypothetically occur in the future gave investors a false and misleading assurance that PCC was not engaging in practices that were driving, or would necessarily prompt, at least one of its key customers, Rolls-Royce, to permanently shift business away from PCC and indefinitely reduce inventory purchased from PCC, thereby rendering the disclosed risks a then-concealed reality.

151. The 1Q14 Form 10-Q was also materially false and misleading because it failed to include a discussion of material changes, including in known trends or uncertainties, that were reasonably likely to have a material adverse effect on the Company's results of operations, as required by Item 303 of Regulation S-K. For example, the Company failed to disclose its increasing reliance on pull in sales to meet earnings and growth targets, and that its inability to

rely upon this practice in future quarters could result in a material decline in its sales, revenues and income. The Company also failed to disclose that, unbeknownst to investors, Rolls-Royce's inventory reduction and rationalization initiatives and destocking had been preventing, and would indefinitely (if not permanently) prevent, PCC from pulling in sales to Rolls-Royce and achieving its 2016 EPS target. Indeed, as the Company would later admit, although "things changed" after the FY16 guidance was issued in January 2013, Precision failed to update investors on such changes.

**C. <u>Citi Global Industrials Conference</u>**

152. On September 17, 2013, the Company was asked to provide an update on engine destocking developments during the Citi Global Industrials Conference. When asked for an update "[o]n the engine de-stocking with the new programs that you talked about in the most recent quarter … and whether that March quarter still is the quarter where we get back on track," Donegan confirmed the destocking was "***temporary***" and would end by the end of the March 2014 quarter. Donegan explained:

> ***Yes***. Again, the way I look at it, certainly we have – I guess I need to back up to – if you look at what makes us tick, what do we look for, ***we have long-term contracts that are in play that basically guide and direct our market share, our pricing. Those are in place and those all have very strong content on***. And then you look at the rollout of the new programs, and ***we have extremely strong, probably our best positions we've ever had on those new programs as they are rolling out.***
>
> We see off and on these – based on whatever a particular customer has, these moments where ***they are just doing a temporary de-stocking***. Could be on the raw materials aside, could be on the components side. ***And what it really is, is what we would see as an acceleration pauses for usually two to three quarter period of time.***

> I will say that where we are seeing that, it is playing out pretty much as our customers have told us it was going to go. ***And as we go into Q4, Q1, we go back where that de-stocking goes away and comes back to the normal rates***.

153. The statements contained in ¶152 were materially false and misleading when made because Defendants misrepresented and failed to disclose the following, as further detailed herein:

(a) PCC, in order to meet its internal quarterly sales goals, had been engaging in the unsustainable practice of pulling in sales to its aerospace customers, such as Rolls-Royce, inducing them to take on more inventory than they required or that was necessitated by current and/or forecasted aircraft build rates;

(b) PCC's forecasts and outlook, including its ability to grow organically and meet its fiscal 2016 EPS target (*i.e.*, $15.50 to $16.50 of EPS by fiscal 2016), were contingent on the Company's continued ability to use these undisclosed, aggressive pull in sales practices, particularly in dealings with at least one of its key customers, *i.e.*, Rolls-Royce;

(c) PCC, at least partly due to the practice mentioned in (a), already was experiencing the permanent negative impact of at least one key aerospace customer's—Rolls-Royce's—inventory reduction initiatives, foreclosing PCC from relying on pull in sales to Rolls-Royce to meet its targets; and, rather than being a short-term issue, the inventory reduction or rationalization initiatives announced by at least one of PCC's key customers—Rolls-Royce—was having a long-term negative impact on PCC's demand by foreclosing PCC from relying on pull in sales to Rolls-Royce to achieve organic growth and meet the 2016 EPS targets it continually re-affirmed;

(d) The market-based forecasts and outlook that Precision touted to the market during the Class Period were materially misleading, in that they failed to account for the fact that undisclosed Company practices to boost quarter-end sales, such as pulling in, meant that these metrics did not reflect what the Company would actually be able to sell in upcoming quarters;

(e) Rolls-Royce's inventory reduction or rationalization initiatives, or purported destocking, was negatively impacting, and would continue to curtail, the organic growth and EPS target that Defendants assured investors would occur;

(f) The Company was already losing market share and Rolls-Royce's business to competitors, for reasons including because it was not maintaining competitive advantages that it had previously enjoyed and depended on to maintain and obtain business from its aerospace customers, and because its practice of pulling in sales was eroding its customer relationships;

(g) In light of (a)-(f), anticipated increases in aircraft build rates, such as the 787, Defendants touted as growth drivers would not translate or lead to improved performance, including organic growth, or allow PCC to meet its EPS guidance;

(h) As a result of the foregoing, the Defendants' positive statements about PCC's business, operations, and prospects, including its fiscal 2016 EPS target, lacked a reasonable basis.

**D. Second Quarter Fiscal 2014 Results**

154. On October 24, 2013, the Company issued a press release announcing its second-quarter fiscal 2014 ("2Q14") financial results—*i.e.*, its results for the quarter ended September 30, 2013. In that press release, Defendants reported record sales of $2.36 billion, record EPS of

$2.90 from continuing operations, and touted Precision's growth prospects, including financial results and trends that would allow Precision to achieve the organic growth it promised. That release disclosed:

- "Going forward, ***accelerated sales gains [in the Investment Cast segment] will be driven by further demand from production rate step-ups on existing platforms***, continued frequency of takeoffs and landings, and the segment's increased penetration on the new development engines for reengined narrowbody aircraft platforms, which are scheduled to ramp up quickly into full production."

- "Similar to Investment Cast Products, ***the [Forged Products] segment is well positioned to benefit from ramps in commercial aircraft build rates*** and the acceleration of the new re-engining narrow-body platforms."

155. Similarly, during the October 24, 2013 earnings call, Donegan reported that, going forward in the Investment Castings and Forged Products segments, "we will certainly see the benefit as the rate increases on the 787, and the 737 rate increases already announced." Donegan also touted the fact that PCC's 2Q14 results "***establish[] just another data point on a long road of steady expansion and shareholder value. This type of performance we and you should expect from the Company for the foreseeable future***."

156. Analysts again sought an update on the destocking situation discussed in the prior quarter. Donegan provided the following update:

> [Noah Poponak (Goldman Sachs analyst):] Mark, it is a good quarter. The results look good and there is a lot of discussion about multiple opportunities in front of you. I wondered if you could maybe spend a minute on what you're concerned about in the near to medium term? ***But there wasn't a ton of discussion on the aerospace (inaudible) destocking that we started talking about last quarter. What is the update on that?***
>
> [Mark Donegan:] On the engine side of the equation, it think it is the casting world shows you – ***I think it has kind of remained at that stable level where we were. It certainly feels like that again, we said that as we move into Q3. I think***

> ***that stable continuous***. And then as we get into that Q1, Q2, you start really having to handle that development load that we got to roll out on the reengineering, which is – puts quite a bit of pressure on us, and that standpoint, the rate of acceleration that wants to go. So that is what I would say from there.

157. After the analyst followed up, noting that it sounds like the situation has not changed at all, Donegan explained:

> I think that it has held w[h]ere [it] was on that investment cast side of the equation. So that is all that it came through there.
>
> * * *
>
> [I]f you go back to what we said, we expected to see it stay at this [s]table level for our Q2 and Q3. And as we move the back half of four into one, that is when we start seeing that coming back. But it is important to note though that in that large commercial, we are seeing good demand from large commercial. Large commercial was in almost in that double digit territory. So it really is in that – we code it all together and investment cast products certainly is that military and that after market side of the equation.

158. Donegan also assured investors that PCC was "positioned extremely well" to meet its EPS target of between $15.50 and $16.50 by fiscal 2016, although its 2Q14 results were not ahead of PCC's internal plan and destocking was negatively impacting, and would continue in the near-term to negatively impact, PCC's sales and organic growth by preventing the Company from inflating revenues by pulling in sales from future quarters above what was currently demanded by key customers, such as Rolls-Royce. More specifically, the following exchange occurred:

> [David Strauss (UBS analyst):] ***You mentioned that these results were just one data point on the long road toward your $16 target. Just curious, were the results actually ahead of your internal plan?***
>
> [Donegan:] ***No.*** The way … we think of this – the way I stack this up -- the contracts, the positions, the programs we have – ***we are positioned extremely well***. Now you come down to how can we digested it? How can we grow? How can we effectively manage the cost? So from our standpoint the way we think of

> this road, the way we think of this path, it is a continuum. So we don't – I just said we don't have the ability to make these giant pops. It's just we can't man, we can't move the product, we can get a (inaudible). So it will follow more of a – so when I think of it, I do think of it as a – we are very – our whole mindset – we always talk about staying on the line. You will hear from almost anybody in the Company, our whole world is staying on the line. We want to move products through on a line? Want to drive [verbal costs] through down the line. We want to – everything we do is that staying on the line drum beat. ***So we have a line. If I go from where we were and blow my way out to that 2016 timeframe, I get a line. So we hover around that line. So, no, this was not, from my vantage point, internally where we thought we could get – no. It wasn't that far off.***

159. Similarly, Donegan rejected the notion that the Company's earnings target was being jeopardized by the fact that "sales have perhaps come in a bit light thanks to destocking," noting that "there are also elements in there that are ***outperforming*** what we originally thought." Donegan further assured the market that "***when we say 'expect,' there [are] reasons as to why we expect***. We got a history and we know what we should get."

160. The statements contained in ¶¶154-159 were materially false and misleading when made because Defendants misrepresented and failed to disclose the following, as further detailed herein:

(a) PCC, in order to meet its internal quarterly sales goals, had been engaging in the unsustainable practice of pulling in sales to its aerospace customers, such as Rolls-Royce, inducing them to take on more inventory than they required or that was necessitated by current and/or forecasted aircraft build rates;

(b) PCC's forecasts and outlook, including its ability to grow organically and meet its fiscal 2016 EPS target (*i.e.*, $15.50 to $16.50 of EPS by fiscal 2016), were contingent on the Company's continued ability to use these undisclosed, aggressive pull in sales practices, particularly in dealings with at least one of its key customers, *i.e.*, Rolls-Royce;

(c) PCC, at least partly due to the practice mentioned in (a), already was experiencing the permanent negative impact of at least one key aerospace customer's—Rolls-Royce's—inventory reduction initiatives, foreclosing PCC from relying on pull in sales to Rolls-Royce to meet its targets; and, rather than being a short-term issue, the inventory reduction or rationalization initiatives announced by at least one of PCC's key customers—Rolls-Royce—was having a long-term negative impact on PCC's demand by foreclosing PCC from relying on pull in sales to Rolls-Royce to achieve organic growth and meet the 2016 EPS targets it continually re-affirmed;

(d) The market-based forecasts and outlook that Precision touted to the market during the Class Period were materially misleading, in that they failed to account for the fact that undisclosed Company practices to boost quarter-end sales, such as pulling in, meant that these metrics did not reflect what the Company would actually be able to sell in upcoming quarters;

(e) Rolls-Royce's inventory reduction or rationalization initiatives, or purported destocking, was negatively impacting, and would continue to curtail, the organic growth and EPS target that Defendants assured investors would occur;

(f) The Company was already losing market share and Rolls-Royce's business to competitors, for reasons including because it was not maintaining competitive advantages that it had previously enjoyed and depended on to maintain and obtain business from its aerospace customers, and because its practice of pulling in sales was eroding its customer relationships;

(g) In light of (a)-(f), anticipated increases in aircraft build rates, such as the 787, Defendants touted as growth drivers would not translate or lead to improved performance, including organic growth, or allow PCC to meet its EPS guidance;

(h) As a result of the foregoing, the Defendants' positive statements about PCC's business, operations, and prospects, including its fiscal 2016 EPS target, lacked a reasonable basis.

161. On November 7, 2013, PCC filed with the SEC its Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2013, which was signed by Hagel. The Company's Form 10-Q reaffirmed the financial results and outlook announced in the October 24, 2013 press release and earnings call.

162. For example, the 2Q14 Form 10-Q disclosed, that "The Airline Monitor is projecting further growth in aircraft deliveries in calendar year 2014, and therefore we anticipate that our aerospace sales will increase in the second half of fiscal 2014 compared to fiscal 2013." That Form 10-Q also disclosed:

- ***"Sales gains [in the Investment Cast Products segment] are expected to be driven by further demand from production rate step-ups on existing platforms***, continued frequency of takeoffs and landings, and acceleration of the new development engines for re-engined narrow-body aircraft platforms."
- "Similar to the Investment Cast Products segment, [the Forged Products segment] aerospace OEM business continues to be aligned with current commercial aircraft production rates…[and ***it is] well-positioned to benefit from expected ramp ups in commercial aircraft build rates*** and the acceleration of the new re-engined narrow-body platforms."

163. The 2Q14 Form 10-Q included risk disclosures materially similar to those set forth above at ¶149 (*i.e.*, the risk disclosures appearing in PCC's 1Q14 Form 10-Q).

164. The statements contained in ¶¶161-163 were materially false and misleading when made because Defendants misrepresented and failed to disclose the following, as further detailed herein:

(a) PCC, in order to meet its internal quarterly sales goals, had been engaging in the unsustainable practice of pulling in sales to its aerospace customers, such as Rolls-Royce, inducing them to take on more inventory than they required or that was necessitated by current and/or forecasted aircraft build rates;

(b) PCC's forecasts and outlook, including its ability to grow organically and meet its fiscal 2016 EPS target (*i.e.*, $15.50 to $16.50 of EPS by fiscal 2016), were contingent on the Company's continued ability to use these undisclosed, aggressive pull in sales practices, particularly in dealings with at least one of its key customers, *i.e.*, Rolls-Royce;

(c) PCC, at least partly due to the practice mentioned in (a), already was experiencing the permanent negative impact of at least one key aerospace customer's—Rolls-Royce's—inventory reduction initiatives, foreclosing PCC from relying on pull in sales to Rolls-Royce to meet its targets; and, rather than being a short-term issue, the inventory reduction or rationalization initiatives announced by at least one of PCC's key customers—Rolls-Royce—was having a long-term negative impact on PCC's demand by foreclosing PCC from relying on pull in sales to Rolls-Royce to achieve organic growth and meet the 2016 EPS targets it continually re-affirmed;

(d) The market-based forecasts and outlook that Precision touted to the market during the Class Period were materially misleading, in that they failed to account for the fact that

undisclosed Company practices to boost quarter-end sales, such as pulling in, meant that these metrics did not reflect what the Company would actually be able to sell in upcoming quarters;

(e) Rolls-Royce's inventory reduction or rationalization initiatives, or purported destocking, was negatively impacting, and would continue to curtail, the organic growth and EPS target that Defendants assured investors would occur;

(f) The Company was already losing market share and Rolls-Royce's business to competitors, for reasons including because it was not maintaining competitive advantages that it had previously enjoyed and depended on to maintain and obtain business from its aerospace customers, and because its practice of pulling in sales was eroding its customer relationships;

(g) In light of (a)-(f), anticipated increases in aircraft build rates, such as the 787, Defendants touted as growth drivers would not translate or lead to improved performance, including organic growth, or allow PCC to meet its EPS guidance;

(h) As a result of the foregoing, the Defendants' positive statements about PCC's business, operations, and prospects, including its fiscal 2016 EPS target, lacked a reasonable basis.

165. The risk disclosures in the 2Q14 Form 10-Q alleged above at ¶163 also created a materially false and misleading impression of the true strength of, and specific risks to, PCC and its important Rolls-Royce business, because they omitted any disclosure of the specific risks to PCC from (a) its loss of market share, weakening competitive position, and "softness" in demand, (b) PCC's reliance on the practice of providing Rolls-Royce and other customers with more inventory than was required or dictated by aircraft build rates, (c) PCC's customer's

inevitable, indefinite inventory reduction that would result from this practice and negatively impact PCC's performance, and (d) PCC's practice of forecasting, and touting forecasts, based on publicly available anticipated industry-wide demand—*i.e*., commercial airplane (*e.g*., Boeing 787) build/delivery rates—rather than the actual demand of Precision's customers, such as Rolls-Royce, in light of previously pulled in sales and the extent to which Rolls-Royce's inventory realignment would preclude PCC from further relying on such pull in sales practices. The 2Q14 Form 10-Q's description of the risks to the Company's business as potential and non-specific events that might hypothetically occur in the future gave investors a false and misleading assurance that PCC was not engaging in practices that was driving, or would necessarily prompt, at least one of its key customers, Rolls-Royce, to permanently shift business away from PCC and indefinitely reduce inventory purchased from PCC, thereby rendering the disclosed risks a then-concealed reality.

166. The 2Q14 Form 10-Q was also materially false and misleading because it failed to include a discussion of material changes, including in known trends or uncertainties, that were reasonably likely to have a material adverse effect on the Company's results of operations, as required by Item 303 of Regulation S-K. For example, the Company failed to disclose its increasing reliance on pull in sales to meet earnings and growth targets, and that its inability to rely upon this practice in future quarters could result in a material decline in its sales, revenues and income. The Company also failed to disclose that, unbeknownst to investors, Rolls-Royce's inventory reduction and rationalization initiatives and destocking had been preventing, and would indefinitely (if not permanently) prevent, PCC from pulling in sales to Rolls-Royce and achieving its 2016 EPS target. Indeed, as the Company would later admit, although "things

changed" after the FY16 guidance was issued in January 2013, Precision failed to update investors on such changes.

**E. <u>Credit Suisse Global Industrials Conference</u>**

167. On December 3, 2013, during the Credit Suisse Global Industrials Conference, the Company was asked to provide an update on engine destocking developments, as well as PCC's organic growth outlook and fiscal 2016 EPS target and the extent to which engine destocking developments would negatively impact PCC's organic growth and EPS target. When asked for an update regarding "[w]hat has been the real driver behind that [Rolls-Royce engine destocking], and then as we get into the next calendar year, how should we expect that to play out," Donegan explained:

> I think that, again, there has certainly been, one of the engine guys [Rolls-Royce] has been very vocal about what they've been doing. ***I think the bottom line is there was just a large amount of inventory that they put in the system as that, pretty much I would say that, main was a 787, was make sure that everything was protected. I think as it is now starting to balance itself out, I think it is mainly correction of that particular program.***
>
> ***So that is – I think – as we get into next year, our schedules show us done.*** And we know it has to be gone because there is a – it's – the growth that we would have expected to see compared to – we are under-building to the current level. So I think as soon as that goes away, the schedule shows that coming back up.
>
> So it has been more of – rather than destocking, a lot of times means you fall off. ***It has been more of holding at a flat level, and not taking a step up. But I think that step up does start coming in, the middle of next year***.
>
> But I think it was just basically, a bunch of inventories put in the system, to make sure that there was no misses when there was all the fluctuation of the 787.

168. Donegan promised investors that the destocking would not prevent PCC from obtaining, or otherwise impact, its fiscal 2016 EPS target. Specifically, he explained that there are "other levers" he could pull to make up for any temporary destocking headwinds:

> We are a linear thinking group of people. We are financially driven. Everything we do breaks down to a financial model.
>
> Let there be no mistake, it breaks itself down to the core components. ***So it is not a hope and a prayer****….*
>
> So our mindset is going to be linear. ***You are going to see different movements. I did not circle – we did not get the acceleration from – because of the destocking.***
>
> ***You know what? We pull the other levers. We have got cost take-out, we have got these acquisitions. I know all those levers that are ther***e.

169. The statements contained in ¶¶167-168 were materially false and misleading when made because Defendants misrepresented and failed to disclose the following, as further detailed herein:

(a) PCC, in order to meet its internal quarterly sales goals, had been engaging in the unsustainable practice of pulling in sales to its aerospace customers, such as Rolls-Royce, inducing them to take on more inventory than they required or that was necessitated by current and/or forecasted aircraft build rates;

(b) PCC's forecasts and outlook, including its ability to grow organically and meet its fiscal 2016 EPS target (*i.e.*, $15.50 to $16.50 of EPS by fiscal 2016), were contingent on the Company's continued ability to use these undisclosed, aggressive pull in sales practices, particularly in dealings with at least one of its key customers, *i.e.*, Rolls-Royce;

(c) PCC, at least partly due to the practice mentioned in (a), already was experiencing the permanent negative impact of at least one key aerospace customer's—Rolls-Royce's—inventory reduction initiatives, foreclosing PCC from relying on pull in sales to Rolls-Royce to meet its targets; and, rather than being a short-term issue, the inventory reduction or rationalization initiatives announced by at least one of PCC's key customers—Rolls-Royce—

was having a long-term negative impact on PCC's demand by foreclosing PCC from relying on pull in sales to Rolls-Royce to achieve organic growth and meet the 2016 EPS targets it continually re-affirmed;

(d) The market-based forecasts and outlook that Precision touted to the market during the Class Period were materially misleading, in that they failed to account for the fact that undisclosed Company practices to boost quarter-end sales, such as pulling in, meant that these metrics did not reflect what the Company would actually be able to sell in upcoming quarters;

(e) Rolls-Royce's inventory reduction or rationalization initiatives, or purported destocking, was negatively impacting, and would continue to curtail, the organic growth and EPS target that Defendants assured investors would occur;

(f) The Company was already losing market share and Rolls-Royce's business to competitors, for reasons including because it was not maintaining competitive advantages that it had previously enjoyed and depended on to maintain and obtain business from its aerospace customers, and because its practice of pulling in sales was eroding its customer relationships;

(g) In light of (a)-(f), anticipated increases in aircraft build rates, such as the 787, Defendants touted as growth drivers would not translate or lead to improved performance, including organic growth, or allow PCC to meet its EPS guidance;

(h) As a result of the foregoing, the Defendants' positive statements about PCC's business, operations, and prospects, including its fiscal 2016 EPS target, lacked a reasonable basis.

**F. <u>Third Quarter Fiscal 2014 Results</u>**

170. On January 23, 2014, the Company issued a press release announcing its third-quarter fiscal 2014 ("3Q14") financial results—*i.e.*, its results for the quarter ended September December 31, 2013. In that press release, Defendants reported record EPS of $2.95 from continuing operations, and touted Precision's growth prospects, including results and trends that would allow Precision to achieve organic growth it promised. In the release, Donegan explained:

> Our aerospace operations are supporting a historically high commercial aircraft build rate, and, as the customers take the rates to the next level, our sales should track that upward slope….During the quarter, we were hit harder than we have ever been before by last minute customer schedule shifts, and we do not expect to see them again to this degree in the foreseeable future….We came to grips with these late quarter challenges immediately, and we dealt with them as effectively as possible. Going forward, we see upside opportunities, and our operations continue to deliver increased value on higher volumes.

171. Similarly, during the January 23, 2014 earnings call, Donegan reported that regarding the "***forged [segment] and the outlook, if I look at aerospace, as with cast parts, it is product that is contracted for, have in place, and will be driven as those rates increase.*** In this particular area, we will certainly also recover the Q3 schedule shift in Q4." Donegan also confirmed that the 2016 framework and forecast—particularly the fiscal EPS target of $15.50 to $16.50—remained intact, explaining:

> So on one hand, we are accelerating beyond those organic sequential growth ranges. As a benefit to the top line, it usually comes back on the downside when it comes to that range.
>
> This is how we think of our business. I want to make sure you understand. This is not guidance. This is clearly trying to define how we think of movement, quarter-to-quarter and sequentially.
>
> This is very consistent in the way we broke apart, defined, and gave the framework for our FY16. ***Contracts are in place. It is all intact. It was put there,***

> ***to give that framework that, that this is how we kind of get there,*** and it is done in this manner.
>
> So I wanted to have that conversation, again, and the way we think about our business. Again, it is consistent with where we are in that 2016 framework. ***And that 2016 framework, looking at where the market is, and the contracts, and the price line, right now, that framework, it still feels very done, very – in the ability gap, so intact***.

172. Analysts again sought an update on the destocking situation discussed in the prior quarter. Donegan and a Cowen and Company analyst engaged in the following back and forth:

> [Gautam Khanna (Cowen and Company analyst):] And then just, ***expanding on your comments on destocking into the year end. Does this extend beyond the 787 engine programs? And if you could update us on whether you still expect to be shipping in line on those programs with underlying consumption by the March, June quarters***, do you still expect – (multiple speakers)?
>
> [Donegan:] Yes, I think that – this I wouldn't even almost consider just – what the destocking I think there was, if I go through the course of mid last year, there was probably a realignment and a balancing, as the 787 started getting some drumbeat to it. So I think that there was a more specific – ***this to me felt more like a year-end shift***, moving product two to three weeks to the right, versus what would have come into some customers fiscal year end.
>
> ***So it did not feel like a destocking.*** It felt more like an objective, a cash flow, financial target, working capital, it felt like it was more of that. It just moved and shifted, two or three days in some cases. It just got two or three days beyond our end.
>
> ***So going more in, if I look at kind of the remaining --what I consider the remaining destocking, it probably falls in a couple categories.*** I think if falls into that fastener side of the business, and right now at the burn rates, and we do – and we can monitor the burn rates. The way that – we have the access to what they are pulling, we have access to inventory levels. So you can start to plot that crossover point. Again, that June through July/August, that is the quarter that we cross on that 787 hardware.
>
> ***And I think a lot depends on what is our end customer, basically in the case of the 787, as Boeing moves towards production of that 10, obviously I think they will keep pulling the Airframe side of the business. So I think that is the last piece of the puzzle. And then certainly the engine side, I expect to get pick up from the – as we are not at 10 yet on the engine side of business either. So as***

> ***the true production goes to 10, I expect to see that come through, more in that our mid calendar year 2015,*** so that is what it feels like today.

173. Donegan also reiterated that PCC "***expect[ed] to see growth in the Q4 and Q1 [as these are] our quarters where we typically see that movement.***" He added: "***Q4 has in it embedded growth….because there are demands coming from our customers***, and has it in it because we pick up three more manufacturing days. It has it in it, because we have been carrying some inventory, and it has it in it, because certainly, of these – this Q3 dynamic we got into."

174. After a JP Morgan analyst asked whether "are there pluses and minuses to consider when we think about your [fiscal 2016 EPS]target," Donegan assured investors "***no, nothing has gone negative from that standpoint, in terms of the framework, not at all.***" A Citigroup analyst followed up, by asking "If we are sitting here 25 months from now and you don't reach the target, why would that have been the case?" Donegan indicated that it would not be due to any long-term impact from the "destocking" issue, explaining:

> Well, from my standpoint, why would it have been the case, is something fundamentally change with the overall dynamics, build rates didn't step up, something happened in the new product introductions, Yes, China melting down in terms of GDP, more macro dynamics. If you look at what our line of sight to is – again, my contracts are in place, I get share, I know what it is, the build rates are announced. The engine people are marching down, the Framers are going at a pretty reasonable drumbeat right now.
>
> Yes, there are some puts and takes – ***the destocking, the destocking goes away. You close the gap. It has an end to it***.

175. The statements contained in ¶¶170-174 were materially false and misleading when made because Defendants misrepresented and failed to disclose the following, as further detailed herein:

(a) PCC, in order to meet its internal quarterly sales goals, had been engaging in the unsustainable practice of pulling in sales to its aerospace customers, such as Rolls-Royce, inducing them to take on more inventory than they required or that was necessitated by current and/or forecasted aircraft build rates;

(b) PCC's forecasts and outlook, including its ability to grow organically and meet its fiscal 2016 EPS target (*i.e.*, $15.50 to $16.50 of EPS by fiscal 2016), were contingent on the Company's continued ability to use these undisclosed, aggressive pull in sales practices, particularly in dealings with at least one of its key customers, *i.e.*, Rolls-Royce;

(c) PCC, at least partly due to the practice mentioned in (a), already was experiencing the permanent negative impact of at least one key aerospace customer's—Rolls-Royce's—inventory reduction initiatives, foreclosing PCC from relying on pull in sales to Rolls-Royce to meet its targets; and, rather than being a short-term issue, the inventory reduction or rationalization initiatives announced by at least one of PCC's key customers—Rolls-Royce—was having a long-term negative impact on PCC's demand by foreclosing PCC from relying on pull in sales to Rolls-Royce to achieve organic growth and meet the 2016 EPS targets it continually re-affirmed;

(d) The market-based forecasts and outlook that Precision touted to the market during the Class Period were materially misleading, in that they failed to account for the fact that undisclosed Company practices to boost quarter-end sales, such as pulling in, meant that these metrics did not reflect what the Company would actually be able to sell in upcoming quarters;

(e) Rolls-Royce's inventory reduction or rationalization initiatives, or purported destocking, was negatively impacting, and would continue to curtail, the organic growth and EPS target that Defendants assured investors would occur;

(f) The Company was already losing market share and Rolls-Royce's business to competitors, for reasons including because it was not maintaining competitive advantages that it had previously enjoyed and depended on to maintain and obtain business from its aerospace customers, and because its practice of pulling in sales was eroding its customer relationships;

(g) In light of (a)-(f), anticipated increases in aircraft build rates, such as the 787, Defendants touted as growth drivers would not translate or lead to improved performance, including organic growth, or allow PCC to meet its EPS guidance;

(h) As a result of the foregoing, the Defendants' positive statements about PCC's business, operations, and prospects, including its fiscal 2016 EPS target, lacked a reasonable basis.

176. On February 6, 2014, PCC filed with the SEC its Quarterly Report on Form 10-Q for the fiscal quarter ended December 31, 2013, which was signed by Hagel. The Company's Form 10-Q reaffirmed the financial results and outlook announced in the January 23, 2014 press release and earnings call.

177. For example, the 3Q14 Form 10-Q disclosed, that ***"The Airline Monitor is projecting further growth in aircraft deliveries in calendar year 2015, and therefore we anticipate that our aerospace sales will increase in fiscal 2015 compared to fiscal 2014."***

178. The 3Q14 Form 10-Q included risk disclosures materially similar to those set forth above at ¶149 (*i.e.*, the risk disclosures appearing in PCC's 1Q14 Form 10-Q).

179. The statements contained in ¶¶176-178 were materially false and misleading when made for the reasons alleged above at ¶175.

180. The risk disclosures alleged above at ¶178 also created a materially false and misleading impression of the true strength of, and specific risks to, PCC and its important Rolls-Royce business, because they omitted any disclosure of the specific risks to PCC from (a) its loss of market share, weakening competitive position, and "softness" in demand, (b) PCC's reliance on the practice of providing Rolls-Royce and other customers with more inventory than was required or dictated by aircraft build rates, (c) PCC's customer's inevitable, indefinite inventory reduction that would result from this practice and negatively impact PCC's performance, and (d) PCC's practice of forecasting, and touting forecasts, based on publicly available anticipated industry-wide demand—*i.e.*, commercial airplane (*e.g.*, Boeing 787) build/delivery rates—rather than the actual demand of Precision's customers, such as Rolls-Royce, in light of previously pulled in sales and the extent to which Rolls-Royce's inventory realignment would preclude PCC from further relying on such pull in sales practices. The 3Q14 Form 10-Q's description of the risks to the Company's business as potential and non-specific events that might hypothetically occur in the future gave investors a false and misleading assurance that PCC was not engaging in practices that were driving, or would necessarily prompt, at least one of its key customers, Rolls-Royce, to permanently shift business away from PCC and indefinitely reduce inventory purchased from PCC, thereby rendering the disclosed risks a then-concealed reality.

181. The 3Q14 Form 10-Q was also materially false and misleading because it failed to include a discussion of material changes, including in known trends or uncertainties, that were reasonably likely to have a material adverse effect on the Company's results of operations, as required by Item 303 of Regulation S-K. For example, the Company failed to disclose its increasing reliance on pull in sales to meet earnings and growth targets, and that its inability to rely upon this practice in future quarters could result in a material decline in its sales, revenues and income. The Company also failed to disclose that, unbeknownst to investors, Rolls-Royce's inventory reduction and rationalization initiatives and destocking had been preventing, and would indefinitely (if not permanently) prevent, PCC from pulling in sales to Rolls-Royce and achieving its 2016 EPS target. Indeed, as the Company would later admit, although "things changed" after the FY16 guidance was issued in January 2013, Precision failed to update investors on such changes.

## G. Fourth Quarter Fiscal 2014 & Full Year Fiscal 2014 Results

182. On May 8, 2014, the Company issued a press release announcing its fourth-quarter fiscal 2014 ("4Q14") financial results. In that press release, Defendants reported record EPS of $3.27 from continuing operations, record sales of $2.53 billion, and touted Precision's growth prospects, including results and trends that would allow Precision to achieve the organic growth it promised. In the release, Donegan explained: "***We have won major share on all current-production commercial aircraft programs, and the demand in that market continues to be very healthy.***"

183. During the May 8, 2014 earnings call, Donegan agreed that "a 4% to 5% organic growth rate [was] doable in 2015 on the revenue side," explaining "[w]e are going to drive after

every opportunity on every single aspect of this Corporation. So I think from that standpoint, yes, I feel really solid about kind of what we're looking at in this Corporation, absolutely."

184. Donegan also reiterated that PCC was on track to meet its fiscal 2016 EPS target, confirming "we obviously feel very, very, very solid about kind of what's out there."

> Robert Spingarn (Credit Suisse analyst)]: When we think about the comments you've made in the past, you've been very clear, Mark, that you've got lots of levers to get to your long term guidance range . . .What do you need to have happen for you to update the guidance? What is the catalyst or the milestone that we should be looking for?
>
> Donegan: You know typically we have a pattern that we will, when we under commit and over deliver. That's pretty much what our motto is from that standpoint.
>
> * * *
>
> ***In terms of the whole, I don't know it's not guidance, the targets whatever you want to call it, I think what I would say is that we obviously feel very, very, very solid about kind of what's out there***.

185. The statements contained in ¶¶182-184 were materially false and misleading when made because Defendants misrepresented and failed to disclose the following, as further detailed herein:

(a) PCC, in order to meet its internal quarterly sales goals, had been engaging in the unsustainable practice of pulling in sales to its aerospace customers, such as Rolls-Royce, inducing them to take on more inventory than they required or that was necessitated by current and/or forecasted aircraft build rates;

(b) PCC's forecasts and outlook, including its ability to grow organically and meet its fiscal 2016 EPS target (*i.e.*, $15.50 to $16.50 of EPS by fiscal 2016), were contingent on

the Company's continued ability to use these undisclosed, aggressive pull in sales practices, particularly in dealings with at least one of its key customers, *i.e.*, Rolls-Royce;

(c) PCC, at least partly due to the practice mentioned in (a), already was experiencing the permanent negative impact of at least one key aerospace customer's—Rolls-Royce's—inventory reduction initiatives, foreclosing PCC from relying on pull in sales to Rolls-Royce to meet its targets; and, rather than being a short-term issue, the inventory reduction or rationalization initiatives announced by at least one of PCC's key customers—Rolls-Royce—was having a long-term negative impact on PCC's demand by foreclosing PCC from relying on pull in sales to Rolls-Royce to achieve organic growth and meet the 2016 EPS targets it continually re-affirmed;

(d) The market-based forecasts and outlook that Precision touted to the market during the Class Period were materially misleading, in that they failed to account for the fact that undisclosed Company practices to boost quarter-end sales, such as pulling in, meant that these metrics did not reflect what the Company would actually be able to sell in upcoming quarters;

(e) Rolls-Royce's inventory reduction or rationalization initiatives, or purported destocking, was negatively impacting, and would continue to curtail, the organic growth and EPS target that Defendants assured investors would occur;

(f) The Company was already losing market share and Rolls-Royce's business to competitors, for reasons including because it was not maintaining competitive advantages that it had previously enjoyed and depended on to maintain and obtain business from its aerospace customers, and because its practice of pulling in sales was eroding its customer relationships;

(g) In light of (a)-(f), anticipated increases in aircraft build rates, such as the 787, Defendants touted as growth drivers would not translate or lead to improved performance, including organic growth, or allow PCC to meet its EPS guidance;

(h) As a result of the foregoing, the Defendants' positive statements about PCC's business, operations, and prospects, including its fiscal 2016 EPS target, lacked a reasonable basis.

186. On May 29, 2014, PCC filed with the SEC its Annual Report on Form 10-K for the fiscal year ended March 31, 2013 (the "2014 Form 10-K"), which was signed by Donegan and Hagel. The 2014 Form 10-K reaffirmed the financial results and outlook announced in the January 23, 2014 press release and earnings call, and disclosed materially similar information to what it disclosed in the 2014 Form 10-K and Form 10-Qs detailed above, including that forecasted increases in aircraft deliveries would drive PCC's growth over the next year. The 2014 Form 10-K also included risk disclosures materially similar to those set forth above at ¶149 (*i.e.*, the risk disclosures appearing in PCC's 1Q14 Form 10-Q). The statements contained in the 2014 Form 10-K, were materially false and misleading when made for the reasons alleged above at ¶185.

187. The risk disclosures alleged above at ¶186 also created a materially false and misleading impression of the true strength of, and specific risks to, PCC and its important Rolls-Royce business, because they omitted any disclosure of the specific risks to PCC from (a) its loss of market share, weakening competitive position, and "softness" in demand, (b) PCC's reliance on the practice of providing Rolls-Royce and other customers with more inventory than was required or dictated by aircraft build rates, (c) PCC's customer's inevitable, indefinite inventory

reduction that would result from this practice and negatively impact PCC's performance, and (d) PCC's practice of forecasting, and touting forecasts, based on publicly available anticipated industry-wide demand—*i.e.*, commercial airplane (*e.g.*, Boeing 787) build/delivery rates—rather than the actual demand of Precision's customers, such as Rolls-Royce, in light of previously pulled in sales and the extent to which Rolls-Royce's inventory realignment would preclude PCC from further relying on such pull in sales practices. That report's description of the risks to the Company's business as potential and non-specific events that might hypothetically occur in the future gave investors a false and misleading assurance that PCC was not engaging in practices that were driving, or would necessarily prompt, at least one of its key customers, Rolls-Royce, to permanently shift business away from PCC and indefinitely reduce inventory purchased from PCC, thereby rendering the disclosed risks a then-concealed reality.

188. The 2014 Form 10-K was also materially false and misleading because it failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material adverse effect on the Company's net sales, revenues and income from continuing operations, as required by Item 303 of Regulation S-K. For example, the Company failed to disclose its increasing reliance on pull in sales to meet earnings and growth targets, and that its inability to rely upon this practice in future quarters could result in a material decline in its sales, revenues and income. The Company also failed to disclose that, unbeknownst to investors, Rolls-Royce's inventory reduction and rationalization initiatives and destocking had been, preventing, and would indefinitely (if not permanently), prevent PCC from pulling in sales to Rolls-Royce and achieving its 2016 EPS target. Indeed, as the Company would later admit,

although "things changed" after the FY16 guidance was issued in January 2013, Precision failed to update investors on such changes.

## VII. THE TRUTH BEGINS TO EMERGE

### A. First Quarter Fiscal 2015 Results

189. On July 24, 2014, the relevant truth and foreseeable consequences concealed by Defendants' misconduct and their false representations and omissions during the Class Period began to be revealed and/or partially materialized. On that date, the Company issued a press release announcing its first quarter fiscal 2015 financial results, which missed consensus estimates, and held a conference call regarding its earnings. For the market, this drop was the first evidence that the Company's promised strong organic growth needed to reach its fiscal 2016 EPS target was not materializing. On that day, investors were disappointed to learn that, a full quarter after Universal, one of Precision's competitors, announced that "destocking has largely ended" and "customers are buying to their needs," Defendants continued to attribute Precision's earnings misses to Rolls-Royce's destocking that Defendants previously assured investors would be concluded by this time. Specifically, Donegan attributed the lower than expected earnings to "some destocking that was occurring from some of the European customers [Rolls-Royce]."

190. Analysts attributed the lower than expected results to the Company's inability to grow organically and continued destocking. Cowen and Company, for instance, noted that "sales seem light" and "[i]f we remove Q4's $50MM of shipment catch-ups from the Q4 base, then organic sales appear to have risen by <1% sequentially. On prior calls, PCP mgmt has indicated that organic sequential growth should be close to 4% in FQ1."

191. On this news, Precision's stock price fell 5.5 percent, from $250.03 at prior close to close on July 24, 2014 at $236.21 per share.

192. Despite this partial disclosure of adverse news and/or materialization of an undisclosed risk that destocking was severely inhibiting the Company's ability to "pull in" revenue from future quarters, and thus its ability to meet fiscal year 2016 targets, the Company's stock price remained artificially inflated due to Defendants' continuous representations that destocking would soon come to an end and that the Company was still "on track" to meet its 2016 targets.

193. Specifically, in an effort to contain the fallout from the Company's disappointing results, Defendants continued to tout Precision's growth prospects, including results and trends that would allow Precision to achieve the organic growth it promised. For example, PCC's July 24, 2014 press release quoted Donegan as stating the following:

> Our order books began to fill in rapidly, and customer demand for accelerated delivery increased. As a result, ***we now have a clear line of sight to the steady growth we are anticipating in the second half of our fiscal year.***
>
> * * *
>
> Commercial aerospace activity is and will continue to be the single biggest driver of our growth in fiscal 2015…. ***Across the Company, base aircraft production continues to be solid. Production of 787 components in the majority of our aerospace operations now supports the original goal of 10 aircraft per month, and we now have orders in hand that will close the gap completely.*** In addition, some Airframe Products' customers significantly accelerated their ordering activity during the quarter. These higher volumes, along with further share gains, are driving the segment's operations to take steps right now to be ready for the increased production that we can expect later this fiscal year.
>
> * * *
>
> ***Coming into the third and fourth quarters, we are looking forward to solid growth in all of our segments….***

194. In a similar effort to comfort investors concerned about the Company's long-term prospects, during the July 24, 2014 earnings call, Donegan assured investors "[t]hat [destocking that impacted this quarter's results] ***goes away and gives us a step up*** [as we move into the back half of 2015.]" After a Cowen and Company analyst asked Donegan to expand on the inventory realignment/destocking issue, Donegan, for the first time, attributed the destocking to Rolls-Royce but remained adamant that the destocking was "starting to go away" and "coming to an end." More specifically, Donegan explained:

> ***The destocking coming out of Rolls, yes. I'd say we do definitely see that coming to an end***. To be fair to Rolls, they've been pretty consistent when they said we were going to see it come to an end. And as we move into our Q4, that's when it comes to an end. Then the TIMET orders, again, that's that Rolls-Royce piece of the equation, that we do have the orders of this point in time on hand. It shows that going away.

195. Analysts also inquired as to whether PCC was seeing a market share shift and aerospace business being directed to PCC's competitors. Donegan responded that "we do not."

196. In another attempt to assuage investor concerns over the Company's long-term prospects, Donegan addressed PCC's 2016 targets, stating: "***I want to be clear in regards to FY16 targets. I want to reaffirm the target and the framework is in place***."

197. These statements left investors unaware that the Company was losing market share and Rolls-Royce's business to competitors, and that PCC, in order to meet its internal quarterly sales goals, had been engaging in the unsustainable and short-sighted practice of providing its aerospace customers, such as Rolls-Royce, with more inventory than they required or that was necessitated by current and/or forecasted aircraft build rates. These statements also continued to mischaracterize PCC's disappointing results as attributable to a temporary destocking problem, and failed to disclose that the Company's results were being impacted, and

would continue to be impacted, because it was having to abandon the pulling in practices that it had used with Rolls-Royce (among other customers) and driven its sales numbers for so long.

198. By continuing to misstate and omit material facts, Defendants succeeded, to some extent, in assuaging analyst fears. For instance, in a report issued on July 24, 2014, Wells Fargo explained:

> While the company missed consensus EPS expectations by $0.03 (just 1%) due to a 3% top-line shortfall, ***we believe the fundamental PCP thesis is entirely intact***: ***Over the next several years PCP will benefit organically*** from rising aircraft production rates (*e.g.*, 787, A350), meaningfully higher average aircraft content (*e.g.*, 737MAX), and an improving competitive position in power and energy markets.

199. Similarly, in an article entitled "Market Loses Patience as Sales Upside Shifts to the Second Half," Credit Suisse stated that the market had "appeared to overreact" to Precision's latest earnings miss. Morningstar likewise parroted managements' pacifying remarks, stating "***demand remains steady and visibility is high*** as production-rate increases in aerospace are well supported by immense aircraft backlogs at original equipment manufacturers."

200. On August 7, 2014, PCC filed with the SEC its Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2014, which was signed by Hagel. The Company's Form 10-Q reaffirmed the financial results and outlook announced in the July 24, 2014 release and earnings call, and disclosed materially similar information to what it disclosed in the Form 10-Ks and Form 10-Qs detailed above. The 1Q15 Form 10-Q also included risk disclosures materially similar to those set forth above at ¶186 (*i.e.*, the risk disclosures appearing in PCC's 2014 Form 10-K). The statements contained in PCC's 1Q15 Form 10-Q, were materially false and misleading when made for the reasons alleged above at ¶¶185, 197.

201. The risk disclosures in the 1Q15 Form 10-Q, as alleged above at ¶200, also created a materially false and misleading impression of the true strength of, and specific risks to, PCC and its important Rolls-Royce business, because they omitted any disclosure of the specific risks to PCC from (a) its loss of market share, weakening competitive position, and "softness" in demand, (b) PCC's reliance on the practice of providing Rolls-Royce and other customers with more inventory than was required or dictated by aircraft build rates, (c) PCC's customer's inevitable, indefinite inventory reduction that would result from this practice and negatively impact PCC's performance, and (d) PCC's practice of forecasting, and touting forecasts, based on publicly available anticipated industry-wide demand—*i.e.*, commercial airplane (*e.g.*, Boeing 787) build/delivery rates—rather than the actual demand of Precision's customers, such as Rolls-Royce, in light of previously pulled in sales and the extent to which Rolls-Royce's inventory realignment would preclude PCC from further relying on such pull in sales practices. The 1Q15 Form 10-Q's description of the risks to the Company's business as potential and non-specific events that might hypothetically occur in the future gave investors a false and misleading assurance that PCC was not engaging in practices that were driving, or would necessarily prompt, at least one of its key customers, Rolls-Royce, to permanently shift business away from PCC and indefinitely reduce inventory purchased from PCC, thereby rendering the disclosed risks a then-concealed reality.

202. The 1Q15 Form 10-Q was also materially false and misleading because it failed to include a discussion of material changes, including in known trends or uncertainties, that were reasonably likely to have a material adverse effect on the Company's results of operations, as required by Item 303 of Regulation S-K. For example, the Company failed to disclose its

increasing reliance on pull in sales to meet earnings and growth targets, and that its inability to rely upon this practice in future quarters could result in a material decline in its sales, revenues and income. The Company also failed to disclose that, unbeknownst to investors, Rolls-Royce's inventory reduction and rationalization initiatives and destocking had been preventing, and would indefinitely (if not permanently) prevent, PCC from pulling in sales to Rolls-Royce and achieving its 2016 EPS target. Indeed, as the Company would later admit, although "things changed" after the FY16 guidance was issued in January 2013, Precision failed to update investors on such changes.

### B. Second Quarter Fiscal 2015 Results

203. On October 23, 2014, the Company issued a press release announcing its second quarter fiscal 2015 financial results, which missed consensus estimates, and held an earnings call. Investors again were disappointed that Rolls-Royce's destocking was still cited as a headwind to organic growth months after it had stopped impacting the results of other Rolls-Royce parts suppliers. Specifically, Donegan disclosed during the earnings call that a "key driver [impacting aerospace sales] was destocking primarily by a single engine customer [Rolls-Royce,]" "[t]he value of that in the quarter negatively impacted Forged Products' growth overall by 2.5 percentage points," and "the destocking that went on from that single customer was a large number in the aerospace side of the equation."

204. Analysts expressed considerable concern over the Company's disappointing second quarter financial results. For example, Morningstar issued an analyst report on October 23, 2014 noting that Precision's results "are weaker than required for our prior annual projections" and that "prior growth estimates now seem too high." Similarly, Wells Fargo

published a report on the same day noting that "PCP's long-awaited above-market organic growth story appears to be 1-2 quarters away," while KeyBanc Capital Markets acknowledged that "investor patience is wearing thin with PCP shares."

205. On this news, Precision's stock price fell 0.95 percent, from a prior close of $226.20 per share to close at $224.06 per share.

206. Despite this partial disclosure of adverse news and/or materialization of an undisclosed risk that destocking was severely inhibiting the Company's ability to "pull in" revenue from future quarters, and thus its ability to meet fiscal year 2016 targets, the Company's stock price remained artificially inflated due to Defendants' misrepresentations that destocking would soon come to an end, that demand was strong, and that the Company was still poised to meet its 2016 targets. For example, PCC's October 23, 2014 press release quoted Donegan as stating:

> ***Going forward, our markets remain strong, and customer demand has given us a clear line of sight to sustained growth.***
>
> * * *
>
> We have won solid share positions on all production and development programs in our key end markets…. ***We have a strategic plan for growth, and we are steadily executing that plan.***

207. During the October 23, 2014 earnings call, Donegan likewise provided false assurances to investors by reiterating the 2016 framework and EPS target, stating: "***I want to make sure that it's clearly understood that we remain fully committed to our FY16 framework…. there is no change to the framework we laid out***." Further, Donegan cited "destocking that we experienced …that goes away" as one "factor[]…sitting on top of us now that certainly support that confidence" in Precision's ability to meet this target.

208. In addition, when analysts expressed frustration that destocking was still impacting PCC's performance, Donegan assured them that the destocking was still just a temporary headwind that would not interfere with PCC's ability to meet its fiscal 2016 EPS target, and PCC was not losing market share. For example, a UBS analyst noted that the "destocking that you talked about specifically at Forged, I think the 2.5% or whatever it was, …. [i]t seems like we've been talking about this for quite a long time" and asked "how much further can this go out of this customer?" Donegan agreed that "we have been talking about it [destocking at Rolls-Royce] for a long time." He added:

> ***I would tell you that right now the schedules that we have on us says that it ends and starts to recover in our Q4 and fully recovers in Q1.*** We have orders on us that say that. And at this point in time that all I can go for. But I would agree with you. It has been a redo with this customer probably two to three times it has been. I do believe that it is getting to the point that it cannot be reduced anymore. ***So I guess I'd say that my confidence at this point in time is higher that it will, in fact, stick to the current schedules than it has in the past.***

209. After an RBC Capital Markets analyst requested additional details regarding the destocking, Donegan provided the market with false comfort that the negative impact due to destocking was coming to an end, stating: "[A]ll I can answer at this point in time is the demand we've seen, or ***the destocking that we've seen, bottoms out and closes off in the Q3 time frame, and then the orders on top of us start to recover***."

210. Citigroup analyst, Jason Gursky, followed up on the "destocking customer," by asking Donegan to "talk a little bit about the types of parts that this represents," address whether "it [is] the same parts that we saw a year ago or we are now moving on to a different set of parts," "describe your visibility into your other customers" and whether the destocking "was this

particular customer just not managing their inventory well at all and they had a lot of room to go." Donegan explained:

> A year ago we had multiple customers going through a destocking. It went through – we still are carrying over the destocking from the fasteners a year ago. There was castings that were in the destocking.
>
> This one tends to be, and has been throughout the course of this year, squarely aimed at the raw materials. So, you're looking at a billet or ingot, depending on what the particular product is. So, 10,000-pound round going in that's then subsequently sent out to a forger, or whatever it is. And you're looking at forged components. So, you're looking at discs, rings, not rotating parts, inside a jet engine.
>
> * * *
>
> [T]he bulk of this is basically OEM related….I'd say probably 85% to 90% of the demand is going into OEM. It's not a high spares. It's not a turbine blade. Again, discs, rings, typically those tend to have a very low overall in repair.
>
> * * *
>
> I'll tell you, the signals over the last 12 months, the signals from the balance of our business have been very consistent. And they predicted, if I look at the fastener side of the equation, you look at the burn down rate, you look at what they say they are going to do, you look at how they have started ordering, look at the incoming order rate, they've been pretty predictable.
>
> So, I'd say overall, the rest of the business, except for a Q3 dynamic, meaning some sort of cash flow inventory, no. I'd say the rest of the businesses have been well within reasonable as to what you'd expect something like that to do. So, no, I'd say it really is residing in one customer at this point in time.

211. Each of the foregoing statements by Defendants in ¶¶206-210 were materially false and misleading when made for the reasons set forth above in ¶¶185, 197.

212. In light of these continued misrepresentations and omissions, some analysts still believed that the Company could generate increased organic growth and achieve its 2016 EPS target. For instance, the KeyBanc Capital Markets report also noted that the "[d]estocking trend

appears to have an end in sight," and "should begin to abate in fiscal 2H15 according to management." Wells Fargo agreed, relying on management's representation that the destocking issue "should be resolved during H2 2015." Moreover, S&P Capital IQ issued a report on October 23, 2014 stating that "we believe PCP is on track to hit its $15.50-$16.50 EPS goal for FY 16," while Canaccord analysts "[n]ote[d] that PCP reaffirmed its $15.50-$16.50 FY16 EPS guidance."

213. Thereafter, on November 6, 2014, PCC filed with the SEC its Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2014, which was signed by Hagel. The Company's Form 10-Q reaffirmed the financial results and outlook announced in the October 23, 2014 release and earnings call, and disclosed materially similar information to what it disclosed in the Form 10-Ks and Form 10-Qs detailed above. The 2Q15 Form 10-Q also included risk disclosures materially similar to those set forth above at ¶186 (*i.e.*, the risk disclosures appearing in PCC's 2014 Form 10-K). The statements contained in PCC's 2Q15 Form 10-Q were materially false and misleading when made for the reasons alleged above at ¶185, 197.

214. The risk disclosures in the 2Q15 Form 10-Q, as alleged above at ¶213, also created a materially false and misleading impression of the true strength of, and specific risks to, PCC and its important Rolls-Royce business, because they omitted any disclosure of the specific risks to PCC from (a) its loss of market share, weakening competitive position, and "softness" in demand, (b) PCC's reliance on the practice of providing Rolls-Royce and other customers with more inventory than was required or dictated by aircraft build rates, (c) PCC's customer's inevitable, indefinite inventory reduction that would result from this practice and negatively impact PCC's performance, and (d) PCC's practice of forecasting, and touting forecasts, based

on publicly available anticipated industry-wide demand—*i.e.*, commercial airplane (*e.g.*, Boeing 787) build/delivery rates—rather than the actual demand of Precision's customers, such as Rolls-Royce, in light of previously pulled in sales and the extent to which Rolls-Royce's inventory realignment would preclude PCC from further relying on such pull in sales practices. The 2Q15 Form 10-Q's description of the risks to the Company's business as potential and non-specific events that might hypothetically occur in the future gave investors a false and misleading assurance that PCC was not engaging in practices that were driving, or would necessarily prompt, at least one of its key customers, Rolls-Royce, to permanently shift business away from PCC and indefinitely reduce inventory purchased from PCC, thereby rendering the disclosed risks a then-concealed reality.

215. The 2Q15 was also materially false and misleading because it failed to include a discussion of material changes, including in known trends or uncertainties, that were reasonably likely to have a material adverse effect on the Company's results of operations, as required by Item 303 of Regulation S-K. For example, the Company failed to disclose its increasing reliance on pull in sales to meet earnings and growth targets, and that its inability to rely upon this practice in future quarters could result in a material decline in its sales, revenues and income. The Company also failed to disclose that, unbeknownst to investors, Rolls-Royce's inventory reduction and rationalization initiatives and destocking had been preventing, and would indefinitely (if not permanently) prevent, PCC from pulling in sales to Rolls-Royce and achieving its 2016 EPS target. Indeed, as the Company would later admit, although "things changed" after the FY16 guidance was issued in January 2013, Precision failed to update investors on such changes.

**C. Credit Suisse Global Industrials Conference**

216. On December 3, 2014, the Company was asked to provide an update on engine destocking developments during the Credit Suisse Global Industrials Conference. After a participant asked whether Precision was seeing destocking alleviate in the second half of this fiscal year, given that most of the third quarter had past, as Defendants previously indicated it would, Donegan assured investors, explaining: "Yes, we are seeing it [end]." Donegan also rejected the notion that Rolls-Royce was "either going elsewhere or bringing some work inside," instead referring to its inventory reduction as "a straight destock." He added:

> [T]here was a lot of product where we got hit on the destock where the application is kind of a – right now we're a kind of sole source. So we're able to look at a position where we are the only avenue and you could track just this huge disconnect in terms of what they pulled out of – so you can look at here's the delivery rates, here's what they're ordering. You could see it. You could match it up to a part where we're the only solution, and say – okay, it matches out. On the flip side, when you get to the back half you can start seeing the increase going back towards the build rate.

217. Donegan also falsely assured investors that the fiscal 2016 EPS target was still intact notwithstanding Rolls-Royce's destocking, assuring investors:

> So you look again at this model that, against a backdrop of a number of things that would be headwinds [like Rolls-Royce destocking in the quarter ended September 30, 2014],***we're still able with the robustness of what we have available to us,*** this is kind of the drumbeat of what we'll deliver as an ongoing basis.

218. The statements contained in ¶¶216-217 were materially false and misleading when made for the reasons alleged above in ¶185, 197.

## VIII. THE FULL TRUTH IS REVEALED & OTHER POST-CLASS PERIOD EVENTS

219. After the market closed on January 15, 2015, the Company shocked the market by preannouncing third-quarter 2015 sales and earnings, which once again missed consensus

estimates at least in part because of the impact of Rolls-Royce's purported destocking. The release again attributed PCC's dismal performance and lowered expectations in large part to "further aerospace engine destocking at a single customer." More specifically, the release disclosed:

> Precision Castparts Corp. (NYSE: PCP) announced today that lower demand in oil & gas end markets, further aerospace engine destocking at a single customer, yearend customer inventory management actions, and an extended equipment upgrade negatively impacted the company's third quarter fiscal year 2015 sales and earnings. The combination of these factors leads the company to expect that third quarter sales will be in the range of $2.42 billion to $2.47 billion and earnings per share (EPS) from continuing operations (attributable to PCC) in the range of $3.05 to $3.10 (diluted).
>
> * * *
>
> [P]reviously discussed destocking at a single commercial aerospace customer and calendar year-end customer inventory management actions had a greater impact on the third quarter than had been anticipated.

220. With these disclosures, the market finally recognized what Defendants had falsely denied throughout the Class Period: that a sustained demand decline lasting nearly two years and costing the Company millions in revenues suggested a long-term reduction in market share rather than just "temporary inventory destocking." This belated realization cast a cloud over the Company's management, eviscerated the claim that the Company had successfully pivoted away from an acquisition-driven growth strategy, and led the market to understand once and for all that the fiscal 2016 EPS target, which Defendants had continued to affirm just one month earlier, was not obtainable and would need to be revised downward. The market reacted harshly. On this news, Precision's stock price declined by nearly 10 percent, from a prior close of $219.72 per share to $199.63 per share at close on January 16, 2015.

221. Numerous analysts immediately recognized that this decline in PCC's stock price was (or would be) triggered by its January 15, 2016 disclosures, and they began questioning the credibility of PCC's management and their excuse that destocking at Rolls-Royce was the key reason for PCC's disappointing performance and lagging organic growth. For example, JP Morgan analysts published a report, dated January 16, 2015, in which they predicted that PCC's disclosure would cause a decline in its stock price, and expressed doubt and concern over PCC's destocking excuse, writing:

> **PCP pre-announced a Q3 miss.** ***We expect the stock to trade off as the miss exacerbates ongoing concerns about organic growth and should pressure estimates.*** Management cited oil and gas as a driver but only as one among several, indicating earnings would have missed even if oil and gas had performed as expected.
>
> * * *
>
> Weak oil and gas sales are the first reason management offered for the miss and there may be a lot of focus on this item, given oil's place in the headlines. However, the oil/gas and other category was only 6% of sales last year and a significant chunk was minimally profitable work on large contracts with Aramco and Adnoc that are in the process of winding down anyway. Overall, oil and gas was therefore expected to be only perhaps a ~2% proportion of EBIT vs this 8% miss relative to our estimate. ***The other causes cited for the preannouncement are more familiar, and include one customer's multi-year destocking effort,*** broader customer inventory management around calendar year-end, and unscheduled equipment downtime, ***all of which have been reasons for organic growth shortfalls the past 2-3 years*****.**
>
> * * *
>
> **Organic growth has been a persistent problem.** ***Disappointing organic growth has been the key issue behind EPS missing consensus now in eight of the past 11 quarters.*** There are a number of reasons why organic growth has not matched the level that PCP's end-market exposures imply, but ***we have had trouble understanding the full extent of the shortfall, and this miss should increase concerns about whether there is a larger problem – we have wondered about share loss, but management insists this is not the case – and stoke further doubts about the company's ability to grow consistently.***

* * *

> **Miss could pressure estimates further.** Some of the issues weighing on Q3, such as destocking, inventory positioning, and equipment outages, could be considered temporary in a vacuum. However, PCP has rarely recovered fully from past growth shortfalls, even those deemed temporary, and so we expect estimates to come under pressure.

222. A January 16, 2015 Credit Suisse analyst report, bearing the headline "So Much for Visibility," expressed similar skepticism regarding the Company's destocking excuse, predicted that PCC's announcement indicated it would not achieve even the low end of its EPS guidance range and would cause its stock price to decline, and attributed the disappointing performance to a loss of market share:

> ***No sooner was the paint dry on our 2015 Outlook where we and our buyside respondents both selected PCP as our preferred commercial OE overweight, did the company issue its first formal profit warning in… forever*** [ellipsis in original]. While it is not wholly unreasonable to be experiencing weakness in its oil and gas markets, there's more to this than that. First, we did not expect the O&G impact so soon, given fairly recent commentary from management in early December that these businesses were in a reasonably good state.
>
> ***Another surprise is continued destocking (the absence of ordering) from a single aero engine customer (likely Rolls) that was supposed to be improving (coming to an end during FQ4 and abating entirely by FQ1), another point that was reaffirmed at our conference. Based on yesterday's announcement, it's clear to us that is not the case, and we still wonder if there is some share loss here.***
>
> **Not Just About Messaging Anymore:** While the magnitude of the profit warning is not huge vs. consensus (4.5% below Street sales to $2.42-2.47B, and 9% below Street EPS of $3.39, at $3.05-$3.10) – note we only measure against consensus because the company does not guide quarterly – ***this name is already suffering from visibility/timing issues. Investors were already struggling with PCP's earnings reliability over the past several quarters, so last night's news may be the last straw on the proverbial back of the camel for some. They might now conclude that this management team, which claims to have fairly good visibility, if not a keen sense of timing, is really dealing with a shorter cycle business that we thought.***

> ***Thus, we expect shares to take a meaningful leg down today, likely a percentage similar to the 9% EPS shortfall***, and it may be difficult for a while for shares to catch a sustainable bid, not because the miss is so large (it really isn't), but because 1) there will be fear it can happen again, and 2) when annualizing the quarterly miss, one is challenged to achieve the low end of next year's guidance range of $15.50-$16.50.

223. Robert Stallard of RBC Capital Markets similarly wrote on January 16, 2015:

> PCP's share price was already feeling market pressure thanks to its oil & gas exposure (~$200m of sales, ~6% of the group), and so cuts here are not a huge surprise – even if they have come quicker than perhaps expected. ***What we see of more importance is the continued destocking and inventory issues from aerospace customers. Our caution over this issue led to our downgrade in October – and we remain concerned that this will remain an issue until we get closer to the volume ramp on the LEAP X and GTF, helped by rate step ups on the 787 and A350***. This should come in 2H15, but the timing is difficult to predict. ***PCP management has arguably been too optimistic on this issue given the actions of its customers in the past, notably at the same point last year***.

224. Analysts further concluded that this long-term decline in demand had rendered the Company's 2016 EPS target unattainable. A Canaccord analyst noted that: "***We believe these issues also will impact the prior $16.00 in EPS in fiscal 2016 guidance*** the company had provided, creating an additional overhang." Similarly, Cowen & Company issued a report on January 16, which reduced the price target for Precision from $270 to $219.72, stating: "On the 1/22 earnings call, we expect PCP to ***quantitatively reset***, or at a minimum, ***qualitatively talk down*** its F16 EPS target of $15.50-$16.50 before cash deployment." A Deutsche Bank analyst report issued the same day titled "3Q pre-announcement continues the confidence erosion" noted that Precision's 2016 targets "seem ***even less*** achievable to us than they did previously," and reduced the bank's price target for Precision from $240 to $219.72

225. On January 20, 2015, JP Morgan issued a report disclosing that it was lowering its estimates following PCC's third-quarter pre-announcement in large part due to the impact of, and

uncertainties surrounding, continued weak sales to Rolls-Royce. More specifically, JP Morgan reported:

> ***Weak sales to one key customer continue to plague PCP. The lower than anticipated sales to a single customer widely believed to be Rolls-Royce was an issue yet again this quarter, and PCP continues to classify it as destocking. After speaking with the company, we believe that sales to RR declined sequentially and may have declined more y/y than they did last quarter. This issue has been persistent and management forecasts that it will recede have been premature.*** PCP insists it is not losing share, as it has LTAs that stipulate market share on specific part numbers, but ***we wonder if perhaps RR is fulfilling its commitments in a way that has led to share transfer from PCP to Firth Rixson/Alcoa*** over the course of the LTAs and as Firth's new Georgia plant has expanded its operations. ***In any case, this issue should remain an overhang for Forged Products until we actually see the situation improve or better understand what is happening.***

226. On January 22, 2015, Precision issued a press release announcing its third-quarter fiscal 2015 results and held a conference call regarding those results. During the call, Donegan confirmed what the market predicted following PCC's January 15, 2015 press release. Namely, that the impact from the destocking "was not a small number"—between $40 and $50 million, and that "FY16 results will be below previously stated EPS targets of $15.50 to $16.50." During PCC's January 22, 2015 earnings call, analysts attempted to obtain clarity on the destocking issue, PCC's lagging organic growth, and its repeated target misses.

227. For example, after an RBC Capital Markets analyst asked for Donegan's latest view on how long destocking will go on for, Donegan now disclosed he "would be hesitant to tell you it is at the end."

228. Further, a Deutsche Bank analyst, who noted "obviously the last targets didn't go so well from your own perspective," asked: "How do you approach giving guidance that is actually hittable? How do you change the way you externally communicate the business so that

there's true alignment of expectations?" Dongean and PCC's Vice President of Investor Relations, Jay Khetani, responded by conceding that mistakes were made, indicating PCC's prior targets lacked a reasonable basis, and effectively admitting that PCC's prior statements regarding its outlook and the impact of destocking, alleged above, were materially false and misleading. For example, Donegan explained:

> I think then we go back to what we did. The original goal two years ago basically, at this point in time, was to just provide a thought process based on where we saw the market at that point in time of what we thought the values business would be. It was certainly a long horizon. ***I think number one, the first mistake was looking out at the time three years to say what we think this business can do. There's a lot of dynamics that can change. Number one, certainly it [our guidance going forward] will not be looking out that far.*** We will target and we will go after a year.
>
> * * *
>
> ***[Going forward,] we will provide what assumptions*** – so we will have to make some assumptions on things like oil and gas. ***I think that we will clarify as we communicate to you where we think some of that volatility may exist in terms of those assumptions. It will then be incumbent on us to either validate that our assumptions were right – they were better or worse***.
>
> ***I think that this whole – our whole mindset will now be clear to what is more solid against where is the risk in confirming where that risk is, or what assumptions we're making. N***ow we're confirming on a three-month snapshot how's that year going to play out. I think that we'll be able to give a -- it's totally different dynamics, I think, from the standpoint.

229. Khetani followed up on Donegan's statement by conceding PCC failed to provide, and investors thus lacked, sufficient insight into PCC's prior forecast for fiscal 2016, and PCC made no changes to its forecast/target to account known for changes in circumstances that rendered the target misleading during the Class Period. Khetani explained:

> [The guidance/target that will be provided going forward will be] a one-year time frame with a set of sensitivities and assumptions stated, which ***you didn't have insight into our original FY16 discussion***. ***We also went two years without***

> ***updating, so things changed during that time frame.*** Clearly, as we talk each quarter to you going forward, we will essentially update for changes that occur there. I think the entire structure of what we're doing going forward will look nothing like how we've handled it in the past."

230. The Deutsche Bank analyst, apparently not satisfied by Donegan's and Khetani's explanations, commented that "[s]ix months ago the targets were still reiterated and still confident. They were stated two years ago, but they were still reiterated within the last six months." This prompted Donegan to take responsibility for not providing sufficient information to the market in prior quarters, explaining:

> ***[A]t the end of the day, I got nobody to look at but myself.*** Let there be no mistake that as we have thought this thing through, all of your questions have been fired at me by the group here, as well as looking at myself in the mirror. Number one, I understand the need clearly. ***I accept the responsibility wholeheartedly. We will make sure that there is enough information to you that you will be able to understand the dynamics, and we will be able to communicate on a quarterly basis any changes plus or down to those dynamics. I think it will be different.***

231. Following Precision's full third quarter release and earnings call on January 22, 2015, analysts noted that the financial impact of Defendants' January 22, 2015 statements confirmed facts that had been revealed to the market a week earlier, on January 16. For example, JP Morgan noted in a January 23, 2015 report that its "estimates and price target are little changed following the full Q3 release from where we set them following last week's pre-announcement," while a Deutsche Bank analyst report issued on January 23, 2015 similarly noted that "[g]iven PCP's pre-announcement last week, the bad news was out" and the earnings call concerned the Company's "communication" and "predictability (or lack thereof) of their biz."

232. Nevertheless, analysts continued to question, and express concern over, PCC's attempt to blame earnings misses and slow organic growth on destocking at Rolls-Royce. For example, JP Morgan wrote on January 23, 2015 that "Destocking remains difficult to understand," adding:

> ***Management continues to characterize lower sales to one particular aero engine customer, widely believed to be Rolls-Royce, as destocking, and this remains a significant headwind even after two years.*** The latest shift downward came during last quarter and management has indicated that there are incremental sequential headwinds in Q4 and the schedule for calendar 2015 was recently lowered, ***so this issue should persist well into a third year.*** Management remains adamant that PCP is not losing share, citing that declines on parts where they are clearly the sole source are consistent with those where there is competition. This may be the case but ***we have a hard time getting past the fact that the competitive landscape looks tougher and there are many other datapoints that strongly suggest that Rolls is directing business elsewhere. Regardless of the cause, understanding when sales to Rolls will stabilize is important for estimates***. In May, management plans to reveal the degree to which this issue has kept the company from reaching its FY16 EPS target and it indicated that the magnitude of the impact would be surprising.

233. Headwinds from Rolls-Royce's inventory reduction/realignment continued to negatively impact PCC's results and organic growth in the quarters that followed—further confirmation that during the Class Period, Precision was experiencing a permanent decline in demand, market share loss, and inability to drive growth by pulling in Rolls-Royce sales. For example, PCC disclosed that Rolls-Royce destocking negatively impacted aerospace sales and organic growth in the quarters ended March 31, 2015 and June 30, 2015.

## IX. <u>LOSS CAUSATION</u>

234. During the Class Period, as detailed herein, Defendants engaged in a scheme and wrongful course of business that artificially inflated the price of PCC's securities by making false and misleading statements, and omitting material information, about the Company's

operations, financial results and business prospects. These material false statements and omissions concealed numerous material facts from investors, including but not limited to the fact that (i) Precision's disappointing financial results during the Class Period were being caused by a ***permanent*** decline in demand resulting, in part, from at least one key customer's (Rolls-Royce's) inventory reduction initiatives, which prevented PCC from engaging in the undisclosed, unsustainable and short-sighted practice of pulling in sales to its aerospace customers by inducing them to take on more inventory than they required, and (ii) Precision depended on its ability to continually engage in this practice in order to achieve organic growth and its fiscal 2016 EPS target of $15.50 to $16.50. In addition, Defendants' false statements and omissions concealed from the market risks known or foreseeable to Defendants, including the risk that Rolls-Royce's inventory initiative would have an indefinite, if not permanent, impact on Precision's ability to generate revenue by pulling in Rolls-Royce sales, result in disappointing financial results, and prevent it from reaching its fiscal 2016 EPS target. As a result of Defendants' material misstatements and omissions, the price of Precision securities was artificially inflated during the Class Period.

235. As alleged herein, the artificial inflation in the price of PCC securities dissipated on July 24, 2014, October 23, 2014, and January 15-16, 2016, as Defendants' false and misleading statements and omissions became apparent to the market, and the price of PCC securities fell. As a result of their acquisitions of PCC securities at artificially inflated prices during the Class Period, plaintiffs and other members of the Class suffered economic loss.

236. The declines in the price of PCC stock pled herein were a direct result of the nature, extent and impact of Defendants' prior false and misleading statements and omissions

being revealed to investors and the market. The timing and magnitude of the price declines of PCC securities negates any inference that the loss suffered by plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific factors unrelated to Defendants' wrongful conduct.

237. The economic loss suffered by plaintiffs and other members of the Class was a direct result of Defendants' wrongful conduct, which inflated the prices of PCC common stock and resulted in the subsequent decline in the value of PCC common stock when Defendants' prior false and misleading statements and omissions were revealed.

## X. PRESUMPTION OF RELIANCE

238. At all relevant times, the market for Precision's securities was efficient for the following reasons, among others:

(a) Precision's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Precision filed periodic reports with the SEC and NYSE;

(c) Precision regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Precision was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales

force and certain customers. Each of these reports was publicly available and entered the public market place.

239. As a result of the foregoing, the market for Precision stock reasonably promptly digested current information regarding Precision from all publicly available sources and reflected such information in Precision's stock price. Under these circumstances, all purchasers of Precision securities during the Class Period suffered similar injury through their purchase of Precision securities at artificially inflated prices, and a presumption of reliance applies.

240. Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

241. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

242. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding the Company's organic growth and the cause of the Company's poor earnings results throughout the Class Period, which the Company attributed to temporary inventory destocking when, in reality, Precision actually suffered decreased demand for its products. Given the then-existing facts

contradicting Defendants' statements, any generalized risk disclosures made by Precision were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

243. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Precision who knew that those statements were false when made.

244. Specifically, to the extent Defendants' statements that the Company's organic growth was strong are characterized as forward-looking statements, the statutory safe harbor does not apply because Defendants Donegan and Hagel knew that the Company's growth was not sustainable. Indeed, as set forth above in detail, Defendants Donegan and Hagel knew that the Company's sales targets were achieved not because of strong organic demand for its products, but because Precision had been "pulling in" sales by persuading customers to purchase more product than those customers needed at the time.

245. Moreover, to the extent Defendant's statements that temporary destocking at Rolls-Royce was impacting the Company's sales are characterized as forward looking statements, the statutory safe harbor does not apply because Defendants Donegan and Hagel knew that the true cause of the Company's disappointing financial results was a permanent loss of demand for Precision's products and the inability to continue pulling in sales. Indeed, confidential witnesses confirm that Precision was actually suffering weakened demand for its

products, and that Defendants simply used the term "destocking" as a catchall for general "softness" it was seeing in demand and the inability to pull in sales.

## XII. CLASS ACTION ALLEGATIONS

246. Lead Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the securities of Precision between May 9, 2013 and January 15, 2015, inclusive (the "Class"), and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of Precision at all relevant times, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, and any entity in which Defendants or their immediate families have or had a controlling interest. For the avoidance of doubt, "affiliates" are persons or entities that directly, or indirectly through one or more intermediaries, control, are controlled by or are under common control with one of the Defendants, and include any employee benefit plan organized for the benefit of Precision's employees.

247. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Precision shares were actively traded on NYSE. As of May 19, 2015, Precision had 132,228,926 shares of common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds-of-thousands of members of the proposed Class. Class members who purchased Precision securities may be identified from records maintained by Precision or its transfer

agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

248. Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

249. Lead Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

250. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts;

(c) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether Defendants acted with scienter; and

(e) the proper way to measure damages.

251. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the

burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## XIII. CAUSES OF ACTION

### COUNT I
### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5 PROMULGATED THEREUNDER
### (Against Defendants Precision, Donegan, and Hagel)

252. Lead Plaintiffs repeat and re-allege every allegation set forth above as if fully set herein.

253. This Count is asserted on behalf of all members of the Class against Defendants Precision, Donegan, and Hagel for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

254. During the Class Period, Defendants disseminated or approved the false statements specified herein, among others, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

255. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Precision securities during the

Class Period. As detailed herein, the misrepresentations contained in, or the material facts omitted from, those statements included, but were not limited to the following:

(a) PCC, in order to meet its internal quarterly sales goals, had been engaging in the unsustainable practice of pulling in sales to its aerospace customers, such as Rolls-Royce, inducing them to take on more inventory than they required or that was necessitated by current and/or forecasted aircraft build rates;

(b) PCC's forecasts and outlook, including its ability to grow organically and meet its fiscal 2016 EPS target (*i.e.*, $15.50 to $16.50 of EPS by fiscal 2016), were contingent on the Company's continued ability to use these undisclosed, aggressive pull in sales practices, particularly in dealings with at least one of its key customers, *i.e.*, Rolls-Royce;

(c) PCC, at least partly due to the practice mentioned in (a), already was experiencing the permanent negative impact of at least one key aerospace customer's—Rolls-Royce's—inventory reduction initiatives, foreclosing PCC from relying on pull in sales to Rolls-Royce to meet its targets; and, rather than being a short-term issue, the inventory reduction or rationalization initiatives announced by at least one of PCC's key customers—Rolls-Royce—was having a long-term negative impact on PCC's demand by foreclosing PCC from relying on pull in sales to Rolls-Royce to achieve organic growth and meet the 2016 EPS targets it continually re-affirmed;

(d) The market-based forecasts and outlook that Precision touted to the market during the Class Period were materially misleading, in that they failed to account for the fact that undisclosed Company practices to boost quarter-end sales, such as pulling in, meant that these metrics did not reflect what the Company would actually be able to sell in upcoming quarters;

(e) Rolls-Royce's inventory reduction or rationalization initiatives, or purported destocking, was negatively impacting, and would continue to curtail, the organic growth and EPS target that Defendants assured investors would occur;

(f) The Company was already losing market share and Rolls-Royce's business to competitors, for reasons including because it was not maintaining competitive advantages that it had previously enjoyed and depended on to maintain and obtain business from its aerospace customers, and because its practice of pulling in sales was eroding its customer relationships;

(g) In light of (a)-(f), anticipated increases in aircraft build rates, such as the 787, Defendants touted as growth drivers would not translate or lead to improved performance, including organic growth, or allow PCC to meet its EPS guidance;

(h) As a result of the foregoing, the Defendants' positive statements about PCC's business, operations, and prospects, including its fiscal 2016 EPS target, lacked a reasonable basis.

256. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Precision securities, which were intended to, and did:

(a) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, the softening in demand for Precision's products; (b) artificially inflate and maintain the market price of Precision securities; and (c) cause Lead Plaintiffs and other members of the Class to purchase Precision securities at artificially inflated prices and suffer losses when the true facts became known.

257. Defendant Precision is liable for all materially false and misleading statements made during the Class Period, as alleged above.

258. Defendants Donegan and Hagel are liable for the false and misleading statements they made and for which they were responsible, as alleged above.

259. As described above, the Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Precision stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

260. The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at Precision, establish a strong inference that Defendants acted with scienter in making the materially false and misleading statements set forth above during the Class Period.

261. Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Precision securities, which inflation was removed from their price when the true facts became known. Lead Plaintiffs and the Class would not have purchased Precision securities at the prices they paid, or at all, if they

had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

262. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their purchases of Precision securities during the Class Period.

**COUNT II**
**FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT**
**(Against Defendants Donegan and Hagel)**

263. Lead Plaintiffs repeat and re-allege every allegation set forth above as if fully set herein.

264. This Count is asserted on behalf of all members of the Class against each of the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

265. During their tenures as officers and/or directors of Precision, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of Precision, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Precision during the Class Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

266. In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Donegan and Hagel had direct involvement in the day-to-day

operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions. Defendants Donegan and Hagel signed the Company's SEC filings during the Class Period, and were directly involved in providing false information and certifying and/or approving the false statements disseminated by Precision during the Class Period. As a result of the foregoing, Defendants Donegan and Hagel, as a group and individually, were controlling persons of Precision within the meaning of Section 20(a) of the Exchange Act.

267. As set forth above, Precision violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of Precision and as a result of their own aforementioned conduct, Defendants Donegan and Hagel are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Precision securities. Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of Precision, each of these Defendants was culpable for the material misstatements and omissions made by Precision, including such misstatements as the Company's false financial statements, as set forth above.

268. As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Precision securities.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray relief and judgment as follows:

(a) Declaring the action to be a proper class action pursuant to Fed. R. Civ. P. 23;

(b) Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d) Awarding such equitable, injunctive, and other relief as the Court may deem just and proper.

## XV. JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

DATED this 26th day of September, 2016.

Respectfully submitted,
GARVEY SCHUBERT BARER

By */s Robert C. Weaver, Jr.*
Robert C. Weaver, Jr., OSB # 801350
E-Mail: rweaver@gsblaw.com
Paul H. Trinchero, OSB #014397
E-Mail: ptrinchero@gsblaw.com
GARVEY SCHUBERT BARER
121 SW Morrison Street
Eleventh Floor
Portland, Oregon 97204-3141
Telephone: (503) 228-3939
Facsimile: (503) 226-0259

*Liaison Counsel for the Class*

KESSLER TOPAZ MELTZER & CHECK LLP

Darren J. Check (*pro hac vice*)
E-Mail: dcheck@ktmc.com
Gregory M. Castaldo (*pro hac vice*)
E-Mail: gcastaldo@ktmc.com
Richard A. Russo, Jr. (*pro hac vice*)
E-Mail: rrusso@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7056
Facsimile: (610) 667-7056

LABATON SUCHAROW LLP
Joel H. Bernstein (*pro hac vice*)
E-mail: jbernstein@labaton.com
Michael Stocker (*pro hac vice*)
E-Mail: mstocker@labaton.com
Marisa N. DeMato (*pro hac vice* to be submitted)
E-Mail: MDeMato@labaton.com
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Co-Lead Counsel for Lead Plaintiffs and the Class*

**CERTIFICATE OF SERVICE**

I, Robert C. Weaver, Jr., hereby certify that the Amended Class Action Complaint for Violation of the Federal Securities Laws was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

DATED this 26th day of September, 2016.

*s/ Robert C. Weaver, Jr*___________
Robert C. Weaver, Jr., OSB #801350

GSB:8077613.1