IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KEVIN MURPHY, Individually and On
Behalf of All Others Similarly Situated,

              Plaintiffs,

       v.

PRECISION CASTPARTS CORPORTION,
MARK DONEGAN, and SHAWN R.
HAGEL,

              Defendants.

Case No. 3:16-cv-00521-SB

**FINDINGS AND
RECOMMENDATION**

**BECKERMAN, Magistrate Judge.**

      AMF Pensionsförsäkring AB and the Oklahoma Firefighters Pension and Retirement

System (hereinafter "Plaintiffs") filed an "Amended Class Action Complaint for Violation of the

Federal Securities Laws" on behalf of all persons or entities who purchased or otherwise

acquired the publicly traded securities of Precision Castparts Corporation ("PCC") between May

9, 2013 and January 15, 2015, seeking to pursue remedies under the Securities Exchange Act of

1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995

("PSLRA"). Specifically, Plaintiffs brought this action against PCC, a manufacturer of complex

metal components, Mark Donegan ("Donegan"), the Chairman and Chief Executive Officer

PAGE 1 – FINDINGS AND RECOMMENDATION

("CEO") of PCC, and Shawn Hagel ("Hagel"), the Executive Vice President and Chief Financial

Officer ("CFO") of PCC (collectively, "Defendants"), alleging violations of sections 10(b) and

20(a) of the Exchange Act and Securities and Exchange Commission ("SEC") Rule 10b-5

promulgated thereunder.

Defendants filed a motion to dismiss pursuant to Rules 9(b) and 12(b)(6) of the Federal

Rules of Civil Procedure ("FRCP"), and the PSLRA, on the grounds that Plaintiffs failed to

plead falsity with particularity, failed to allege facts that give rise to a "strong inference" of

scienter, and failed adequately to plead loss causation. (Defs.' Mot. Dismiss 1-3.) For the reasons

that follow, the district judge should deny Defendants' motion to dismiss.

## BACKGROUND

Between May 9, 2013 and January 15, 2015 (the "Class Period"), PCC was a publicly traded

company that manufactured metal components for industrial and aerospace customers in three

principal business segments: (1) investment cast products, (2) forged products, and (3) airframe

products. (Am. Compl. ¶¶ 27-28.) Defendant Donegan has been the CEO of PCC since 2002 and the

Chairman since 2003. Defendant Hagel started with PCC in 1997, was promoted to CFO in 2008,

and has served as Executive Vice President since 2012. (Defs.' Mot. Dismiss 3.)

Since its founding in 1953, PCC "grew to become the market leader in manufacturing

large, complex structural investment castings, airfoil castings, forged components, aero

structures and highly engineered, critical fasteners for general and industrial customers." (Am.

Compl. ¶ 32.) PCC employed an aggressive acquisition strategy to become "a dominant player in

the aerospace market." (Am. Compl. ¶ 34.) Between 2009 and 2012, PCC acquired more than

fifteen different companies, and these acquisitions contributed to a large increase in profits and

growth. (Am. Compl. ¶ 34.) As an example, between fiscal year 2010 and fiscal year 2013, PCC

increased its net income from $922 million to $1.429 billion, an almost sixty-five percent increase. (Am. Compl. ¶ 34.)

Seventy percent of PCC's overall sales is derived from aerospace customers such as General Electric Corporation ("GE"), The Boeing Company ("Boeing"), Airbus SAS ("Airbus"), Pratt & Whitney, and Rolls-Royce. (Am. Compl. ¶ 32.) In its filings with the SEC, PCC discloses that Rolls-Royce is one of its "key customers." (Am. Compl. ¶ 33.) PCC supplies Rolls-Royce with components for Rolls-Royce's Trent 1000 turbofan engine, which powers the Boeing 787 Dreamliner, and the Trent XWB, which powers the Airbus A350 XWB. (Am. Compl. ¶ 33.)

In January 2013, PCC "took the unusual step of providing investors with a concrete earnings target that reflected an expected three-year increase in earnings per share ("EPS") of nearly 100%." (Am. Compl. ¶ 2.) Specifically, PCC announced to its investors that PCC would increase its annual EPS of $15.50 to $16.50 by fiscal year 2016, solely through sustainable growth, *i.e.*, growth without acquiring new companies. (Am. Compl. ¶¶ 36-37.) Defendant Donegan assured investors that he knew precisely the level of sales necessary to reach the target, stating that the sales "number [that] gets me to my [20]16 [EPS target] is stuck on people's foreheads." (Am. Compl. ¶¶ 37, 73.)

In an effort to achieve its 2016 EPS, PCC worked aggressively to "pull in" future sales, by persuading customers to accept early delivery of product that would ordinarily ship in a future quarter. (Am. Compl. ¶ 43.) This strategy allowed PCC to report higher sales and meet earnings targets in the current quarter, but these immediate higher sales came at the expense of future sales. (Am. Compl. ¶¶ 43-44.) In support of their allegations that PCC was in the practice of

aggressively pulling in sales during the Class Period, Plaintiffs rely on statements from several

confidential witnesses ("CW"):

- CW1 explained that the slowdown in acquisitions in 2013 led to the company-wide practice of pulling in sales to meet quarterly targets. (Am. Compl. ¶ 47.)

- CW2 confirmed that PCC convinced customers, including Rolls-Royce, to accept early delivery of product to meet quarterly numbers. The expectation was that employees would do whatever was necessary to meet quarterly goals, including focusing all efforts to pull in sales during the last three weeks of each quarter. (Am. Compl. ¶ 51.)

- CW3 stated that PCC's "ship at all costs" philosophy was so entrenched that during the Class Period PCC manufactured product based on its own internal sales projections rather than in response to customer demand. (Am. Compl. ¶ 52.)

Plaintiffs allege that Defendant Donegan was the driving force behind PCC's practice of

"charging the cliff," *i.e.*, pushing to meet PCC's internal goals. (Am. Compl. ¶ 42.) Specifically,

CW3 stated that Defendant Donegan "very heavily led" the command to ship product ahead of

demand. (Am. Compl. ¶ 52.) CW1 stated that Defendant Donegan's ultimate goal was to meet

quarterly forecasts at any cost and he created a culture of fear through which he pressured

employees to charge the cliff by shipping extra product to customers. (Am. Compl. ¶¶ 48, 117;

*see also* ¶ 49 (*Bloomberg* article stated that every quarter, Defendant Donegan received "the

same set of 26 charts" from each plant "that highlighted things like productivity, earnings,

market share and fixed costs per employee"); ¶ 73 (Defendant Donegan stated that the sales

"number [that] gets me to my [20]16" EPS target was "stuck on people's foreheads"); ¶ 119

(Defendant Donegan stated that he "look[s] at [PCC's] market shares across all assets").)

Plaintiffs allege that PCC's practice of pulling in sales did not generate sustainable

growth during the Class Period and subjected PCC to numerous risks that were not disclosed to

investors. (Am. Compl. ¶ 44.) Instead, PCC's practice of pulling future sales into the current

quarter resulted in a "hole" in its future targets and required PCC to pull in "progressively higher

numbers." (Am. Compl. ¶ 44.) Additionally, PCC would use discounts and extend payment options to encourage customers to accept early delivery of product. The impact of these favorable terms for the customers was to reduce PCC's margins and overall profitability. (Am. Compl. ¶ 45.) PCC's quarterly pulling in practice also depended on its ability to persuade customers to stock larger amounts of inventory. (Am. Compl. ¶ 46.)

In June 2013, the president of Aerospace at Rolls-Royce – alleged to be one of PCC's largest and most important customers – announced a plan to improve the profitability of Rolls-Royce's passenger jet-engine business. (Am. Compl. ¶ 63.) One component of Rolls-Royce's plan to improve profitability was an inventory policy change that would cut its inventory in half. (Am. Compl. ¶ 64.) Rolls-Royce's shift to a "lean management" approach to inventory had a direct impact on PCC's ability to achieve sales targets because Rolls-Royce would no longer accept product beyond its current needs. (Am. Compl. ¶¶ 66-67.) According to Plaintiffs, Rolls-Royce's reduction of its inventory levels to conform to its new lean inventory policy had a permanent downturn on PCC's sales to Rolls-Royce because PCC could no longer pull in sales from Rolls-Royce. (Am. Compl. ¶ 67.) Investors were unaware of PCC's reliance on pull-in sales to meet its quarterly figures and, as such, could not fully understand the long-term consequences of this inventory policy change. (Am. Compl. ¶ 68.)

Plaintiffs allege that PCC "falsely" represented that the impact of Rolls-Royce's new inventory policy would be "temporary" and would not result in any long-term decline in demand. (Am. Compl. ¶ 68; *see also* ¶ 142 (alleging that on July 25, 2013, Defendant Donegan assured investors that even though PCC was being impacted by "some modest destocking" resulting from "an inventory realignment" by some customers, "the demand is there, the contracts are there, the schedules are there"); ¶ 144 (alleging that Defendant Donegan affirmed that PCC was

on track to meet its 2016 EPS guidance, stating that "we're pretty much on that drum beat" to achieve the "low double-digits or even mid-teens" growth necessary to achieve the 2016 EPS target).)

Throughout the Class Period, Defendant Donegan never acknowledged that long-term demand for PCC's products was declining. Instead, he continued to describe this permanent impairment to PCC's profitability as a "temporary" phenomenon resulting from "destocking" by customers such as Rolls-Royce. (Am Compl. ¶ 152 ("[W]e have long-term contracts that are in play that basically guide and direct our market share, our pricing . . . . they are just doing a temporary destocking . . . . Q4, Q1, . . . destocking goes away and comes back to the normal rates.").) Donegan continued to assure investors that PCC was on track to meet its fiscal year 2016 earnings target, and that destocking would not impact PCC's ability to reach its target. (Am. Compl. ¶ 158 ("So we have a line. If I go from where we were and blow my way out to that 2016 timeframe, I get a line. So we hover around that line."); ¶ 184 ("In terms of the . . . targets . . . I think what I would say is that we obviously feel very, very, very solid about kind of what's out there."); ¶ 168 (stating that PCC could simply "pull the other levers" to make up for any destocking headwinds); ¶ 174 (stating that PCC's poor earnings were the result of a "temporary destocking" issue that "has an end to it").)

On May 1, 2014, Universal Stainless & Alloy Products, a principal PCC competitor, declared that "destocking ha[d] largely ended," and that "customers [were] buying to their needs." (Am. Compl. ¶ 88.) Later that week, PCC announced positive earnings results, and analysts thought that destocking had finally "abated in this segment." (Am. Compl. ¶ 89.) In spite of the news that destocking had mostly ended, on July 24, 2014, PCC disclosed earnings results that fell short of analyst expectations. Defendant Donegan attributed the earnings shortfall

PAGE 6 – FINDINGS AND RECOMMENDATION

to continued destocking at Rolls-Royce and continued to refer to the issue as "temporary," but acknowledged that "we have been talking about [destocking] for a long time." (Am. Compl. ¶¶ 69, 208; *see also* ¶ 93 ("we . . . definitely see [destocking] coming to an end").) The market reaction to the news of PCC's earnings falling below expectations was a 5.5% decline in its stock price "from $250.03 at prior close to close on July 24, 2014 at $236.21 per share." (Am. Compl. ¶ 191.)

Defendants persisted in briefing investors that PCC's lower than expected earnings were due to "destocking coming out of Rolls" and that "we do definitely see that coming to an end" in the short term. (Am. Compl. ¶ 194; *see also* ¶ 193 ("[W]e now have a clear line of sight to the steady growth . . . in the second half of our fiscal year" and "we now have orders in hand that will close the gap completely.").) Additionally, Defendant Donegan assured investors that the temporary earnings shortfalls would not impact the 2016 EPS target: "I want to be clear in regards to FY16 targets. I want to reaffirm the target and the framework is in place." (Am. Compl. ¶ 195.)

On October 23, 2014, PCC reported earnings for the next quarter that missed consensus estimates. Market analysts expressed concern "over [PCC's] disappointing second quarter financial results." (Am. Compl. ¶ 204 (Wells Fargo stated that PCC's "long-awaited above-market organic growth story now appears to be 1-2 quarters away." Morningstar stated that based on "prior annual projections . . . prior growth estimates now seem too high.").) In response, PCC's stock price fell by $2.14 a share to close at $224.06 on October 23, 2014. (Am. Compl. ¶ 97.) Defendants continued to attribute the earnings decline to "destocking primarily by a single engine customer," and reassuring investors that "customer demand has given us a clear line of sight to sustained growth." (Am. Compl. ¶¶ 203, 205-206.) Once again, Defendant

Donegan reaffirmed the 2016 EPS guidance, stating that "I want to make sure that it's clearly understood that we remain fully committed to our FY16 framework . . . . [T]here is no change to the framework we laid out." (Am. Compl. ¶ 207.)

However, on January 15, 2015, PCC pre-announced third quarter 2015 earnings results that were short of analyst expectations. Despite Defendants' continued statements that the earnings miss was a result of destocking, analysts concluded that PCC was being impacted by a sustained decline in demand rather than a "temporary inventory destocking." (Am. Compl. ¶¶ 219-220.) Plaintiffs allege that this market realization "cast a cloud over [PCC's] management, eviscerated the claim that [PCC] had successfully pivoted away from an acquisition-driven growth strategy, and led the market to understand once and for all that the fiscal 2016 EPS target . . . was not obtainable and would need to be revised downward." (Am. Compl. ¶ 220.) Following the January 15, 2015 news, PCC's stock price declined by almost 10%, "from a prior close of $219.72 per share to $199.63 per share at close on January 16, 2015." (Am. Compl. ¶ 220.)

On January 22, 2015, PCC acknowledged that "FY16 results [would] be below previously stated EPS targets of $15.50 to $16.50." (Am. Compl. ¶ 226.) Additionally, in a retreat from prior statements about his "clear line of sight" into market demand and the "temporary" nature of destocking, Defendant Donegan was reluctant to assure investors that the negative impacts of Rolls-Royce's inventory reduction were over. (Am. Compl. ¶¶ 106, 193, 206, 227.) Defendant Donegan and PCC's Vice President of Investor Relations, Jay Khetani ("Khetani"), also acknowledged to investors that PCC "went two years without updating" its 2016 EPS guidance even though "things changed during that time frame." (Am. Compl. ¶ 229; *see also* ¶¶ 228-29 (Defendant Donegan and Khetani stated that they did not provide investors

with sufficient "insight" into the assumptions underlying PCC's 2016 EPS targets, and

announced that, going forward, PCC would disclose those "sensitivities and assumptions" and

communicate to [investors] where we think some of that volatility may exist in terms of those

assumptions.").) Amid continued questions about why PCC was not more forthcoming in prior

quarters with information regarding the viability of the 2016 EPS targets, Defendant Donegan

stated: "I accept the responsibility wholeheartedly. We will make sure that there is enough

information to you that you will be able to understand the dynamics, and we will be able to

communicate on a quarterly basis any changes plus or down to those dynamics." (Am. Compl. ¶

230.)

     Plaintiffs allege that in 2014, during the Class Period, PCC's "common stock price was

artificially inflated due to the fraudulent misconduct" of Defendants. (Am. Compl. ¶ 121.) At

that time, Defendants Donegan and Hagel each profited personally by exercising lucrative stock

options. Specifically, between May 13, 2014 and May 14, 2014, Defendant Donegan exercised

options to purchase 89,752 shares of PCC common stock at a price of $101.41, for a total of

$9,101,750. Defendant Donegan immediately sold those shares at prices between $253.03 and

$254.76 per share and earned a profit of $13,757,117. (Am. Compl. ¶ 121.)

     Similarly, on May 30, 2013, Defendant Hagel exercised options to purchase 18,750

shares of PCC common stock at a price of $57.77 per share, and immediately sold that stock for

$215.47 per share, recognizing an instant profit of $2,956,875. On November 27, 2013,

Defendant Hagel again exercised options to purchase 25,000 shares at $101.41 per share, and

immediately sold those shares at $259.93 per share, recognizing an instant profit of $3,963,000.

(Am. Compl. ¶ 121.)

## PLEADING STANDARDS

Under FRCP 12(b)(6), a party may move to dismiss a complaint based on the failure to state a claim upon which relief may be granted. A FRCP 12(b)(6) motion to dismiss challenges the legal sufficiency of the claims alleged. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

A securities fraud complaint must satisfy the heightened pleading requirements of FRCP 9(b) and the PSLRA. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). Specifically, FRCP 9(b) requires a plaintiff alleging fraud to "state with particularity the circumstances constituting fraud." In addition, the PSLRA requires a plaintiff alleging securities fraud to "plead with particularity both falsity and scienter." *Zucco Partners*, 552 F.3d at 990.

With respect to falsity, the complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). To the extent an allegation is based on information and belief, "the complaint shall state with particularity all facts on which that belief is formed." *Id.* "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).

With respect to scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). That is, plaintiffs must plead with particularity the facts evidencing "the defendant's intention to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quotation and citation omitted). To satisfy the rigorous pleading standards of the PSLRA, the complaint's scienter allegations must give rise not simply to a plausible

inference of scienter, but rather to an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314.

## DISCUSSION

In Count One of the Amended Complaint, Plaintiffs allege that all Defendants violated section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.[1] (Am. Compl. ¶ 253.) Section 10(b) of the Exchange Act makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]" 15 U.S.C. § 78j(b). SEC Rule 10b–5, promulgated under the authority of section 10(b), in turn, provides:

> It shall be unlawful for any person . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. The elements of a Rule 10b-5 claim are: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Defendants argue that Plaintiffs' Rule 10b-5 and section 10(b) claims fail

---

[1] In Count Two of the Amended Complaint, Plaintiffs allege that the individual defendants violated section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). (Am. Compl. ¶ 264.) Section 20(a) provides for liability of a "controlling person." 15 U.S.C. § 78t(a). To establish a cause of action under this provision, a plaintiff must first prove a primary violation of underlying federal securities laws, such as section 10(b) or Rule 10b-5, and then show that defendant exercised actual power over the primary violator. *Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1065 (9th Cir. 2000). Defendants do not challenge Plaintiffs' allegations that Defendants Donegan and Hagel are controlling persons. (Am. Compl. ¶ 265.) Accordingly, the Court's analysis focuses on the sufficiency of Plaintiffs' allegations under section 10(b) and Rule 10b-5.

because Plaintiffs do not adequately plead (1) "why each alleged misrepresentation is false or misleading[,]" (2) scienter, or (3) loss causation. (Defs.' Mot. Dismiss 1-3.) The Court addresses each of these arguments in turn.

## I.    PLEADING FALSITY WITH PARTICULARITY

To assert a claim under the PSLRA, a plaintiff must plead falsity with particularity. *Zucco Partners*, 552 F.3d at 990-91. "The PSLRA has exacting requirements for pleading 'falsity.'" *Metzler Inv.*, 540 F.3d at 1070. To satisfy these "exacting requirements," a plaintiff must plead "specific facts indicating why" the statements at issue were false. *Id.; Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) ("Plaintiffs' complaint was required to allege specific facts that show" how statements were false); *see also* In re Stratosphere Corp. Sec. Litig., No. CV-S-96-708-PMP, 1997 WL 581032, at *13 (D. Nev. May 20, 1997) (to plead falsity, plaintiff must include "evidentiary facts contemporary to the alleged false or misleading statements from which this court can make inferences permissible under Rule 9(b)"). Furthermore, to be actionable, a statement must be false "at [the] time by the people who made them." *Ronconi*, 253 F.3d at 430. "The fact that [a] prediction proves to be wrong in hindsight does not render the statement untrue when made." *In re VeriFone Sec. Litig.*, 11 F.3d 865, 871 (9th Cir. 1993). Mere "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92-93 (2d Cir. 2010). It is "clearly insufficient for plaintiffs to say that [a] later, sobering revelation[ ] make[s][an] earlier, cheerier statement a falsehood." *Yourish v. Cal. Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999) (alterations in original).

///

///

PAGE 12 – FINDINGS AND RECOMMENDATION

A.      **Puzzle Pleading**

Before considering whether Plaintiffs' Amended Complaint satisfies the requirement to plead falsity with particularity, the Court will address Defendants' threshold argument that the Amended Complaint fails because of the style in which Plaintiffs plead the allegations. (Defs.' Mot. Dismiss 13-14.) Relying on the decision in *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1075 (N.D. Cal. 2001), Defendants argue that the PSLRA and FRCP 9(a) require plaintiffs to "craft a complaint in such a way that a reader can, without undue effort divine precisely which statements (or portions of statements) are alleged to be false or misleading, and the reason or reasons why each statement is false or misleading." (Defs.' Mot. Dismiss 13 (quoting *Splash Tech.*).) According to Defendants, Plaintiffs' Amended Complaint is "exactly the pleading that the PSLRA specificity requirement was designed to prevent" because the reader must read lengthy passages and page back and forth to determine which statements are alleged to be false or misleading. (Defs.' Mot. Dismiss 14.)

Plaintiffs respond that each misstatement includes a narrative to explain the false or misleading portions, as well as bold and italicized font to identify "the actionable portions of each quote." (Pls.' Opp. 24.) In addition, Plaintiffs contend that the misstatements include a narrative to explain why a particular statement was false or misleading when it was made, and citations to the relevant paragraphs containing the statements. (Pls.' Opp. 24-25.) Plaintiffs argue that the "lengthy quotations" are necessary to satisfy the PSLRA's pleading standard and to provide context. (Pls.' Opp. 25.) Finally, Plaintiffs maintain that the Amended Complaint satisfies the pleading requirements because Defendants are clearly able to challenge the alleged misstatements and omissions as evidenced by their motion to dismiss. (Pls.' Opp. 25-26.)

Plaintiffs bear the burden of identifying misleading statements and including particular facts to establish that each statement was false or misleading at the time it was made.

*Glenfed, Inc. Sec. Litig.,* 42 F.3d 1541, 1553-54 (9th Cir. 1995) ("A complaint is not a puzzle . . . and we are loathe to allow plaintiffs to tax defendants, against whom they have leveled very serious charges, with the burden of solving puzzles in addition to the burden of formulating an answer to their complaint."). Puzzle pleading shifts responsibility to defendants and the court to match alleged misleading statements with reasons for the falsity. *See Primo v. Pac. Biosciences of California, Inc.*, 940 F. Supp. 2d 1105, 1111-12 (N.D. Cal. 2013) ("In the context of securities class action complaints, courts have repeatedly lamented plaintiffs' counsels' tendency to place 'the burden [ ] on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting Plaintiffs' claims.'"). As such, district courts find that puzzle pleadings fail "to set forth a 'short and plain' statement of their claims in violation of Rule 8(a)," to "make each allegation 'simple, concise and direct'" and to satisfy the specific pleading requirements of the PSLRA. *Primo*, 940 F. Supp. 2d at 1112.

In the Amended Complaint, Plaintiffs list the alleged misstatements and omissions in a labeled section – "VI Defendants' Materially False and Misleading Statements and Omissions." (Am. Compl. ¶ 41.) Section VI of the Amended Complaint includes separate headings for misstatements and omissions made within a particular fiscal quarter or at a particular event, along with the reasons each statement is false or misleading. Although the Amended Complaint is 125 pages long, it includes sufficiently particularized allegations such that the reader can match the alleged misstatements and omissions with Plaintiffs' explanation of why each statement is misleading. *Cf. In re Cornerstone Propane Partners, L.P.,* 355 F. Supp. 2d 1069, 1081 (N.D. Cal. 2005) (finding that puzzle pleadings "abuse the principles of Rule 8 not because they are not short" but because they are not plain). This Court is able without undue effort to divine which statements Plaintiffs allege to be false and misleading and why. Therefore, the

Amended Complaint is sufficient to put Defendants on notice of the substance of the allegations against them and allows Defendants a meaningful opportunity to respond. Accordingly, the district judge should deny Defendants' request for dismissal of the Amended Complaint on the ground that it violates the rule against impermissible puzzle pleading.

### B.    Actionable Misstatements or Omissions

Defendants contend that Plaintiffs' three categories of misstatements and omissions – that the practice of pulling in sales was not sustainable, that destocking was temporary, and that PCC was losing market share and the 2016 EPS target was not attainable – are not actionable misrepresentations. (Defs.' Mot. Dismiss 14-15.) Defendants' arguments regarding these three categories of statements focus on whether PCC had a duty to disclose the information and whether PCC's statements were materially misleading.

### 1.    Standards

#### a.    Duty to Disclose

A duty to disclose "does not arise from the mere possession of non-public information." *Chiarella v. United States,* 445 U.S. 222, 235 (1980); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) ("[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information."). Rather, in the absence of a legal duty, a company may elect not to disclose certain information to the market. *See id.* at 45 ("[C]ompanies can control what they have to disclose under [the PSLRA] by controlling what they say to the market."); *see also Basic Inc. v. Levinson,* 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5.").

However, under Rule 10b-5(b), a defendant may be liable for the omission of material information if it has a duty to disclose that information. Specifically, when a company conveys information to the market, a duty to disclose will arise if the disclosure is "necessary in order to

PAGE 15 – FINDINGS AND RECOMMENDATION

make the statements made . . . not misleading . . . ." 17 C.F.R. § 240.10b-5; *Matrixx Initiatives, 563 U.S. at 44* (same) (quoting 17 C.F.R. § 240.10b-5); *see also Schueneman v. Arena Pharms., Inc., 840 F.3d 698, 706 (9th Cir. 2016)* ("But once defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." (quotations, alterations and citation omitted)).

### b.    Materiality

For an omission to be actionable under the PSLRA, it must be misleading as to a material fact. *Brody v. Transitional Hospitals Corp., 280 F.3d 997, 1006 (9th Cir. 2002)*. An omitted fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having substantially altered the 'total mix' of information made available." *Basic, Inc., 485 U.S. at 231-32* (quoting *TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)*). "[I]n other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody, 280 F.3d at 1006*.

### 2.    Alleged Misstatements and Omissions

### a.    Pulling In Sales

Defendants argue that neither the practice of pulling in sales to pursue its quarterly goals, nor their failure to disclose such a sales strategy, is actionable. (Defs.' Mot. Dismiss 15.) According to Defendants, Plaintiffs have not identified an inaccurate statement about pulling in or explained how the statements identified in the Amended Complaint mandated that Defendants disclose pricing strategies that constitute pulling in. (Defs.' Mot. Dismiss 16.)

Plaintiffs respond that they are not arguing that PCC's practice of pulling in sales violated section 10(b). Rather, Plaintiffs allege that "Defendants misleadingly touted PCC's ability to

PAGE 16 – FINDINGS AND RECOMMENDATION

generate sustainable organic growth, the 'temporary' nature of its sales declines, and PCC's ability to achieve the 2016 EPS target." (Pls.' Opp. 13.) Plaintiffs contend that these statements were false and misleading because PCC's inability to sustain pull-in sales from customers such as Rolls-Royce was a cause of the long-term decline in demand during the Class Period. (Pls.' Opp. 13; *see also* Am. Compl. ¶ 130 (alleging that PCC's representations during the Class Period constituted materially false and misleading statements and omissions at the time because Defendants failed to disclose, among other things, that PCC "had been engaging in the unsustainable . . . practice of pulling in sales to its aerospace customers, such as Rolls-Royce . . . .").)

The Court concludes that Plaintiffs have sufficiently pleaded that Defendants' omissions regarding PCC's practice of pulling in sales were misleading under the circumstances of Defendants' other representations about PCC's ability to reach the 2016 EPS target. Plaintiffs contend that PCC's widespread practice of pulling in sales must be analyzed in the context of two additional factors. First, PCC was representing to investors that it could sustain organic growth based on increased demand for its products and not simply by way of acquisitions, hence the ambitious 2016 EPS targets. Second, PCC's pulling in strategy depended on its large customers holding more inventory than currently needed. Rolls-Royce's new inventory policy was contrary to PCC's reliance on pulling in sales.[2] (Am. Compl. ¶ 42 (alleging that in an effort to meet target earnings, PCC resorted to "unsustainable means of increasing sales" and "to convince investors" that PCC was experiencing sustainable organic growth to justify the 2016 EPS targets); *id.* ("[C]ontrary to [PCC's] representations that it could achieve sustained EPS

---

[2] Plaintiffs correctly point out that even without the reduction in inventory by a key customer such as Rolls-Royce, PCC's pulling in strategy was not sustainable in the long term.

growth without reliance on acquisitions, [PCC] was not experiencing increasing sustainable demand from its customers.").)

According to the allegations in the Amended Complaint, PCC "repeatedly boasted that its organic growth was strong without telling investors that this purported growth was actually being manufactured by its unsustainable pull in strategy rather than increased demand." (Am. Compl. ¶ 59.) An example of this alleged omission occurred on May 9, 2013, the first day of the Class Period. PCC publicly announced that its fourth-quarter fiscal 2013 financial results exceeded analysts' estimates and "reflected robust aerospace performance at [PCC]." (Am. Compl. ¶ 59.) Defendant Donegan "reported that overall aerospace sales grew by roughly 32 percent, with organic growth increasing by four percent, and explained that 'organic [growth was] moving in the right direction,' without disclosing that a material portion of that growth resulted from an unsustainable practice of pulling in sales." (Am. Compl. ¶ 59.)

Although there is nothing inherently wrong with the practice of "aggressively pursuing quarterly results" by pulling in sales (Defs.' Mot. Dismiss 15), for the reasons explained above, such a practice may be misleading to the extent it creates the impression of a sustainable demand for PCC's products. Defendants' representations about organic growth did not include disclosure of the additional facts that PCC was aggressively pulling in sales, offering discounts, and extending payment options to encourage larger sales.[3] See Schueneman, 840 F.3d at 706 ("[O]nce defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the

_____

[3] Plaintiffs are not required to identify specific pull in transactions. See Luna v. Marvell Tech. Group Ltd., No. 15-cv-05447-RMW, 2016 WL 5930655, at *9 (N.D. Cal. Oct. 12, 2016) (finding that "where a complaint sufficiently 'identifies the circumstances of the alleged fraud so that defendants can prepare an adequate answer,' the details of specific transactions are not required" (quoting Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997)).

positive information." (quotations, alterations, and citation omitted)); *see also Luna*, 2016 WL 5930655, at *9-10 (finding plaintiff's allegations that defendants' "business metrics were fraudulently inflated during the class period because defendants prematurely recognized revenue that should have been earned in subsequent periods" satisfied the pleading requirement for a material misstatement). This information may be important information to a reasonable investor.[4] A fact-finder could determine that PCC's failure to disclose to investors that PCC's sales were resulting in large part from aggressive pulling in strategies was material information.

### b.    Destocking

Defendants argue that Plaintiffs' allegations about destocking and inventory are not actionable because Defendants' characterizations of destocking as temporary were genuinely held statements of opinion. (Defs.' Mot. Dismiss 21-23.) Defendants also contend that their destocking comments were "statements of corporate optimism" and reasonable investors do not rely on such statements. (Defs.' Mot. Dismiss 23-24.)

### 1)    The Statements in Question

Plaintiffs allege that Defendants' statements attributing PCC's declining demand to customer destocking were misleading because the statements assured investors that the destocking was only temporary and that demand would rebound. (*See, e.g.*, Am. Compl. ¶ 141 (attributing results to "modest de-stocking" by some customers); ¶ 142 (destocking is "simply an inventory realignment . . . and the demand does show back in the future"); ¶ 148 (stating that near-term growth is being impacted by "continued engine customer destocking"); ¶ 152 ("they

---

[4] What information is important to a reasonable investor is a fact-based inquiry once a plaintiff pleads a material statement or omission. *Matrixx Initiatives*, 563 U.S. at 43.

are just doing a temporary de-stocking . . . that destocking goes away and comes back to the normal rates"); ¶ 174 ("the destocking goes away"); ¶ 194 (the "destocking coming out of Rolls . . . we do definitely see that coming to an end").) However, Plaintiffs further allege that due to changes in customer inventory practices, it was likely that the demand for PCC's product would be permanently impacted, in part, because PCC's pulling in practice was contingent on its customers' willingness to continue to carry surplus inventory. (*See, e.g.*, Am. Compl. ¶ 130(a) (alleging that "in order to meet its internal quarterly sales goals," PCC "had been engaging in the unsustainable and short-sighted practice of pulling in sales to its aerospace customers . . . inducing them to take on more inventory than they required or that was necessitated by current and/or forecasted aircraft build rates").) In addition, CW1 stated that: (1) PCC referred to "destocking" as a euphemism for "softness" in product demand, (2) "what [Defendant] Donegan kept claiming was destocking was actually market share loss," and (3) even Rolls-Royce was puzzled by Defendants' representations that PCC's declining sales were attributable to temporary destocking. (Am. Compl. ¶¶ 75, 78 ("What is destocking? What the hell are you talking about?").)

### 2)    Fact Versus Opinion

Defendants are correct that general assertions of corporate optimism or statements of "mere puffing" are not actionable as material misrepresentations under the PSLRA.[5] *See, e.g.*, *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("When valuing corporations,

---

[5] The Court applies the same analysis to statements of opinion that it applies to statements of vague or optimistic "puffery." *See, e.g.*, *Omnicare, Inc. v. Laborers. Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1326 (2015) (using the term "puffery" in considering whether a statement is fact or opinion, *i.e.*, puffery); *see also* *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.").

however, investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers."); *Glen Holly Entm't Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003) ("We agree with the district court that these statements – generally describing the 'high priority' Tektronix placed on product development and alluding to marketing efforts – do not state an actionable fraud or negligent misrepresentation claim."). "Statements of 'mere puffing' are forward-looking statements of optimism that are 'not capable of objective verification' and 'lack a standard against which a reasonable investor could expect them to be pegged.'" *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008) (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997)). Such statements include terms that are "not measurable" and not "tethered to facts 'that a reasonable person would deem important to a securities investment decision.'" *In re Cornerstone*, 355 F. Supp. 2d at 1087.

In the Ninth Circuit, a statement of opinion becomes an actionable, material misrepresentation when "(1) the statement is not actually believed, (2) there is no reasonable basis for belief, or (3) the speaker is aware of undisclosed facts tending to seriously undermine the statement's accuracy." *Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir. 1994), overruled in part by *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F. 3d 605 (9th Cir. 2017). In *City of Dearborn*, the Ninth Circuit first held that the Supreme Court's decision in *Omnicare* applies to section 10(b) and Rule 10b-5 claims. 856 F.3d at 609. Relying on *Omnicare*, the court then established three different standards for pleading falsity of opinion statements. *Id.* at 616-17. If a plaintiff alleges a theory: (1) of material misrepresentation, "plaintiff must allege both that 'the speaker did not hold the belief [he] professed' and that the belief is objectively untrue," (2) "that a statement of fact contained within an opinion statement

is materially misleading, the plaintiff must allege that 'the supporting fact [the speaker] supplied [is] untrue,'" or (3) "of omission, the plaintiff must allege 'facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'" *Id.* (quoting *Omnicare, Inc.,*135 S. Ct. at 1327, 1332).

Under *City of Dearborn* and *Omnicare*, the first question for the Court is whether Defendants' destocking statements were statements of fact or opinion. Even if the Court finds that the statements were at least in part opinion statements, Defendants' representations may still be actionable if their statements included a material misrepresentation of fact, or if Defendants did not believe the statements and were aware of facts to undermine the representations. *See id.* (holding that "[t]he first and third methods of pleading falsity under [*Kaplan*] are consistent with *Omnicare's* standards for pleading falsity").

The Court finds that many of the statements relied upon by Plaintiffs are factual representations, as opposed to statements of generalized optimism. (Am. Compl. ¶ 142 ("the demand is there, the contracts are there, the schedules are there"); ¶ 144 ("we've seen what the [destocking] customer wants"); ¶ 152 ("they are just doing a temporary destocking"); *id.* ("As we go into Q4, Q1 . . . that de-stocking goes away and [demand] comes back to the normal rates"); ¶ 174 ("[T]he destocking goes away . . . . It has an end to it."); ¶ 194 ("[W]e do definitely see [destocking] coming to an end."); ¶ 208 ("the schedules that we have say that it ends and starts to recover in our Q4 and fully recovers in Q1"). The statements are either true or false and can be objectively evaluated and verified. *See, e.g., Oregon Pub. Emps. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 606 (9th Cir. 2014) ("Statements by a company that are capable of objective verification are not 'puffery' and can constitute material misrepresentations"); *cf. In re Dura*

*Pharm., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1033 (S.D. Cal. 2006) (holding that immaterial puffery conveys facts "that are not measurable"); *In re Apple Comput., Inc. Sec. Litig.,* 243 F. Supp. 2d 1012, 1018 (N.D. Cal. 2002) (finding the statements "drop dead," "incredibly functional," and the "whole thing is perfect" to be puffery). Additionally, Defendants' statements regarding destocking and product demand were specific and implied that destocking was temporary and product demand would quickly return to normal.

It is reasonable to infer that the prospect of a temporary versus long-term depression in product demand was material information for investors. In addition, Defendants' statements about destocking and product demand were made at a time when investors would have been concerned about the decline in stock price and looking for assurances that such declines were not a trend. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (holding that "a complaint may not properly be dismissed" on materiality grounds unless misstatements "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance"). As an example, in response to an analyst's question about whether PCC "get[s] back on track" next quarter, Defendant Donegan stated "Yes . . . . [W]e have long-term contracts that are in play that basically guide and direct our market share." (Am. Compl. ¶ 152; *see also* ¶ 128 (in response to analyst's question, Defendant Donegan stated that investors "should start to see organic moving in the right direction").) Additionally, Plaintiffs allege that investors did, in fact, rely on Defendants' statements regarding the temporary nature of destocking. (Am. Compl. ¶ 74 (KeyBank stated that "[m]anagement did indicate that it believes the destocking trend is a short-term dynamic"); ¶ 81 (KeyBank stated that "management indicated that the engine destocking trend . . . has remained stable, and . . . remains on track to normalize").)

PAGE 23 – FINDINGS AND RECOMMENDATION

Accordingly, the Court concludes that Defendants' statements about destocking were not generalized statements of optimism or statements of puffery or opinion. Alternatively, even if some portion of Defendants' representations included statements of opinion, Plaintiffs pleaded with particularity that the statements about the impact of destocking on the 2016 EPS targets were inaccurate because Defendants knew both that PCC's pulling-in practice was no longer viable in light of destocking by key customers *and* that destocking was not temporary because "they had visibility into actual customer demand." (Pls.' Opp. 15.) Specifically, Plaintiffs allege that once Rolls-Royce shifted to its new inventory policy, PCC was aware that its historic demand levels that resulted from pulling in would decline. Rather than acknowledge to PCC's investors that it was facing demand challenges, Defendant Donegan continued to assure investors that PCC's sluggish performance resulted from temporary destocking. (*See, e.g.*, Am. Compl. ¶ 116 (CW1 stated that PCC did not have forecasts justifying its statements that "softness" in demand was temporary); ¶ 222 (January 2015 analyst report titled "So Much for Visibility" noted that PCC is "suffering from visibility/timing issues"); ¶ 152 ("[W]e have long-term contracts that are in play that basically guide and direct our market share[.]"); ¶ 172 ("[W]e have access to [customer's] inventory levels."); ¶ 173 ("Q4 has in it embedded growth . . . because there are demands coming from our customers[.]"); ¶ 174 ("If you look at what our line of sight [] is . . . my contracts are in place, I get [market] share, I know what it is[.]"); ¶ 193 ("[W]e now have a clear line of sight to the steady growth we are anticipating[.]").) Under the circumstances, Defendants are unable to demonstrate that their statements about temporary destocking and a rebound in the demand for PCC's products were non-actionable statements of opinion or puffery.

### c.    Loss of Market Share

Finally, Defendants maintain that their "statements regarding [their] 2016 EPS target and other future plans [] are not actionable because they are protected by the PSLRA's safe harbor

for forward-looking statements." (Defs.' Mot. Dismiss 24-25.) The PSLRA provides that a defendant "shall not be liable with respect to any forward-looking statement" if (1) the statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or (2) plaintiff fails to show that the statement was "made with actual knowledge" that the statement was false or misleading. 15 U.S.C. § 78u-5(c)(1). The definition of forward-looking statements includes, among other things, statements containing projections of revenues, income, earnings per share, management's plans or objectives for future operations, predictions of future economic performance, or the assumptions underlying any of these issues. 15 U.S.C. § 77z-2(i)(1)(A)-(D) (Securities Act); *id.* at § 78u-5(i)(1)(A)-(D) (Exchange Act); *see also In re Cutera Sec. Litig.,* 610 F.3d at 1111 ("[An] earnings projection is by definition a forward-looking statement.").

Plaintiffs respond that Defendants' statements about the 2016 EPS targets "were representations concerning the current state of affairs at PCC – *i.e.*, that PCC was . . . on track to meet its EPS target." (Pls.' Opp. 21.) Alternatively, Plaintiffs contend that even if Defendants' 2016 EPS target statements were forward-looking, they were not accompanied by "meaningful cautionary statements" as required by the PSLRA's safe harbor provision. (Pls.' Opp. 22.) Additionally, Plaintiffs argue that Defendants may not rely on the safe harbor provisions because they had "actual knowledge of the falsity" of their statements that the 2016 EPS targets were on track. (Pls.' Opp. 22.)

### 1)    The Statements in Question

The threshold question is whether Defendants' statements about the 2016 EPS targets were forward-looking. Plaintiffs allege that Defendant Donegan "repeatedly assured investors

during the Class Period that PCC was on track to meet its 2016 EPS target." (Pls.' Opp. 20.)

According to Plaintiffs, these representations by Donegan concerned current market conditions:

- [W]e have a line. If I go from where we were and blow my way out to that 2016 timeframe, I get a line. We hover around that line. (Am. Compl. ¶ 158.)

- We're pretty much on that drum beat. (Am. Compl. ¶ 142.)

- [T]he framework for our FY16 [EPS target] . . . is all intact. (Am. Compl. ¶ 171.)

- Nothing has gone negative . . . in terms of the [EPS] framework, not at all. (Am. Compl. ¶ 174.)

- In terms of . . . the targets whatever you want to call it, we feel very, very, very solid about kind of what's out there. (Am. Compl. ¶ 184.)

- I want to be clear in regards to FY16 targets. I want to reaffirm the target and the framework is in place. (Am. Compl. ¶ 196.)

- [W]e remain fully committed to our FY16 framework and there is no change to the [2016 EPS] framework we laid out. (Am. Compl. ¶ 207.)

### 2) Forward-Looking Statements or Representations of Present Facts

The Court finds that Defendants' statements do not fit within the PSLRA's definition of a forward-looking statement because they contain representations of present fact and omit material information. *See, e.g., Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 513 F.3d 702, 705 (7th Cir. 2008) ("The element of prediction in saying that sales are 'still going strong' does not entitle Tellabs to a safe harbor with regard to the statement's representation concerning current sales."); *Mulligan v. Impax Lab., Inc.*, 36 F. Supp. 3d 942, 965 (N.D. Cal. 2014) (finding that statements which are "at least in part, statements of present or historical fact" are not forward-looking); *In re MGM Mirage Sec. Litig.,* No. 2:09-cv-01558-GMN-VCF, 2013 WL 5435832, at *7 (D. Nev. Sept. 26, 2013) ("[S]tatements that a project is "on-track," "on-budget," or "on-schedule," are not forward-looking but statements relating to *current* conditions."); *In re Secure Computing*

*Corp. Sec. Litig.*, 120 F. Supp. 2d 810, 818 (N.D. Cal. 2000) (finding that Defendants' statements that the company was "on track" to meet analysts' earnings expectations were statements of current business conditions and not forward-looking).

For example, PCC's assertion that it remained "fully committed to our FY16 framework and there is no change to the [2016 EPS] framework we laid out" is a statement about the current condition of PCC's customer demand and earnings potential. While the statements relate to the 2016 EPS target, each statement is a representation of PCC's current market status, *i.e.*, hitting benchmarks along the way to achieving the 2016 goal. Defendants' remarks suggested to investors that PCC's market share was currently where it needed to be in order to achieve the 2016 EPS target. Additionally, Defendants did not provide any contemporaneous information about the impact that destocking by key customers – in light of PCC's historic pulling-in sales practices resulting in lower demand – was having on PCC's sales. The Court concludes that Defendants' statements regarding the 2016 EPS projections are not protected by the PSLRA's safe harbor for forward-looking statements. *See Mulligan*, 36 F. Supp. 3d at 966 (holding at the motion to dismiss stage that "the PSLRA safe harbor does not apply").

### 3.    Confidential Witness Allegations

Defendants assert that Plaintiffs' allegations arising from CW statements do not establish falsity because the CWs lacked personal knowledge, their allegations are "impermissibly vague" and, in any event, the allegations do not contradict any public statement. (Defs.' Mot. Dismiss 17-21.) Plaintiffs respond that Defendants do not dispute "the central fact reiterated by each CW: that PCC aggressively sought to pull in sales in order to meet its earnings targets." (Pls.' Opp. 23.) As such, the CW statements each "support the falsity of [PCC's] statements concerning PCC's sustainable growth prospect, the temporary impact of Rolls Royce's inventory reduction, and PCC's ability to achieve its 2016 EPS target." (Pls.' Opp. 24.)

PAGE 27 – FINDINGS AND RECOMMENDATION

Under Ninth Circuit law, a confidential witness must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005); *see also Zucco Partners,* 552 F.3d at 995 (same). In determining the reliability of confidential witnesses, the court must look at the "level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Id.*

In the Amended Complaint, Plaintiffs identify four CWs, from different groups within PCC, who provide consistent (mutually corroborating) accounts of PCC's pulling in and ship-at-all-costs practices. The CWs' allegations are further corroborated by PCC's own statement that they engaged in the "legitimate practice" of pulling in sales. *See Zucco Partners*, 552 F.3d at 995 (in assessing reliability of CW allegations, district courts should consider "the corroborative nature of the other facts alleged" and "the coherence and plausibility of the allegations"). In addition, Plaintiffs identify the CWs' actual titles at PCC, the relevant time period during which they were employed, and the person to whom they reported or spoke. (Am. Compl. ¶ 47 (CW1 described as an "Executive Vice President from 2009 to October 2014, reporting directly to Defendant Donegan"); ¶ 50 (CW2 described as a "senior-level employee in Precision's Corporate Planning, Purchasing, and Procurement department who interacted with Defendant Donegan prior to, during, and after the Class Period"); ¶ 52 (CW3 described as a "Supply Chain Director at SPS Technologies, a Precision subsidiary, from July 2013 to December 2014"); ¶ 53 (CW4 described as a "Sales Manager at Precision in the Investment Casting Division from June 2014 until August 2014").)

PAGE 28 – FINDINGS AND RECOMMENDATION

Consistent with the Ninth Circuit's holdings in *Zucco Partners* and *Daou*, the Court finds that Plaintiffs' CW allegations in the Amended Complaint include sufficient indicia of reliability. Specifically, Plaintiffs provided particularized allegations regarding the reliability and personal knowledge of the confidential witnesses. *See In re Daou Sys., Inc.*, 411 F.3d at 1016 ("Plaintiffs here describe the confidential witnesses with a large degree of specificity. Plaintiffs number each witness and describe his or her job description and responsibilities. In some instances, plaintiffs provide the witnesses' exact title and to which Daou executive the witness reported."); *Rudolph v. UTStarcom*, 560 F. Supp. 2d 880, 890 (N.D. Cal. 2008) ("[P]laintiff must describe the witnesses' period of employment, what the witnesses' job duties were, their expertise, and how they had access to the information being provided."); *see also Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1240 (11th Cir. 2008) (finding that confidential witness allegations are reliable where complaint "describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame").

With regard to the substance of the CWs' information, Plaintiffs rely on the CW allegations to demonstrate the widespread reliance on aggressive sales strategies, including pulling in, to create an impression of organic and sustainable growth. Such information from the CWs supports Plaintiffs' allegations that Defendants' statements about PCC's sustainable organic growth, the temporary impact of Rolls Royce's inventory reduction, and PCC's ability to achieve its 2016 EPS target were incomplete and misleading. As such, the CWs' statements may be probative of falsity. *See Freudenberg v. E*TRADE Fin. Corp.*, 712 F. Supp. 2d 171, 183 (S.D.N.Y. 2010) (finding complaint adequately alleged falsity where CW allegations revealed internal facts contradicting company's public statements).

///

## II.    PLEADING SCIENTER

Defendants contend that Plaintiffs' allegations do not support a strong inference of scienter. Specifically, Defendants argue that Plaintiffs' "CW allegations do not create an inference that Defendants intentionally or with deliberate recklessness made false or misleading statements regarding the 2016 EPS target." (Defs.' Mot. Dismiss 29.) Defendants further contend that Plaintiffs' allegations of insider trader by Defendants Donegan and Hagel do not suggest that the stock sales were unusual or suspicious in light of prior trading practices by these individuals. (Defs.' Mot. Dismiss 30.)

In response, Plaintiffs maintain that the Amended Complaint includes three bases for a strong inference of scienter: (1) Donegan's "own statements and involvement in [PCC's] undisclosed pulling in practices," (2) Defendants Donegan's and Hagel's executive positions and hands-on management style, and (3) the suspicious timing and size of Defendants Donegan's and Hagel's insider transactions. (Pl.'s Opp. 27-31.)

Under the PSLRA, the complaint must state with particularity "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2), *compare* FRCP 9(b) ("malice, intent, knowledge, and other conditions of a person's mind may be alleged generally"); *see also* In re Silicon Graphics Inc. Sec. Litig, 183 F.3d 970, 974 (9th Cir. 1999) (facts must come closer to demonstrating intent as opposed to mere motive and opportunity), *abrogated on other grounds by*, S. Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 782 (9th Cir. 2008). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *See* Tellabs, 551 U.S. at 319. The required state of mind is "that the defendants made false or misleading statements either intentionally or with deliberate recklessness." Zucco Partners, 552 F.3d at 991. To satisfy the scienter requirement, a plaintiff "must plead facts

rendering an inference of scienter *at least as likely* as any plausible opposing inference." *Tellabs*, 551 U.S. at 328 (emphasis in original).

In determining whether a plaintiff can survive a motion to dismiss for failure to plead a strong inference of scienter, the courts must consider the factual allegations collectively and determine whether all of the alleged facts give rise to a strong inference of scienter. *Tellabs*, 551 U.S. at 322-23, 326 ("the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically"); *S. Ferry LP*, 542 F.3d at 784 ("The Supreme Court's reasoning in *Tellabs* permits a series of less precise allegations to be read together to meet the PSLRA requirement."). "When conducting this holistic review, however, [a court] must also 'take into account plausible opposing inferences' that could weigh against a finding of scienter." *Zucco Partners*, 552 F.3d at 1006 (quoting *Tellabs*, 551 U.S. at 323). In accordance with the Supreme Court's instructions in *Tellabs*, the Court will consider all of Plaintiff's allegations to determine whether the alleged facts collectively give rise to a strong inference of scienter.

## A.    Defendant Donegan's Knowledge

In their Amended Complaint, Plaintiffs allege that throughout the Class Period, Defendants Donegan and Hagel "knew or were severely reckless in disregarding" that Rolls Royce's inventory reduction plan was not temporary, PCC was losing sales and experiencing a weakened demand for its products, and PCC's practice of pulling in sales was not sustainable. (Am. Compl. ¶ 114.) Plaintiffs argue that the allegations in the Amended Complaint regarding Defendant Donegan's knowledge and direction that PCC employ aggressive sales practices demonstrate that his public statements to investors were misleading. *See, e.g.*, *In re Daou Sys., Inc.*, 411 F.3d at 1023 (finding strong inference of scienter where "top executives actually directed" practice that rendered public statements misleading); *No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. West Holding Corp.*, 320 F.3d 920, 941-42 (9th Cir. 2003)

(finding strong inference of scienter where officers were aware of "maintenance and operational problems" when they touted company's long-term prospects).

In support of Defendant Donegan's scienter, Plaintiffs allege:

- According to CW1, "it was known internally that destocking was not to blame for [PCC's] poor sales figures and that Donegan used the term 'destocking' as a catchall for general 'softness' [PCC] was seeing in demand." (Am. Compl. ¶ 115 (emphasis omitted).) Additionally, CW1 stated that PCC did not have any actual forecasts to support its representation that softness in demand would soon end, and PCC elected not to analyze whether it instead was losing market share. (Am. Compl. ¶ 116 ("CW1 explained [PCC] would just wing it and hope it worked out.").)

- According to the CWs, Defendant Donegan was aware that PCC shipped excess product to customers because he directed the practice. Specifically, in an effort "to hit quarterly numbers at any cost," Defendant Donegan would instruct PCC employees to charge the cliff. (Am. Compl. ¶ 117, *see also* ¶ 118 ("CW2 confirmed that Precision employees were instructed to push product on customers . . . so that the Company would meet quarterly sales figures."); *id.* ("Defendant Donegan 'very heavily led' the command to ship product to customers prematurely.").)

- Defendant Donegan knew the demand for PCC's product would "return to historic levels" after customers refused to accept early deliveries as did occur during the Class Period. Despite public statements to the contrary, Defendant Donegan knew the slowdown in demand for PCC products would be long term. (Am. Compl. ¶ 118.)

## B.   Defendants Donegan's and Hagel's Roles at PCC

Plaintiffs also allege that Defendants Donegan's and Hagel's knowledge of the weakened demand for PCC's products may be inferred from their executive roles as CEO and CFO, respectively. Specifically, 70% of PCC's total sales are derived from the aerospace market, with Rolls-Royce being a key customer in that market. (Am. Compl. ¶ 119.) As such, Plaintiffs contend that it is reasonable to infer that Defendants Donegan and Hagel monitored PCC's market position in relation to Rolls-Royce. *See, e.g., Reese v. Malone*, 747 F.3d 557, 575-76 (9th Cir. 2014) (holding that allegations that management defendants had "actual access to the disputed information" may satisfy the scienter requirement), overruled on other grounds by *City of Dearborn*, 856 F.3d 605; *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 (9th Cir.

2008) (inferring that executives responsible for company's day-to-day activities were aware of facts impacting profitability).

Plaintiffs further argue that during the Class Period, Defendants Donegan and Hagel approved PCC's "false and misleading SEC filings and certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 therein ("SOX Certifications.")[6] (Am. Compl. ¶ 120.) Plaintiffs contend that this provision "contributes" to Defendant Donegan's and Hagel's scienter. (Pls.' Opp. 32 n.20.)

### C.    Timing of Defendants Donegan's and Hagel's Stock Transactions

Finally, Plaintiffs contend that scienter is established by the timing and size of Defendants Donegan's and Hagel's stock transactions. Specifically, Plaintiffs allege that Defendants Donegan and Hagel engaged in large stock transactions at a time when PCC's common stock price was artificially inflated from fraudulent conduct. (Am. Compl. ¶ 121.) In particular, on May 13-14, 2014, Defendant Donegan exercised options to purchase and immediately sell nearly 40% of the shares he held, for a profit of $13.757 million. (Am. Compl. ¶ 121.) A few weeks later, on May 30, 2014, Defendant Hagel exercised options to purchase and immediately sell 18,750 shares of PCC common stock, for a profit of almost $3 million. Later that year, on November 27, 2013, Defendant Hagel exercised options to purchase and

---

[6] Section 302 of the Sarbanes-Oxley Act, 15 U.S.C. § 7421, requires principal executive and financial officers to certify each annual and quarterly report. Section 302 mandates that signing officers certify that they are "responsible for establishing and maintaining internal controls" and "have designed such internal controls to ensure that material information relating to the [company] and its consolidated subsidiaries is made known to such officers by others within those entities, particularly during the period in which the periodic reports are being prepared." 15 U.S.C. §§ 7241(a)(4)(A) and (B). The signing officers must have "evaluated the effectiveness of the [company's] internal controls as of a date within 90 days prior to the report" and "have presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date." *Id.* at §§ 7241(a)(4)(C) and (D).

immediately sell 25,000 shares, for a profit of almost $4 million. (Am. Compl. ¶ 121.) Neither

Defendant Donegan's nor Defendant Hagel's options expired until the end of 2018 or later. (Am.

Compl. ¶ 121.) Plaintiffs contend that the size and timing of the individual defendants' stock

transactions is probative of scienter. *See, e.g.*, *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F.

Supp. 3d 1145, 1170 (D. Or. 2015) ("[S]uspicious sales by insiders weigh heavily in favor of a

scienter inference.").

        **D.**      **Totality of Scienter Allegations**

        **1.**      **Defendant Donegan**

Viewing the allegations of scienter in their entirety, the Court finds that Plaintiffs

adequately allege a strong inference of scienter with regard to Defendant Donegan. The

allegations raise the question of whether Defendant Donegan knowingly misled investors about

PCC's ability to sustain sales organically and meet the 2016 EPS target, particularly in light of

factors such as PCC's pulling-in practices, Rolls Royce's new inventory management plan, and

PCC's decline in market share as a result of lower demand. In addition, the facts alleged create

an inference that Defendant Donegan was aware of these problems yet downplayed the

significance of these events with respect to PCC's ability to meet the 2016 projections. When

viewed holistically, Plaintiffs allege facts that support a strong inference of scienter with regard

to Defendant Donegan.

        **2.**      **Defendant Hagel**

Defendants argue that the Amended Complaint does not include allegations of any

statements by Defendant Hagel. Rather, the sole allegations against Defendant Hagel are her

position at PCC, her stock sales, and her signing of PCC's financial statements. According to

Defendants, these allegations do not give rise to a strong inference of scienter.

While a "core operations inference," without more, rarely satisfies the scienter requirement, a plaintiff may "bridge the gap" between a defendant's access to information and an inference of scienter. *S. Ferry LP*, 542 F.3d at 783, 785 n.3. Specifically, a plaintiff relying on a defendant's role in the company must allege specific information "conveyed to management and related to the fraud." *Id.* at 784-85 (quotations and citation omitted). In particular, allegations about management's role in the company may be sufficient "where they are particular and suggest that defendants had actual access to the disputed information . . . ." or "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Id.* at 785-86.

Plaintiffs allege that Defendant Hagel "reviewed, approved, and signed" PCC's SEC filings, "reviewed and approved false and misleading press releases[,]" and participated in conference calls with securities analysts during which [PCC's] false and misleading statements . . . were presented and discussed." (Am. Compl. ¶ 30.) Plaintiffs also allege that "[Defendant] Hagel's knowledge of weakened demand for [PCC's] aerospace products, specifically with respect to Rolls-Royce, can be inferred because these facts are critical to PCC's core operations . . . ." (Am. Compl. ¶ 119.) In particular, PCC relies "on the aerospace market for 70 percent of its total sales" and PCC "refers to Rolls-Royce as one of its 'key customers.'" (Am. Compl. ¶ 119.)

PCC's 2016 EPS targets were publicly known to market analysts and investors. Defendant Hagel, by virtue of her position as CFO, was necessarily aware that PCC repeatedly reaffirmed those public financial forecasts. Additionally, Plaintiffs allege in the Amended Complaint that because of the significant revenue earned from aerospace customers, it is reasonable to infer that Defendant Hagel was aware of the impact from Rolls-Royce's new

inventory policy in light of PCC's pulling in practices. As such, Plaintiffs' allegations "bridge the gap" as required by the Ninth Circuit in *S. Ferry LP*.

The Court finds that Plaintiffs' scienter allegations are adequate to create a strong inference that Defendant Hagel had "knowledge of the relevant facts." *S. Ferry LP*, 542 F. 3d at 784; *see also Institutional Investors Grp. v. Avaya, Inc.,* 564 F.3d 242, 270 (3d Cir. 2009) ("Given the specificity and repetition of the analysts' questions, [defendant's] position as Chief Financial Officer, and the alleged state of [the company's] business at the time the questions were asked, there is a strong inference that [defendant's] behavior reached this threshold of recklessness."). Viewed holistically, Plaintiffs allege facts that support a strong inference of scienter with regard to Defendant Hagel.

## III.    LOSS CAUSATION

Defendants contend that Plaintiffs did not include allegations of a corrective disclosure in the Amended Complaint and have thus failed adequately to allege the element of loss causation. (Defs.' Mot. Dismiss 34.) Specifically, Defendants argue that none of Plaintiffs' "three alleged corrective disclosures reveal[] . . . any prior misstatement or other misconduct." (Defs.' Mot. Dismiss 34.)

Loss causation is the causal connection between the material misrepresentation or other fraudulent activity and the loss. *Dura Pharm.,* 544 U.S. at 342. To prevail at trial, a plaintiff must prove that defendant's misrepresentation was a "substantial cause" of the financial loss. *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014). However, at the pleading stage, "plaintiff need only allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors." *Id.* (citing *Metzler Inv.,* 540 F.3d at 1062). Specifically, a plaintiff must allege in the complaint that "the practices [he] contends are fraudulent were

PAGE 36 – FINDINGS AND RECOMMENDATION

revealed to the market and caused the resulting losses." *Metzler Inv.*, 540 F.3d at 1063. "The burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.'" *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209-10 (9th Cir. 2016) (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2406 (2014)).

Plaintiffs allege that Defendants' misleading statements and omissions caused PCC's share price to be artificially inflated during the Class Period, and that the price dissipated only after "Defendants' false and misleading statements and omissions became apparent to the market . . . ." (Am. Compl. ¶ 235.) In addition, Plaintiffs contend that the decline in PCC stock price was "a direct result of the nature, extent and impact of Defendants' prior false and misleading statements and omissions being revealed to investors and the market" rather than a change in market conditions, macroeconomic or industry factors, or PCC specific factors. (Am. Compl. ¶ 236.)

When PCC reported poor results in January 2015, the market concluded that PCC's decline in demand was not temporary and that the 2016 EPS target was no longer attainable. (Am. Compl. ¶ 221 ("this miss should increase concerns about whether there is a larger problem . . . and stoke further doubts about the company's ability to grow organically"); ¶ 222 ("we still wonder if there is some [market] share loss here"); ¶ 224 ("[w]e believe these issues also will impact the prior $16.00 in EPS in fiscal 2016 guidance"); *see also* ¶¶ 226-33 (Defendants acknowledged mistaken assumptions).) As such, Plaintiffs argue that PCC's earnings misses revealed the facts previously concealed by Defendants' alleged misstatements, *i.e.,* PCC's declining demand and growth prospects.

The Court concludes that Plaintiffs have adequately alleged specific facts to show that PCC's stock price was initially inflated as a result of misleading reports by Defendants that PCC was on track for the 2016 EPS targets, and subsequently declined in response to PCC's acknowledgements that there were mistaken assumptions and failures to communicate material information to investors. (Am. Compl. ¶ 228 ("I think that we will clarify as we communicate to you where we think some of that volatility may exist in terms of those assumptions. It will then be incumbent on us to either validate that our assumptions were right – they were better or worse.") ¶ 229 ("[Y]ou didn't have insight into our original FY16 discussion. We also went two years without updating, so things changed during that time frame. Clearly, as we talk each quarter to you going forward, we will essentially update for changes that occur there. I think the entire structure of what we're doing going forward will look nothing like how we've handled it in the past.").) Plaintiffs' allegations are sufficient to demonstrate a link between Defendants' conduct and Plaintiffs' losses. *See Dura Pharm.*, 544 U.S. at 347 (holding that at the pleading stage plaintiff's complaint must "provide defendant with some indication of the loss and the causal connection that plaintiff had in mind"); *see also Metzler Inv.*, 540 F.3d at 1062 ("A plaintiff's complaint must, however, set forth allegations that if assumed true, are sufficient to provide the defendant with some indication that the drop in defendant's stock price was causally related to the defendant's financial misstatements." (quotations and citations omitted)). Accordingly, Plaintiffs' allegations of loss causation satisfy the pleading requirements set forth above.

## CONCLUSION

Based on the foregoing, the district judge should DENY Defendants' Motion to Dismiss (ECF No. 66).

PAGE 38 – FINDINGS AND RECOMMENDATION

**SCHEDULING ORDER**

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 27th day of June 2017.

_____
STACIE F. BECKERMAN
United States Magistrate Judge