IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KEVIN MURPHY, Individually and On
Behalf of All Others Similarly Situated,

            Plaintiff,

      v.

PRECISION CASTPARTS CORP., MARK
DONEGAN, and SHAWN R. HAGEL,

            Defendants.

Case No. 3:16-cv-00521-SB

**OPINION AND ORDER**

**[REDACTED VERSION]**

**BECKERMAN, U.S. Magistrate Judge.**

        AMF Pensionsförsäkring AB and the Oklahoma Firefighters Pension and Retirement

System (hereinafter, "Lead Plaintiffs") filed an Amended Class Action Complaint for Violation

of the Federal Securities Laws on behalf of all persons or entities who purchased or otherwise

acquired the publicly traded securities of Precision Castparts Corporation ("PCC") between May

9, 2013 and January 15, 2015 (hereinafter, the "Class Period"), seeking remedies under the

Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities

Litigation Reform Act of 1995 ("PSLRA"). Lead Plaintiffs allege that PCC, PCC's Chairman

and Chief Executive Officer ("CEO") Mark Donegan ("Donegan"), and PCC's Executive Vice

PAGE 1 – OPINION AND ORDER

President and Chief Financial Officer ("CFO") Shawn Hagel ("Hagel") (collectively, "Defendants"), violated Sections 10(b) and 20(a) of the Exchange Act and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.

Lead Plaintiffs and Defendants filed cross motions for summary judgment pursuant to FED. R. CIV. P. 56. The Court has jurisdiction over this matter under 28 U.S.C. § 1331, and all remaining parties have consented to the jurisdiction of a U.S. Magistrate Judge pursuant to 28 U.S.C. § 636. For the reasons discussed below, the Court denies Lead Plaintiffs' motion for partial summary judgment, grants in part and denies in part Defendants' motion for summary judgment, and denies Defendants' motion to exclude the expert testimony of Chad Coffman.

## INTRODUCTION

Lead Plaintiffs allege that Defendants made forty-four statements during the Class Period that were materially false and misleading, primarily with respect to PCC's earnings guidance for Fiscal Year 2016 ("FY16"). Lead Plaintiffs' theory of liability is that Defendants always knew that the FY16 earnings guidance was unattainable because their financial projections were based on unrealistic assumptions, and Defendants knew throughout the Class Period that PCC was failing to achieve the organic growth necessary to meet the target in part because PCC's practice of pulling in sales to earlier quarters was unsustainable and a large customer was continuing to destock its inventory. Lead Plaintiffs allege that Defendants nevertheless made statements throughout the Class Period misrepresenting that PCC was achieving anticipated benchmarks en route to its FY16 target, which created an impression of a state of affairs materially different from the one that existed.

In denying Defendants' motion to dismiss earlier in this case, the Court held that the PSLRA's Safe Harbor for forward-looking statements does not protect all of Defendants'

statements because not all of the statements were forward-looking in their entirety. The Court now concludes that the Safe Harbor protects twenty-two of the forty-four statements, and four additional statements are not actionable because they are vague statements of puffery.

Of the remaining eighteen statements, all are Donegan's unscripted oral statements, which absolves Hagel of liability. However, there are disputed issues of material fact regarding whether Donegan's statements were materially false and misleading, whether he knew his statements were false and misleading, and whether his statements caused economic loss to class members. Those are questions a jury must resolve, and therefore the Court denies the cross motions for summary judgment with respect to those eighteen statements.

## BACKGROUND[1]

### I.    PCC

PCC is an Oregon corporation headquartered in Portland. (Defs.' Mot. Summ. J. Ex. 4 at 1.) Operating approximately 160 plants, PCC is a leading supplier of metals and parts for the aerospace, energy, military, and general industrial sectors. (Decl. of Mark Donegan ("Donegan Decl.") ¶¶ 27-29, ECF No. 237.)

///

///

///

///

---

[1] The Court grants Defendants' unopposed requests for judicial notice of various SEC filings, press releases, earnings call transcripts, earnings call presentations, analyst reports, and the Europe Brent Spot Price FOB, Daily. (ECF Nos. 242, 290.) The Court overrules Defendants' evidentiary objections to Lead Plaintiffs' exhibits for lack of proper foundation and failure to comply with the "best evidence" rule and Defendants' objection to Lead Plaintiffs' demonstrative exhibit, with leave to renew at trial.

## II.    CHALLENGED STATEMENTS

In January 2013, PCC announced an earnings per share ("EPS") target of $15.50-$16.50 for its 2016 fiscal year (the "Target" or "FY16 Target" or "FY16 Framework"). (Defs.' Ex. 39 at 19.)[2]

Throughout the Class Period, PCC issued earnings releases at the end of every quarter and hosted a webcast ("Earnings Call"), during which Donegan reviewed PowerPoint slides presenting key metrics and significant quarterly developments and answered questions from analysts. (Defs.' Mot. Summ. J. at 7) (citing Defs.' Exs. 21-29; 39-47.) Donegan's statements during these calls and at investor conferences, along with PCC's press releases during the Class Period, are the subject of this action and described below. *See* App. 1 to Defs.' Reply ("App. 1") (listing all forty-four statements) (the "Challenged Statements" or "Statements").

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|------|------|----------------------|-------|---------|
| 1. | 5/9/2013 | ***In our fourth quarter, we started to realize the solid benefits of a long-term plan for continued profitable growth.*** [. . .] We have focused on and have been diligent in acquiring the right assets over the last few years, and now those acquisitions have started to deliver on the value we anticipated. ***Our fourth quarter performance is only an initial data point on a long continuum for improved sales and earnings*** | Press Release | PCC |

---

[2] Hereafter, the Court refers to Defendants' exhibits in support of their motion for summary judgment as "Defs.' Ex."

[3] The Court adopts the numbering system that Defendants use to refer to the Challenged Statements. *See* App. 1. According to Defendants, this chart is a comprehensive list of the statements that Lead Plaintiffs alleges are false or misleading in Lead Plaintiffs' Supplemental Responses and Objections to Defendant Precision Castparts Corp.'s Second Set of Interrogatories. *Id.* Plaintiffs indicated that the bold italicized font denotes those portions of the statements that they allege are false or misleading, and Defendants have added the full statements for context. *Id.*

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | *performance in the future.* (App. 1 at 1; First Am. Compl. ("FAC") ¶ 122.) | | |
| 2. | 5/9/2013 | *[W]hat we've tried to do [with our EPS target of $15.50 to $16.50 by fiscal year 2016] is tell you that what we do is we think of the business, we think of that number, we think of the opportunities in pieces. And what I mean by that is if I get a business where growth isn't growing at mid- or mid- to high-single digits, you know what, I should expect to see a better performance out of the operations.* (App. 1 at 1; FAC ¶ 125.) | Earnings Call | Donegan |
| 3.<br><br>(Pls.' No. 1)[4] | 5/9/2013 | *What I would say is, we tend to be pretty linear-thinking type of people. So I think that you will kind of move around that. But I don't think we're going to set ourselves up to have some giant run towards the end*, that's just not our mentality. So what I drive this business to is if the organic growth slows, I better see a lot more operationally. If the organic growth picks up and I get – and these platforms come in, I'm going to drive the living hell out of you to make sure that you're – you may not be getting as much, but you better be getting a subsequent drop-through on the volume drop-through we get. But again, *I would say, in total, we tend to be more linear in thinking and I wouldn't – my mentality wouldn't allow me to say I'm going to be marginal, marginal and then, make this huge run towards the end.* (App 1. at 1-2; FAC ¶ 125.) | Earnings Call | Donegan |
| 4. | 5/9/2013 | [Robert Spingarn (Credit Suisse analyst):] I'd like to go back to the long-term question [. . .] with your trajectory toward your guidance. I'm going to | Earnings Call | Donegan |

---

[4] The Court cross-references herein the numbering system that Lead Plaintiffs use in their motion for partial summary judgment. (*See* Pls.' Mot. at 21) (seeking summary judgment on eight statements).

| No.³ | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | throw out a couple of numbers but hopefully, you can help me here. To get from here to there, and I'm taking the midpoint of the guidance you've given, so $16 in fiscal '16. It's about a 3.5% sequential earnings growth rate from here to there by quarter. But it seems to me not so much that it's back-end loaded, but maybe it's a little front-end loaded with the combination of the Timet synergies in the near term, next several quarters, and the 787 doubling in rate. So is it truly linear or is it front-end loaded with back-end conservatism?<br><br>[Answer:] Well, I think it's a valid question. ***I think that directionally your math is very appropriate.*** What I would say, and if I think of our processes – so we tend to look at casting or forging, whatever it is, and you obviously look at any metric or any model and you plot a straight line. You do see ups and downs to that. But directionally, they average, kind of, out at that particular number. [. . .] I do think you see ups and downs. And when you get something like a 787 kicking in or whatever it is, it may move up above that, and when you get a stall into Q2 because of outages and European shutdowns, it may go a little bit below that. (App. 1 at 2-3; FAC ¶ 126.) | | |
| 5. | 5/9/2013 | [Joe Nadol (JP Morgan analyst):] So Mark, your organic growth, I know there's a lot of moving parts here, particularly the third-party sales of your metal businesses that – because pricing was down this quarter. But the organic growth, overall, was about kind of flattish this quarter and pretty flattish for the year. Just – and I know there's the press issue looking backwards, there's the selling prices of the metal and increased intercompany sales. But | Earnings Call | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | putting all that together and looking forward, when do you think that reaccelerates, at least back into the mid single digits?<br><br>[Answer:] [. . .] [I]f I look at it, if you kind of say what we said where you got 787 rates coming through, you got the 737 rates coming through, *I think you start getting to the back half of this year is when I think you start seeing kind of those type of numbers that you were asking about.* (App. 1 at 3; FAC ¶ 127.) | | |
| 6. | 5/9/2013 | [Joe Nadol (JP Morgan analyst):] When I look at, sort of, the year-on-year or what your [organic] growth rates were a year ago. I mean, you were pretty much up or down 2% every quarter this past year. Prior year was higher than that. So I know you don't want to overpromise, but do you see it picking up a little more near term?<br><br>[Answer:] *[T]here's nothing wrong with your logic. But again, when you start saying – it tends to be when you start saying into the mid, kind of, surrounding the mid, you need to get that 787. But I would agree with you that, if you start looking at comps, yes, you should start to see organic moving in the right direction. I would agree with that.* (App. 1 at 3; FAC ¶ 128.) | Earnings Call | Donegan |
| 7. | 7/25/2013 | *We are achieving strong earnings growth on stable commercial aircraft schedules, gaining share on new airframe and engine development programs,* maintaining a steady drumbeat to meet or exceed our cost-reduction targets, and continuing to set an aggressive pace in integrating our new acquisitions. [. . .]<br><br>Looking ahead, we have secured solid positions on all major production and | Press Release | PCC |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | development commercial aircraft programs, and our casting and forging operations will ramp up or level out as the OEM schedules dictate. [. . .] Beginning in the back half of calendar 2014, many of our operations will be ramping up to handle increased volumes, as the new aircraft and engine development programs roll out. (App. 1 at 4; FAC ¶ 140.) | | |
| 8. | 7/25/2013 | [I]n aerospace, we had overall growth of 30% versus last year. We saw very solid contribution from our acquisitions. Our base sales were flat. But again, this does have in it the lower metal pricing. We also had a union-related disruption in our Portland operations [. . .]. **We have seen some modest destocking by some engine customers, but it is important to note the demand is there, the contracts are there, the schedules are there. It is simply an inventory realignment that we experienced, and the demand does show back in the future.** (App. 1 at 4; FAC ¶ 142.) | Earnings Call | Donegan |
| 9. | 7/25/2013 | [Joe Nadol (JP Morgan analyst):] Mark, the destocking you're talking about that you're seeing, is it multiple customers, or is it 1 major engine customer? And what do you think is behind this? Is it aftermarket related on their end, or what's driving it? And then you say it might last a couple of quarters, 2 or 3 quarters. Typically, these things tend to last a little longer than that. I would say 12 to 18 months, if it's a real destocking cycle. What gives you the sense that it's really only a couple of quarters?<br><br>[Answer:] **[M]aybe destocking is not the proper terminology. I mean, it is at a couple of engine primes, and it appears to be an inventory reduction in this calendar year. And why I say that is we do see the demand sitting in our Q4** | Earnings Call | Donegan |

| No.³ | Date | Challenged Statements | Forum | Speaker |
|------|------|----------------------|-------|---------|
| | | ***[i.e., the quarter ended March 31, 2014]. So if I kind of look at what it wants to do, it wants to remain stable and then it wants to jump up in Q4.*** Now our challenge will be to go back and say we can't jump up in that manner. It has to be spread out. ***So do I think it's anything longer than that? No, I do not. It appears to be just an inventory for whatever reasons, in a very specific time frame that does want to re-accelerate going into next calendar year.*** So it does appear to be a yearly number, not some general spares or fall, but it does appear to be an inventory objective. [Joe Nadol (JP Morgan analyst):] When you look at the part numbers and just the types of parts, and it seems like you have visibility to the other end of it that would schedule filling up in the fourth quarter, your fourth quarter. [. . .] [D]o you get the sense that it's a 1 or 2 types of engines, or is this really just kind of broadbased?<br><br>[Answer:] I'd say that it's falling in a couple of different categories. And on the material obviously we don't – so if I look at the Cannon, that's going into some of the engine primes. I don't know exactly what engines it's going into, but it is – it's not a broad swept across everything. ***It is more of a specific realignment in a – in 2 or 3 engine types. So it's not like an overall reduction of x percent. It does appear to be very specific.*** The only thing I would add to that, too, is it's not dragging out of us. The metal side did for a quarter, but that recovers kind of back almost this quarter. It really is just that, that growth we're seeing wants to reside in Q4 and Q1, take a step-up, and we're just trying to claw and pull it back into this particular period. ***So like I said, it*** | | |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | ***appears to be an inventory-related on a very specific target on a couple of programs.*** (App. 1 at 5-6; FAC ¶ 143.) | | |
| 10. | 7/25/2013 | [Noah Poponak (Goldman Sachs analyst)]: [I]t does sound like, without quantifying it directionally, the next couple of quarters, excluding metal price movements, are closer to flat organically for the step-up in 4Q and continuing into '15? [Answer:] Yes, I would say that – I mean, when you get into these inventory movements, there tends to be some unpredictability. But I'd say seeing what I see today, the next couple of quarters, you're probably right and then it wants to get a lot of steam. Again it moves. When you get these, it's not as though it's necessarily the market doing anything, the end market. It can be more volatile. ***I don't think it will be worse at all because I think we've seen what the customer wants.*** (App. 1 at 6; FAC ¶ 144.) | Earnings Call | Donegan |
| 11. (Pls.' No. 2) | 7/25/2013 | [Noah Poponak (Goldman Sachs analyst)]: Mark, I'm wondering if you might be willing to at least attempt to quantify what you think total company organic revenue growth is going to look like for the full year. Because it sounds like a few more quarters of this aerospace engine destock, a few more quarters of IGT not really changing, a little bit more impact from the press, and it's negative in the first quarter. It sort of sounds like, all in, it's going to be difficult for it to be much different than flat for fiscal '14. And then, if I could take you out a little further into the future, in order – if that is true, in order to get into your previously stated longer term fiscal '16 targets, the 15%, 16% organic [growth] looks like it needs to really step up into the low double-digits or even midteens to get into that. Is that | Earnings Call | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | really the more L-shaped path that we're looking at here? Or am I missing something? [. . .] [Answer:] [I]t becomes somewhat difficult, the way I think of it, going out to the 16% number is either with more volume, performance. ***I have to kind of get a drumbeat of what I need to put through for kind of quarter over quarter over quarter in terms of EBIT dollars. If I look at Q1, we're pretty much on that drumbeat.*** So it becomes difficult because there are many, many pieces. Now let me answer the 2 or 3 quarter. I think that we are – what I'd like to see it be 1.5, my goal is I can't – I'm going to struggle to step up in the manner at which they wanted to do. So again, the fact that it looks like it is an inventory goal, the demand is there and they want to step back up in my Q4. Obviously, I'm going try to pull it back. So let's say metals are a constant. Let me – maybe I can answer the question from that standpoint. Metals are a constant. Then I would expect to see that organic growth come our Q4, to start to pick up from that standpoint as it comes through. But I do not look at this as a, "I only get it one way." ***Again, I look at it as, I get to generate EBIT dollars at a rate over the next 2 years and 3 quarters, either through operational improvement, more volume, organic growth, new product introduction, new engines. It doesn't matter to me where I get it from. I have to get it. And if I look at where we were in Q1 from Q4, we're on that slope. And we are on that slope.*** Now does it make your job any easier? No, it doesn't because you – I understand. I understand you're trying to find the A plus B equals | | |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | C. I have A, B, C, D, E, F. I have all these dynamics that I get to incorporate them on. So I really focus on that EBIT dollar improvement. (App. 1 at 6-8; FAC ¶ 144; App. A at 1.) | | |
| 12. | 9/17/2013 | [Jason Gursky (Citigroup analyst):] Then on the engine destocking with the new programs that you talked about in the most recent quarter, can you just give us an update on how that's going and whether that March quarter still is the quarter where we kind of get back on track?<br><br>[Answer:] Yes. Again, I – the way I look at it, certainly we have – I mean, I guess, I need to back up to if you look at what makes us kind of tick, what do we look for? ***We have long-term contracts that are in play that basically guide and direct our market share, our pricing. Those are in place, and those all have very strong content on. And then you look at the rollout of the new programs, we have extremely strong – probably our best positions we've ever had on those new programs as they are rolling out.*** We see often on these, based on whatever a particular customer has, these moments where they're just doing a temporary destocking, it could be on the raw material side, it could be on the component side, and what there really is, is kind of that what we would see is the acceleration kind of process for a usually 2- to 3-quarter period time. I would say that what we're seeing that it is playing out pretty much as our customers had told us it was going to go. ***And as we go into Q4, Q1, we go back where that destocking kind of goes away and comes back to the normal rates.*** (App. 1 at 8; FAC ¶ 152.) | Citi Global Industries Conference | Donegan |
| 13. | 10/24/2013 | So if I basically look, Q2, as with Q1 before, ***establishes just another data*** | Earnings Call | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | *point on a long road of steady expansion of shareholder value. It's the type of performance we and you should expect from the company for the foreseeable future.* (App. 1 at 8; FAC ¶ 155.) | | |
| 14. | 10/24/2013 | [Noah Poponak (Goldman Sachs analyst)]: Well, just – and then just maybe an update on the engine destocking that you were talking about last quarter.<br><br>[Answer:] Well, that's what I'm saying. I think that it's held where it was on that investment cast side of the equation. And so that's all what the – that it came through there. That's the . . .<br><br>[Noah Poponak (Goldman Sachs analyst)]: But it sounds like that hasn't really changed at all since . . .<br><br>[Answer:] No. And again, we – if you kind of go back to what we said, we expected to see it kind of stay at this stable level for kind of our Q2 and Q3. *And then as we move the back half of 4 and into 1, that's when we start seeing kind of that coming back. But it's important to note, though, in that, large commercial, we're seeing good demand from large commercial. I mean, large commercial wasn't almost in that double-digit territory.* So it really is kind of in that – we coat it all together in Investment Cast Products, certainly is that military and that aftermarket side of the equation. (App. 1 at 9; FAC ¶ 157.) | Earnings Call | Donegan |
| 15.<br><br>(Pls.' No. 3) | 10/24/2013 | [David Strauss (UBS analyst):] You mentioned that these results were just kind of one data point on the long road towards your '16 dollar target. Just curious, were the results actually ahead of your internal plan? | Earnings Call | Donegan |

PAGE 13 – OPINION AND ORDER

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | [Answer:] No, no. [. . .] *[T]he way I expect us to have the contracts, the positions, the programs we have, we are positioned extremely well.* Now you come down to how can we digest it? How can we grow, how can we effectively manage the cost. *So from our standpoint, the way we think of this road, the way we think of this path, it is a kind of a continuum. So [. . .] I'll just I say, we don't have the ability to make these giant pops.* It just – we can't man, we can't move the product, we can't get it through in that manner. So, it will follow more of a – so when I think of it, I do think of it as a – we are very – our whole mindset, *we always talk about staying on the line. You'll hear from almost anybody in the company, our whole world is staying online. We wanted to – we want to move products through online. We want to drive variable costs through down the line. We want to – everything we do is that "staying on the line" drumbeat. So we have a line. So if I go from where we were and blow my way out to that '16 time frame, I go to the line. So we hover around that line.* So no, this was not, from my vantage point, internally where we thought we could get. No, it wasn't that far off. (App. 1 at 9-10; FAC ¶ 158; App. A at 1.) | | |
| 16. | 10/24/2013 | So are the margins higher than they were in that overall? Yes, they are. Are they way above where we expected to get at where some of these businesses are now? No, they're not. Again, we tend to be a very data-driven group of people. But there are going to be moments where they probably won't run as high because we will be aggressively training and bringing people on, and revert levels won't be as high. But are they in the range we're expecting to be in the | Earnings Call | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | segments? Yes, they are. And then again, you have on top of that, we've been very open about it, certainly TIMET is outstripping where we thought they'd be. And there are other acquisitions that are performing more rapidly than we expected then to do. So yes, *there are elements in there that are outperforming what we originally thought*, but we don't expect to take our foot off the accelerator on those either. (App. 1 at 10; FAC ¶ 159.) | | |
| 17. | 10/24/2013 | [Robert Stallard (RBC analyst)]: I thought I'd follow up on David's question, actually, about your run rate to 2016 because, if I remember right, the buildup for that target assumed an incremental margin, for example, which is significantly lower than what you achieved in Airframe Products. And also investment cast is kind of hit with a very strong margin. So where do you think we're tracking maybe on your margin expectations even if sales have perhaps come in a bit light, thanks to destocking?<br><br>[Answer:] […] We expect – and I'm just not saying we sit back in pull these items out of the sky. When you have these pauses, you get – you should become more efficient. You are training as aggressively. You're not bringing in as many new people. You should get a productivity pop, you should just get it. Revert utilization should go up. There should be more revert available when you're – you get this time when there's more product on the marketplace being cut, you pull it back, and revert levels go up. *So when we say we expect, there's reasons as to why we expect. We got a history of what we know we should get.* So yes, the margins are running ahead of where they would be in the long haul, but no, it's not unexpected of what we | Earnings Call | Donegan |

PAGE 15 – OPINION AND ORDER

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | wanted to get. (App. 1 at 11; FAC ¶ 159.) | | |
| 18. | 12/3/2013 | I think that, again, there has certainly been – one of the engine guys has been pretty vocal about what they've been doing. *I think the bottom line is there was just a large amount of inventory that they put in the system is that – pretty much I'd say that the main was – the 787 was make sure that everything was protected. And I think as it's now starting to balance itself out, I think it's mainly a correction of that particular program. So that's the kind of – I think as we get into next year, our schedules show it's gone. And we know it has to be gone, because there is a – it's – there's – the growth that we would have expected to see compared to – we're underbuilding for the current level. So I think as soon as that goes away, the schedule shows that it comes back up. So it's been more of – rather than – destocking a lot of times mean that you fall off. It's been more of holding at a flat level, not taking a step up. And I think that step up does start coming in, in the middle of next year.* But I think it was just basically a bunch of inventory was put in the system to make sure that there was no misses when there was all the fluctuation of the 787. (App. 1 at 11-12; FAC ¶ 167.) | Credit Suisse Global Industrials Conference | Donegan |
| 19.<br><br>(Pls.' No. 4) | 12/3/2013 | [Unknown Analyst:] You have lots of levers to pull [to achieve the FY16 EPS Target], top line, bottom line and in between, right? But should we think – those numbers are going to fluctuate to some extent, and market demand's going to play a role, internal things and so on. How do we think about – if we look out over the next few quarters, where should we be focused? [. . .] | Credit Suisse Global Industrials Conference | Donegan |

| No.³ | Date | Challenged Statements | Forum | Speaker |
|------|------|----------------------|-------|---------|
| | | [Answer:] [. . .] *[W]e are a linear-thinking group of people. We're financially driven. Everything we do breaks down to a financial model. Let there be no mistake. It breaks itself down to the core components. So it's not a hope and a prayer.* And if you would sit through a quarterly review, you'd hear somebody, when they start talking about a hope and a prayer, I'll say, "Put up Page 3." Now when you're speaking to me, point to that line, because that's all I care about. Show me that line, or Page 5. I mean, we have all these things. *So our mindset is going to be linear. You're going to see different movements. I didn't shirk when we didn't get the acceleration from – because of the destocking. You know what, we pull the other levers. We got cost takeout. We've got these acquisitions. I know all the levers that are there.* (App. 1 at 12; FAC ¶ 168; App. A at 2.) | | |
| 20. | 1/23/2014 | Our aerospace operations are supporting a historically high commercial aircraft build rate, and, as the customers take the rates to the next level, *our sales should track that upward slope.* [. . .]<br><br>During the quarter, we were hit harder than we have ever been before by last-minute customer schedule shifts, and *we do not expect to see them again to this degree in the foreseeable future [. . .]. We came to grips with these late-quarter challenges immediately, and we dealt with them as effectively as possible. Going forward, we see upside opportunities,* and our operations continue to deliver increased value on higher volumes. (App. 1 at 13; FAC ¶ 170.) | Press Release | PCC |
| 21. | 1/23/2014 | Returning back to Forged [Products]. In the outlook, *if I look at aerospace, as* | Earnings Call | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | *with Cast Parts, it is product that is contracted for, have in place and will be driven as those rates increase. In this particular area, we certainly will also recover the Q3 schedule shift in Q4.* Again, we had a very solid position coming into Q3 on the re-engining and platforms, the best we've had on an engine of this size. And in the quarter, we won additional share, so we continue to expand that presence on that narrow body. And we went over TIMET, and certainly, they had a long runway on all fronts. (App. 1 at 13; FAC ¶ 171.) | | |
| 22.<br><br>(Pls.' No. 5) | 1/23/2014 | *So on one hand, we're accelerating beyond those organic sequential growth range,* as a benefit of the top line. It usually comes back on the downside when it comes to that range. This is how we think of our business.<br><br>I want to make sure you understand. This is not guidance. This is clearly trying to define how we think of the movement, quarter-to quarter and sequentially. *This is very consistent in the way we broke apart, defined and gave the framework for our fiscal year '16. Contracts are in place. It's all intact. It was put there to give that framework that this is how we kind of get there, and it is done in this manner. So I wanted to have that conversation again in the way we think about our business. Again, it's consistent with where we are in that '16 framework. And that '16 framework looking at where the market is and the contracts and the price line, right now, that framework still feels very done, very – in the ability to get so intact.* (App. 1 at 13-14; FAC ¶ 171; App. A at 2.) | Earnings Call | Donegan |
| 23. | 1/23/2014 | [Gautam Khanna (Cowen and Company analyst):] And then just expand on your comments on destocking into the year | Earnings Call | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | end. Did this extend beyond the 787 engine programs? And if you can just update us on whether you still expect to be shipping in line on those programs with underlying consumption by the March, June quarters, kind of do still expect . . .?<br><br>[Answer:] Yes, I think – ***this I wouldn't even almost consider destocking. I think there was – kind of if I go through the course of mid-last year, there was probably a realignment and a balancing as the 787 started getting some drumbeat to it. So I think that there was a more specific – this to me felt more like a year-end shift, moving product 2 to 3 weeks to the right versus what would have come into some customers' fiscal year end. So it did not feel like a destocking.*** It felt more like an objective, a cash flow, financial targets, working capital. It felt like it was more of that. ***It just moved and shifted 2 or 3 days in some cases. It just got 2 or 3 days beyond kind of our end,*** so filling more in. If I look at kind of the remaining – what I consider the remaining destocking, it probably falls in a couple categories. I think if falls into that fastener side of the business. And right now at the burn rates – and we do – we can monitor the burn rates. The way that kind of – we have the access to what they're pulling We have access to their inventory levels. So you can start to plot kind of that crossover point. Again, that June through July, August, that's kind of the quarter that we cross on that 787 hardware. And then I think a lot depends on what is our end customer basically in the case of 787, as Boeing moves towards production of that, then obviously I think they'll keep pulling the Airframe side of the business. So I think | | |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | that's kind of the last piece of the puzzle. And then certainly, the engine side, I expect to get pickup from the – as we are not at 10 yet on the engine side of business either. So as the true production goes to 10, I expect to see that come through more in that – our mid-calendar year '15. So that's kind of what it feels like today. (App. 1 at 14; FAC ¶ 172.) | | |
| 24. (Pls.' No. 5) | 1/23/2014 | [Joe Nadol, JP Morgan analyst:] Are there pluses and minuses to consider when we think about your target? <br><br> [Answer:] There's always pluses and minuses. I mean, every day, when we wake up, you got to realize my job is pretty clear. My job is only to deal with the crap. So yes, every day presents itself with minuses. What I would say to that is we get paid to manage those minuses. So as a shareholder, shareholders look at me and say, we don't really care about the minuses you manage and we only want the upside. And I understand that. So yes, there were minuses. If I look at the one thing that I would say has delayed, it's probably been the fastener side of the equation in terms of the closure to the 787 rate. So in the short haul, it's not been what I wanted it to be. And that's when it becomes difficult for me to say I'm going to go manufacture that. When I look at the framework in the long haul, I get contracts. I have share. I see where they are. I see the endpoint. It's going to come. So when I say the framework is still intact, are there things that go day to day, like did I see the Q3 quarter shifts? I did not see the Q3 quarter shifts the last 2 weeks. I did not. But again, if I look at what I consider framework, contracts, build rates, share gains, all that, and you get out so that, that – so ***no, nothing's gone negative from that standpoint in*** | Earnings Call | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | *terms of the framework, not at all.* (App. 1 at 15; FAC ¶ 174; App. A at 3.) | | |
| 25. | 1/23/2014 | [Jason Gursky (Citigroup analyst):] I want to just stick with this 2016 outlook and maybe just ask it at a different way and put it this way. If we're sitting here 25 months from now and you don't reach the target, why would that have been the case? [Answer:] Well, from my standpoint, why wouldn't that have been the case is something fundamentally changed with the overall dynamics. Build rates didn't step up. Something happened in the new product introductions. Yes, China melting down in terms of GDP, more macro dynamics. ***If you look at what our line of sight to is, again, my contracts are in place. I got share. I know what it is. The build rates are announced.*** The engine people are marching down. The framers are going at a pretty reasonable drumbeat right now. ***Yes, there's some puts and takes. The destocking, the destocking goes away. You close the gap. It has an end to it.*** And like I said, in terms of 787 fasteners, you see the end and then there will be that step-up. So I think what the framework was meant to do was to whack off the quarter-to quarter events and stay focused on the dynamics of the long haul. So from a standpoint of aerodynamics, they're sound. If I look at power dynamics, we weren't considering some wild growth rates. So right now for us, power's playing – I mean, IGT's playing okay. Power, I think when I look, it's sitting in front of us now. Interconnect pipe's come back to about the rates we thought it would come back. And if I look at where we are looking at the oil and gas, I think we're positioned right. So it would have to be something more in the macro level is what I'd say, or some | Earnings Call | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | catastrophic event that occurred in one of our – again, could catastrophic events occur? Sure, but it would have to be something like that. But from that standpoint, it would fall into those categories. It's not going to be a quarter 3 fiscal year '14 schedule shift, it's not going to be that. That's what the framework was meant to say is, hey, some of these things move quarter – that was the whole goal of doing what we did. (App. 1 at 16-17; FAC ¶ 174.) | | |
| 26.<br><br>(Pls.'<br>No. 5) | 1/23/2014 | [Robert Spingarn (Credit Suisse analyst):] I'm wondering if you haven't had a number of positives since you first offered that [EPS] guidance. You've doubled that TIMET synergies in the period that would really encompass '16. You've got a couple more acquisitions, which were not included in the initial guidance. And you've talked about share gains, some of which you hit by then. So shouldn't that target be better than intact, but actually higher at this point?<br><br>[Answer:] Well, let me – I have to be careful because sometimes, the things I say tend to come across in a wise manner. You have understand sitting where we sit, sometimes, talking about the upside of things just get grabbed onto in reports and print pretty quick. So when we typically – if you kind of – let me use TIMET as a baseline. When we put that out there, did we know we were going to do better than that? **We had a high degree of belief that we were going to be able to do better than that.** Now the rate that they accelerated is better than we thought. So if you look at what we do, I think **when we put something out there, it typically tends to be a number that we are committed to, have multiple ways to get there. It is not a hope and a prayer. So when we say the** | Earnings Call | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | *framework is intact, that basic framework had in it the things that we talked about.* There was certainly TIMET in there that – that was all. But to your point, there are things we didn't say were in there. We didn't say that there was going to be – we went up through the acquisitions of TIMET. So we didn't say that the additional M&A we said – we were clear to say it wasn't in there. So if you start saying intact, the framework is intact, to me, that is the baseline of what I told you back then. So to your comment, other things would have a value, to some degree, and that's kind of the way it looks. So again, *when I talked to framework, it goes back to that original baseline of what we said.* Now that might – and again, I don't want somebody going on jacking in $100 million. I mean, my number and my framework on TIMET was certainly more than we put out there as original synergies. So – but TIMET is doing very well. That TIMET team is doing very well. So I hope that gives you some clarity. *Again, when I talk to framework, it's the original framework.* (App. 1 at 17-18; App. A at 3.) | | |
| 27. | 5/8/2014 | [Robert Spingarn (Credit Suisse analyst):] Just following onto what Gautam asked you about, you do have somewhat easier comps now as we get into '15 given how '14 trended. And is a 4% to 5% organic growth rate doable in '15 on the revenue side?<br><br>[Answer:] *Yes*, I think your comments are great. We had some very tough comps coming off. Obviously that military spares was, in Investment Cast, was a big number. I mean, so I do agree with you, as we start moving in the comps become much more reasonable. So yes, I think your statement from that | Earnings Call | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | standpoint is 100% correct. We also expect some of that to come back, too. So let me be clear. And we expect the military spares to come back. Again, they are an active program. So it's not as though that spares falloff is on dead programs. They are very active programs that we've had conversations with our customers that we all know they're going to come back. I think the pipe side of the equation, there's a lot of demand coming in the pipe side of the equation. I do think IGT, we will see another run of spares from that standpoint. So if you put all that in against kind of the comps, I think as you kind of get into that back side of the year, it lines itself up to be strong. Now again, I want to make sure it's clear that when I look at this business, I'm just not going to sit back. And we kind of – we discuss this off and on. I look at this company as every opportunity that I leave on every front. So we're not, just not going to sit back and wait for the organic growth, or we're going to drive kind of where I started this whole conversation at the beginning. ***We are going to drive after every opportunity on every single aspect of this corporation. So I think from that standpoint, yes, I feel really solid about kind of what we're looking at in this corporation, absolutely.*** (App. 1 at 18-19; FAC ¶ 183.) | | |
| 28.<br><br>(Pls.' No. 6) | 5/8/2014 | [Robert Spingarn (Credit Suisse analyst):] When we think about the comments you've made in the past, you've been very clear, Mark, that you've got lots of levers to get to your long-term guidance range. But again, with Permaswage, ADI sounds very interesting, a lot of opportunity there. You've had outperformance at TIMET, and you've been buying back stock. What should investors and – what do you | Earnings Call | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | need to have happen for you to update the guidance? What is the catalyst or the milestone that we should be looking for?<br><br>[Answer:] I think you are correct. I mean, TIMET has done extremely well. Obviously, the delta gap between what you think they're doing well and kind of us think we're doing well is not as great from that standpoint. ***We – typically we have a pattern that we will when we – we under-commit and over-deliver. That's pretty much kind of what our motto is from that standpoint.*** So I do agree that TIMET's doing very well, and they're just – what they're basically doing is pulling everything kind of to the left very aggressively. So I have to give TIMET kind of their due. (App. 1 at 19-20; FAC ¶ 184; App. A at 3.) | | |
| 29.<br><br>(Pls.' No. 6) | 5/8/2014 | If I look at the other ones [PCC acquisitions], ADI, yes, I feel ADI is an asset that – it is a world-class asset. They've got great contractual positions. They've got a great presence on programs that certainly we're looking to grow on. And there is – it is a very good business we feel solid about. ***In terms of the whole – it's not guidance – the targets, whatever you want to call it. I think what I would say is that we obviously feel very, very, very solid about kind of what's out there.*** And again, that baseline is – doesn't include ADI, it doesn't include Permaswage. And any buyback kind of over the non-dilutive would be in there, too. So I'd say that at this point in time, we feel very confident with what we have out there. You'd have to add to that kind of the benefits of ADI and Permaswage, but any formal redoing at this point in time, probably not going to do anything from that standpoint right now. (App. 1 at 20; FAC ¶ 184; App. A at 3.) | Earnings Call | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| 30. | 7/24/2014 | Our order books began to fill in rapidly, and customer demand for accelerated delivery increased. As a result, *we now have a clear line of sight to the steady growth we are anticipating in the second half of our fiscal year.* (App. 1 at 20; FAC ¶ 193.) | Press Release | PCC |
| 31. | 7/24/2014 | Commercial aerospace activity is and will continue to be the single biggest driver of our growth in fiscal 2015. [. . .] *Across the Company, base aircraft production continues to be solid.* Production of 787 components in the majority of our aerospace operations now supports the original goal of 10 aircraft per month, and *we now have orders in hand that will close the gap completely. In addition, some Airframe Products' customers significantly accelerated their ordering activity during the quarter. These higher volumes, along with further share gains, are driving the segment's operations* to take steps right now to be ready for the increased production that we can expect later this fiscal year. (App. 1 at 20-21; FAC ¶ 193.) | Press Release | PCC |
| 32. | 7/24/2014 | TIMET. As we move into the back half of '15, we have a couple of dynamics that are going on. There was some destocking that was occurring from some of the European customers. *That goes away and gives us a step-up.* (App. 1 at 21; FAC ¶ 194.) | Earnings Call | Donegan |
| 33. | 7/24/2014 | [Gautam Khanna (Cowen and Company analyst):] It sounds like Rolls is still destocking. Is that right? [. . .]<br><br>[Answer:] *The destocking coming out of Rolls, yes, I'd say we do definitely see that coming to an end. To be fair to Rolls, they've been very consistent when they said where we're going to see it come to an end. And as we move into our Q4, that's when it comes to an end.* | Earnings Call | Donegan |

PAGE 26 – OPINION AND ORDER

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | In terms of the spares business of the military, I think we do start to see some of it coming back into Q4. We're still working to see if we can potentially get more of that pulled in, to not face kind of the dynamics we think we could potentially face as we move into next year. We're probably – we've got – still got some more work to do to see if we can work to get that pulled in. And then the TIMET orders, again, that's kind of that Rolls-Royce piece of the equation that we do have the orders at this point in time on hand. It shows that going away. I think I answered all your questions. (App. 1 at 21; FAC ¶ 194.) | | |
| 34. (Pls.' No. 7) | 7/24/2014 | *I want to be clear in regards to the fiscal '16 targets. I want to reaffirm a target and a framework is in place.* We've also completed several acquisitions, a couple of larger ones, Permaswage and ADI, that would be additive to that, as well as any reduced share count. (App. 1 at 22; FAC ¶ 196; App. A at 3.) | Earnings Call | Donegan |
| 35. (Pls.' No. 7) | 7/24/2014 | *We have said numerous times, and it's clear as I can say it today, that, that original target we gave, we are committed to that and feel confident in it, and we'll move beyond it based on the things we talked about.* (App. 1 at 22; App. A at 4.) | Earnings Call | Donegan |
| 36. | 7/24/2014 | *I think we are looking at organic moving in a more aggressive manner.* We've been waiting for the fasteners to come through. We've been waiting for the Airframe to come through. We've kind of get those orders sitting on top of us now. We've kind of talked about the huge load we have sitting on top of us on the interconnect pipe that we've got to move through. So I do think that we've been able to stay on that continuum. *I think it's important to note, too, we've been able to stay on that continuum* | Earnings Call | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | *without strong organic growth, and now we're starting to see the organic orders being placed on top of us,* but I think it's still a blended-in rate. (App. 1 at 22.) | | |
| 37. | 10/23/2014 | Overall in Forged segment, the aerospace sales were stable. The key drivers in there: large commercial overall was flat, but a *key driver in that was destocking, primarily by a single engine customer.* The value of that in the quarter negatively impacted Forged Products' growth overall by 2.5 percentage points. So the destocking that went on from that single customer was a large number in the aerospace side of the equation. (App. 1 at 22; FAC ¶ 203.) | Earnings Call | Donegan |
| 38. | 10/23/2014 | Going forward, our markets remain strong, and customer demand has *given us a clear line of sight to sustained growth.* (App. 1 at 22; FAC ¶ 206.) | Press Release | PCC |
| 39. (Pls.' No. 8) | 10/23/2014 | Before I quickly review our '17 to '20 framework, *I want to make sure that it's clearly understood that we remain fully committed to our fiscal '16 framework.* There are a number of factors that are sitting on top of us now that certainly support that confidence. The destocking that we experienced, which I kind of gave a value of that, goes away. The TIMET market shares we have start kicking in and drive their way through '16. The IGT demand is on us right now, and we have to move that through '16. The new engine programs, our content, our value that we've gotten is at an unprecedented level. And again, that has to transition now through the production – through the development and into production again through our '16. And the aerostructures wins that we already have in hand that we have got to get out with the new equipment coming in, those are just to name a few, along with the general updemand we've seen in the fasteners as well as others. So that '16 | Earnings Call | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | framework is still well intact, and we will move through to that.<br><br>Off of that, we showed last quarter kind of this '17 through '20 framework. The only real comment I want to make at this point in time, **there is no change to the framework we laid out.** (App. 1 at 23; FAC ¶ 207; App. A at 4.) | | |
| 40. | 10/23/2014 | [David Strauss (UBS analyst):] The destocking that you talked about specifically at Forged, I think the 2.5% or whatever it was, how much further can this go out of this customer? [. . .]<br><br>[Answer:] I would tell you that right now, the schedules that we have on us says ***that it ends and starts to recover in our Q4 and fully recovers in Q1. We have orders on us that say that.*** And at this point in time that's all I can go for. But I would agree with you, it has been a redo with this customer probably 2 to 3 times it has been. I do believe that it is getting to the point that it cannot be reduced anymore. ***So I guess I'd say that my confidence at this point in time is higher that it will in fact stick to the current schedules than it has in the past.*** (App. 1 at 23-24; FAC ¶ 208.) | Earnings Call | Donegan |
| 41. | 10/23/2014 | [Robert Stallard (RBC analyst)]: One of your customers over here in the U.K. has made it clear they think there's a lot they can still do on inventory. Are they sort of saying one thing to us and saying something different to you? And ultimately, is there still some downward risk here as they look to further destock not just in Q3 but going forward over the next 12 months?<br><br>[Answer:] Yes, I obviously can't answer for any of my customers as to what they do or don't do. The only thing I can do is take the existing dynamics that we've | Earnings Call | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | seen. And if I compare what we saw in the Forged Products world, that would be both in terms of the alloy on the nickel and the titanium side and the Forged shapes, and that would be on, again, the titanium, fan side and the closeddie side. It has been a very aggressive long takeout, different from what we've seen on so many other parts of our business. So all that I can answer at this point in time is the demand we've seen shuts – or the **destocking that we've seen just kind of bottoms out and closes off in the Q3 time frame, and then the orders on top of us start to recover**. What that customer may be referring to, to you, I can't answer that for you. I can just tell you kind of what we're seeing from our standpoint. But I will tell you that the overall Forged has seen it sustain for a long period of time. Again, it tends to be an area to go after. It's large, it's expensive and it's costly. So it's no surprise. It's got the longest lead times. It's no surprise that it's #1 where you go and attack to go drive inventories down. And in the flip side, it's going to have the longest lead times coming back, much more so than a fastener or a structural casting. I mean, your lead times are double or triple when you go all the way back to melting metal to deliver an end product. (App. 1 at 24-25; FAC ¶ 209.) | | |
| 42. | 12/3/2014 | [Unknown Analyst:] Quickly, you alluded to the destocking that you've had to work against. You've said that, that should alleviate in the second half of this fiscal year. We're most of the way through the third quarter here. Are you seeing that?<br><br>[Answer:] Yes. We are – **yes, we are seeing it.** It's not – I would tell you it's not – I've now got 100% order on me. | Credit Suisse Global Industrials Conference | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | What we are seeing as you move into Q4 and to Q1, you are seeing a more normal rate that brings you back up. So have we seen the bottom of it? Yes. Are we seeing an increase in order rate? Yes. And I'd say we really get out of it completely by Q1 is about when we get out of it completely. (App. 1 at 25; FAC ¶ 216.) | | |
| 43. | 12/3/2014 | [Unknown Analyst:] So to be clear on this, because what some people have been concerned about was whether this was a destock or whether the customer was either going elsewhere or bringing some work inside, it's a straight destock.<br><br>[Answer:] Yes, there's a lot of product where we got hit on the destock where the application is kind of a – right now we're kind of sole sourced. So we were able to look at a position where we are the only avenue and you could just – you can track. There's a huge disconnect in terms of what they've pulled out of – you can look at here's the delivery rates, here's what they're ordering, you could see it, you could match it up to a part where we're the only solution and say, okay, it matches out. ***On the flip side, when you get to the back half you can start seeing the increase going back towards the build rate.*** (App. 1 at 25; FAC ¶ 216.) | Credit Suisse Global Industrials Conference | Donegan |
| 44. | 12/3/2014 | So with that, are we done? So I just took a snapshot of the last 2.5 years. We look at fiscal year '13, we saw sales growth of 16%. We turned that 16% sales growth into 19% improvement in EBIT. Our operating margins for this period expanded 70 basis points, but we were bringing in a number of businesses at the time that had lower performing margins. So we absorbed that, overcame that and still delivered an upside in the margins. It delivered EPS of 15% up and it | Credit Suisse Global Industrials Conference | Donegan |

| No.[3] | Date | Challenged Statements | Forum | Speaker |
|---|---|---|---|---|
| | | delivered free cash of roughly 1.4 – $1.14 billion.<br><br>Moved into next year, '14. On top of the 16%, another 14% sales growth. We turned that 14% sales growth into 23% EBIT improvement. We drove EBIT margins up 200 basis points in a 12-month period of time, still acquiring other businesses that had a natural drag on that. The EPS went up 22%. Free cash, just under $1.53 billion.<br><br>First half of '15. Another 8% up in sales, turned that into EBIT up 12%, continued to expand margins of 120. EPS grew by 14% so far and free cash flow was $562 million. In this time, in this 2.5- year period of time, you've seen a huge development in loads that run through our factories with the re-engining. So all of the development costs came through there, all the downhole casing development is in there. You saw volatile material prices from $5 to $8 a nickel and we had a number of businesses that we brought in. So the acquisition model is very robust at lower. Even given all that volatility, we've been able to see these type results.<br><br>And in this first half of the year, in our Q2, we had also a customer destocking that was in there, but we brought down another set of assets in TIMET that we had not brought down the year before and that's in those numbers, too. So you look again at this model that, against a backdrop of a number of things that would be headwind, ***we're still able, with the robustness of what we have available to us, this is kind of the drumbeat of what we'll deliver as an ongoing basis.*** (App. 1 at 26-27; FAC ¶ 217.) | | |

PAGE 32 – OPINION AND ORDER

### III.    FY16 EARNINGS GUIDANCE

### A.    Undisputed Facts

In January 2013, PCC announced its $15.50-$16.50 EPS Target. (Defs.' Ex. 39 at 19.) The FY16 Target referred only to organic EPS, i.e., it excluded the effects of acquisitions and share repurchases. (*Id.*)

PCC retracted its FY16 guidance on January 22, 2015. (Decl. of Richard A. Russo ("Russo Decl.") Ex. 58, ECF No. 226-3.) On an earnings call that day, PCC's Vice President of Investor Relations Jay Khetani ("Khetani") explained to investors that PCC had not provided investors with "insight into our original FY16 discussion[,]" including the "sensitivities and assumptions" underlying the guidance, and Khetani acknowledged that PCC "went two years without updating" its guidance and "things changed during that timeframe." (Russo Decl. Ex. 59 at 9.) On that same call, Donegan also acknowledged that he had reaffirmed the guidance despite changed circumstances, and that he "accept[ed] the responsibility wholeheartedly." (*Id.* at 10.)

### B.    Disputed Facts

### 1.    Lead Plaintiffs' Version of the Facts

To develop the FY16 Target leading up to the January 2013 issuance, Hagel and Khetani directed financial analyst Ray Phillips ("Phillips") to create a financial model for their review. *See* Russo Decl. Ex. 8 at 5 ("In developing the [Target] . . . . [Phillips], acting at the direction of Khetani and/or Hagel, prepared and revised a set of Excel spreadsheets to generate projected [profit and loss] statements[.]"). Phillips spent several months developing a financial projection of PCC's earnings based on PCC's internal data, historical drop-through rates by division, external third-party forecasts, Wall Street opinions, and PCC's then-existing contracts. *See* Russo Decl. Ex. 5 (Dep. of Ray Phillips ("Phillips Dep.")) at 32:2-15 (Phillips testified that "there [were] hundreds of factors and people that [he] talked to in order to" come up with the most

accurate FY16 EPS projection possible). Phillips concluded in January 2013 that the "best financial data available" to him confirmed that the FY16 EPS would be between $13.30 and $13.80. *See* Phillips Dep. at 66:22-67:4. According to Phillips, this EPS figure reflected the "internal consensus" within PCC regarding where EPS could be by FY16. *See* Phillips Dep. at 65:5-9 (Phillips responding "oh, yeah" in response to whether he had "conversations with [Khetani and Hagel] . . . arriving at the 13.30 to 13.80 range"). Consistent with Phillips' figures, Hagel and Donegan had presented an FY16 EPS projection of $13.72 to PCC's Board of Directors in November 2012. *See* Russo Decl. Exs. 13-14.

Defendants internally recognized that the FY16 EPS guidance "must top street view[.]" (Russo Decl. Ex. 9 at 5.) Donegan directed that the FY16 model incorporate a 10% per year earnings before interest and taxes ("EBIT") growth rate, but such a growth rate was inconsistent with available economic data. *See* Russo Decl. Ex. 4 (Dep. of Shawn Hagel ("Hagel Dep.")) at 162:9-10 (Hagel responding that "[y]es. There was a phone call" during which Donegan instructed that the FY16 model should assume a 10% per year EBIT growth); Hagel Dep. at 158:6-13 (Hagel agreeing that "projections for fiscal '14, '15, and '16 . . . . are dismal because [they show] declining growth"). Nevertheless, Hagel instructed Phillips to "force" the 10% growth rate into the FY16 Model. *See* Russo Decl. Ex. 17 (email dated January 18, 2013 where Phillips explains that "[Hagel] asked me to send you the latest projections to include at least a 10% EBIT CAGR [compound annual growth rate]"). Phillips had to "finagle" revenues to "make them look at least somewhat defensible" and go against what finance executives instructed him to do in order to incorporate the 10% growth rate. (Phillips Dep. at 151:6-9.) Even with the forced 10% growth rate, EPS for FY16 was projected to be only $14.67. (Russo Decl. Ex. 22.)

Hagel next directed Phillips to "force" both the 10% growth rate and an incremental margin (i.e., "drop through") rate of 40% into the model. *See* Hagel Dep. at 336:18-337:8 (Hagel testifying that she asked Phillips to run a scenario assuming a 40% drop through rate and a 10% growth rate). Donegan and Hagel directed the input of these assumptions even though a 40% drop through rate "for some of [the divisions] had never been achieved and was very unlikely" and a 10% growth rate across all divisions "when the market demand [was] possibly dropping" was also unlikely. (Phillips Dep. at 73:17-23.) With these "forced assumptions" input into the model, Phillips ran a scenario where "EPS [was] in the range of $15.50 to $16.50[.]" *See* Phillips Dep. at 87:14-20; *see also* Suppl. Decl. of Richard A. Russo ("Russo Suppl. Decl.") Ex. 89, ECF No. 271-1 (Hagel email to Khetani on March 27, 2015, noting that "Mark add[ed] his own opinion" to FY16 earnings guidance). Phillips "tried to reason with" Khetani that the range of $15.50 to $16.50 was "$3 above what we knew to be the appropriate range[.]" (Phillips Dep. at 77:19-78:5.)

PCC developed an internal tracking mechanism to "assess[] where [PCC's] performance was relative to just a very simple linear progression" toward the FY16 Target. (Russo Decl. Ex. 7 at 51:17-24.) Donegan had requested the tracking document, referred to internally as the "FY16 Progression" or "TOC line," which included a constant 3.4% sequential earnings growth rate to the FY16 Target. *See* Russo Decl. Ex. 32 at 4 (the tracking document); *id.* at 1 (April 17, 2013 email to Hagel stating "Mark asked me to put this together").

Donegan, Hagel, and Khetani met every quarter, and discussed PCC's performance "against that simple linear progression" to the FY16 Target. (Russo Decl. Ex. 7 ("Khetani Dep.") 52:12-53:6.) Quarter after quarter, PCC's EPS results fell below the "line" identified in the FY16 Progression. *See* Russo Decl. Ex. 33; *see also* Hagel Dep. at 300:20-301:7 ("Q: [D]espite

including M&A and stock repo . . . you're below the line every quarter, right? A: These lines [in the exhibit] show that it is below, yes. Q: Every quarter for five quarters here, right? A: Yes.").

Khetani recognized in April 2014 that PCC should "[a]mend [the] FY16 target" to provide additional information (Russo Decl. Ex 10 at Slide 3), and was aware in July 2014 that PCC was "coming further off the line[.]" (Russo Decl. Ex. 49 at Slide 15.) In September 2014, Khetani and Hagel provided an "Investor Relations Roadmap" to Donegan, recommending that he "[m]oderate the use of overly enthusiastic language[.]" (Russo Decl. Ex. 51 at 9308-09; Ex. 52 at 143-44.) In October 2014, Hagel instructed Phillips to prepare an EPS "bridge" because PCC was "so far off the mark," which was the "result of forcing a top line that is much higher than the end markets dictated[.]" (Phillips Dep. at 156:24-157:22; 166:25-167:12; 290:21-291:8.) The EPS bridge reflected an organic FY16 EPS forecast of $13.86. (Russo Decl. Ex. 53 at 7604.)

### 2.    Defendants' Version of the Facts

Donegan, Hagel, and Khetani "took the lead in developing the Framework and FY16 Target" and they "each performed [their] own analyses of PCC's operational and financial opportunities and collaborated to develop an EPS range for [PCC's] FY16 Target." (Donegan Decl. ¶ 33.) Hagel hired Phillips to "work in developing an estimate of FY16 earnings." (Decl. of Shawn Hagel ("Hagel Decl.") ¶ 52, ECF No. 239.) However, Hagel "believed that [Phillips'] Five-Year Forecast was overly conservative and was not an appropriate starting point for [PCC's] modeling of the FY16 Target." (Hagel Decl. ¶ 53.) Hagel then "directed [Phillips] to adopt a new modeling approach to forecast FY16 results[.]" (Hagel Decl. ¶ 54.) The assumptions Hagel directed Phillip to "use in these models were the result of [her] own analysis and knowledge of PCC's operations, close collaboration with Mr. Khetani, conversations with [other PCC employees], and conversations with [Donegan.]" (Hagel Decl. ¶ 55.) Phillips input the assumptions at Hagel's direction, and several scenarios he ran reflected "FY16 EPS of $14.90,

PAGE 36 – OPINION AND ORDER

$15.65, [] $16.39 . . . . $15.45[,] and $16.91." (Hagel Decl. ¶ 56.) Donegan never spoke with

Phillips directly about the FY16 model. (Phillips Dep. at 60:11-18.)

Donegan, Hagel, and Khetani concluded that PCC's organic FY16 EPS would likely be

$15.50-$16.50. (Donegan Decl. ¶ 45.) Donegan believed that the EPS would be even higher, but

agreed that $15.50-$16.50 was a reasonable forecast. (*Id.*)

Throughout the Class Period, Donegan acknowledged to investors that PCC's growth

would not track a precise, straight line. *See, e.g.,* Defs.' Ex. 31 at 15 ("[Y]ou obviously look at

any metric or any mode and you plot a straight line. You do see ups and downs to that."); Defs.'

Ex. 36 at 20 ("So is it ever going to be a straight line? The answer to that question is no.").

Donegan, Hagel, and Khetani met before each quarterly earnings call to discuss the FY16

earnings guidance, and their judgment was that the FY16 Framework remained intact and PCC

would achieve the FY16 Target. (Donegan Decl. ¶¶ 46-50; Hagel Decl. ¶¶ 58-60.) A critical

factor in PCC's decision to withdraw the guidance in January 2015 was a precipitous decline in

the price of oil. (Decl. of Christin Hill ("Hill Decl.") ¶ 49, ECF No. 235; Defs.' Ex. 63.)

## IV.    PULL-IN SALES

### A.    Undisputed Facts

When a customer accepts early shipment of a product and PCC ships the product to the

customer before it was originally due, the transaction is sometimes referred to as a "pull-in."

(Donegan Decl. ¶ 65.) PCC, throughout the Class Period, regularly engaged in pull-in sales. *See*

Defs.' Ex. 97 (Dep. of Thomas McDonnell ("McDonnell Dep.")) at 99:14-100:9 (explaining that

pull-in sales were a routine aspect of PCC's operations).

To induce customers to accept early delivery, some PCC plants offered customers

discounts and extended payment terms. *See* Decl. of Eli R. Greenstein ("Greenstein Decl.") Ex.

68, ECF No. 260-1 ("We are significantly behind . . . . We have been trying to pull forward with

PAGE 37 – OPINION AND ORDER

customer agreement as much as possible. This particular customer has used this to his

advantage."); Greenstein Decl. Ex. 69 (Hagel granting "standing approval" for extended payment

terms for pull-ins); Greenstein Decl. Ex. 70 (PCC customer negotiating and securing a 13%

discount in exchange for accepting pull in).

### B.    Disputed Facts

#### 1.    Lead Plaintiffs' Version of the Facts

According to Lead Plaintiffs, pull-ins comprised 16.67% to 27.65% of reported sales

throughout the Class Period at various PCC plants:

| Fiscal Quarter | Plant | Pull-ins | Reported Sales | % of Reported Sales | Exhibit(s) |
|---|---|---|---|---|---|
| 2013 Q4 | Tilton | $1,800,000 | $10,010,00 | 17.98% | Greenstein Decl. Ex. 3 at 7; Greenstein Decl. Ex. 7. |
| 2013 Q4 | HBE | $25,504,000 | $143,367,000 | 17.79% | Greenstein Decl. Ex. 4. |
| 2014 Q1 | Cherry | $6,176,000 | $22,340,000 | 27.65% | Greenstein Decl. Ex. 5; Russo Decl. Ex. 47, ECF No. 226-3. |
| 2014 Q1 | Tilton | $1,500,000 | $8,720,000 | 17.20% | Greenstein Decl. Ex. 7; Russo Decl. Ex. 47. |
| 2014 Q2 | Progressive | $2,545,000 | $13,119,000 | 19.40% | Greenstein Decl. Ex. 8. |
| 2014 Q4 | Schlosser | $4,379,000 | $17,080,000 | 25.64% | Greenstein Decl. Ex. 12; Russo Decl. Ex. 47. |
| FY2014 | Shur-Lok | $20,000,000 | $91,034,000 | 21.97% | Greenstein Decl. Ex. 6; Russo Decl. Ex. 47. |
| 2015 Q1 | Grafton | $14,000,000 | $84,001,000 | 16.67% | Greenstein Decl. Ex. 18; Russo Decl. Ex. 48. |
| 2015 Q2 | Carson City | $2,275,000 | $14,492,000 | 16.68% | Greenstein Decl. Ex. 19; Russo Decl. Ex. 48. |

| Fiscal Quarter | Plant | Pull-ins | Reported Sales | % of Reported Sales | Exhibit(s) |
|---|---|---|---|---|---|
| 2015 Q3 | Carson City | $3,249,000 | $14,598,000 | 22.26% | Greenstein Decl. Ex. 23; Russo Decl. Ex. 48. |

Some PCC employees worried that shipping parts and obtaining payment early meant that a customer's future demand would decrease and ultimately result in missing quarterly earnings targets. *See* Greenstein Decl. Ex. 49 ("Problem is BL is not strong enough in Q3/Q4 to pull without damaging those [quarters]."); Greenstein Decl. Ex. 50 ("This can't go on and be a viable company . . . . we both agreed how can PCC keep on pulling in . . . . The house is built on twigs[.]"); Greenstein Decl. Ex. 44 at 116:17-23 (acknowledging that after pulling in sales the next quarter would yield lower sales).

Due to the general acceptance that pull-ins negatively impacted future earnings, some divisions sought to curtail their reliance on pull-ins during the Class Period. *See* Greenstein Decl. Ex. 54 ("I will be participating at Kevin's GM meeting . . . presenting a detailed plan on how we will grow the business and eliminate the need for pull-ins."). PCC's managers recognized that without pulling in sales, PCC would fall further off the trajectory and be less likely to achieve the FY16 Target. *See* Greenstein Decl. Ex. 56 ("I also heard rumors that Kevin S wants us to stop pulling from future quarters—if this is the case then the only way to do that is to not keep increasing the sales forecast."); Phillips Dep. 178:21-186:3 (Phillips testifying that Hagel and Donegan regularly opined that PCC needed to stop pull-ins); Greenstein Decl. Ex. 75 ("[T]he obvious concern is that we are driving over the edge of a cliff").

PCC ignored the negative impact of pull-in sales, and instead increased pull-ins to mask sluggish organic growth. *See* Greenstein Decl. Ex. 57 (explaining that "sales goals and objectives are based on new sales opportunities and pull ins . . . . this is becoming our standard practice").

PAGE 39 – OPINION AND ORDER

2.        **Defendants' Version of the Facts**

Throughout the Class Period, pull-ins were a routine aspect of PCC's business and resulted in benefits to PCC. *See* McDonnell Dep. at 99:14-100:9 (explaining that it "doesn't make any sense . . . to have the parts on the shelf" when they were completed early, and "reaching out [was] a normal course of commercial activities" because plants wanted to "turn [parts] into cash"); Defs.' Ex. 84 ("Buck Dep.") 117:4-13 ("[W]e have done pull-ins probably for 20 years."); Defs.' Ex. 98 ("Morley Dep.") 158:15-159:1 ("We used pull forwards at any time. I keep repeating. If we had—if there was finished material on the dock that was early, then we would always attempt to try to get the customer to take it."); Defs.' Ex. 105 at 37:19-24 (the Rolls-Royce 30(b)(6) deponent testified that "I would say [pull-ins] were consistent through the entire period 2012 to 2015"). Pull-ins resulted from strategic decisions by PCC plant managers who scheduled production to avoid operating below peak plant capacity one month and above it another month. *See* Buck Dep. at 31:2-23 (explaining that PCC scheduled production so that a plant manager could make full use of the available resources). When a plant completed a part early, it would seek customer approval to ship it early. *See* McDonnell Dep. at 99:14-100:9 (explaining that pull-ins had to be accepted by customers).

During the Class Period, pull-ins had only a -0.55 to 0.78% net impact on reported sales. (Defs.' Mot. Summ. J. at 17) (citing Hill Decl. ¶ 64). Pull-ins were sustained at low levels throughout the Class Period and had no negative impact on PCC's overall business. *See* Donegan Decl. ¶ 66 ("[T]he impact of pull-ins requested by PCC's facilities was [immaterial] to PCC's reported financial results.").

///

///

///

V.    **DESTOCKING**

A.    **Undisputed Facts**

During the Class Period, Rolls-Royce, a key PCC customer, began an "inventory reduction program within the civil aerospace division[.]" (Decl. of Michael Mosley ("Mosley Decl.") ¶ 16, ECF No. 241.) Mosley, Rolls-Royce's Chief Operating Officer ("COO"), informed Donegan in 2013 that Rolls-Royce would be reducing its inventory, otherwise known as "destocking." (Mosley Decl. ¶ 17.)

B.    **Disputed Facts**

1.    **Lead Plaintiffs' Version of the Facts**

PCC expected destocking to continue throughout the Class Period. *See* Greenstein Decl. Ex. 83 (explaining that "[Rolls-Royce] future demand" would be "reducing from 250 in 2013 to 226 in 2014 to 99 in 2015"); Greenstein Decl. Ex. 84 (email to Donegan and Hagel showing a decline in Rolls-Royce demand from FY2014 to FY2015); Greenstein Decl. Ex. 78 (email in May 2014 acknowledging that Rolls-Royce is "going to continue to reduce inventory so [PCC] will see more volume reductions"). Rolls-Royce never told Donegan that destocking was only temporary. *See* Greenstein Decl. Ex. 79 at 70:9-20 (Rolls-Royce employee testifying that based on his review of internal communications between Rolls-Royce and PCC, no one told Donegan that destocking was temporary).

2.    **Defendants' Version of the Facts**

When Rolls-Royce began destocking in early May 2013, Mosley expected destocking to conclude by the end of 2013. (Mosley Decl. ¶ 16.) Mosley shared this information with Donegan during meetings throughout 2013. (Mosley Decl. ¶ 17.)

By early 2014, Mosley achieved his inventory reduction goal, but to his surprise he was instructed to reduce inventory even further. (Defs.' Ex. 99 (Dep. of Michael Mosley ("Mosley

Dep.")) at 212:21-214:7.) Mosley undertook this additional inventory reduction program, which he expected to conclude at the end of 2014, and shared his plan with Donegan. (Mosley Dep. at 212:21-214:7.)

PCC plant executives also informed Donegan that destocking would be temporary, and that they expected that Rolls-Royce demand would rebound by the end of FY15. *See, e.g.,* Defs.' Ex. 81 (showing that sales to Rolls-Royce would begin to recover in Q4 of FY15). However, in late 2014 and early 2015, "additional market conditions unexpectedly reduced or temporarily delayed demand for Rolls-Royce engines further" and "[t]hese unexpected developments caused Rolls-Royce to again re-evaluate its inventory position and extend [destocking] into 2015." (Mosley Decl. ¶ 22.)

Mosley informed Donegan in "late 2014 or early 2015 that Rolls-Royce was unexpectedly continuing" its destocking program into 2015. (Mosley Decl. ¶ 23.) Donegan disclosed this development to investors on the January 22, 2015, earnings call, which took place after the close of the Class Period. *See* Defs.' Ex. 38 at 6 ("[W]e are assuming that a single customer who [has] been destocking continues that activity and that demand steps down from Q3 to Q4[.]").

Despite the destocking, PCC's market share increased from ███ of Rolls-Royce's total expenditures in 2011-12 to ███ in 2015-2016. (Mosley Dep. at 205:11-206:2.)

## VI.    MARKET REACTION

On January 22, 2015, PCC acknowledged that its "FY16 results will be below previously stated EPS targets of $15.50 to $16.50[.]" (Russo Decl. 59 at 6.) Lead Plaintiffs' expert posits four distinct corrective disclosure events: January 23, 2014, July 24, 2014, October 23, 2014, and January 16-20, 2015. (Russo Decl. Ex. 68 at 2.)

### A.    January 23, 2014

On January 23, 2014, PCC "issued a press release announcing third quarter fiscal 2014 results." *Id.* at 52. PCC reported sales of $2.36 billion, which was below the analyst estimate of $2.46 billion. *Id.* Sales reflected 1% growth, while "[a]nalysts were expecting higher organic growth in the 4% to 5% range." *Id.* PCC reported an EPS of $2.95, which missed the consensus analyst estimate of $3.03 to $3.04. *Id.*

Lead Plaintiffs' expert's review of "analyst commentary confirms that, despite [PCC's] continued attempts to reassure the market that it would meet the FY16 EPS Target, there was additional skepticism in the market about whether" that would be possible. *Id.* at 53. The 2013 third quarter results caused PCC stock "to decline by 2.28%, or $6.16 per share[.]" *Id.* at 64. This decline was a "signal that the market was becoming skeptical of the Company's reassurances that it was still on track to meet its FY16 EPS Target." *Id.* Additionally, "there was heavy trading volume of 3.0 million shares on this day, which is more than four times greater than the average daily trading volume of 0.7 million shares during the Class Period." *Id.* at 64-65.

### B.    July 24, 2014

On July 24, 2014, PCC held an earnings call and issued a press release announcing its first quarter 2015 results. *Id.* It announced $2.53 billion in sales which "was below consensus expectations by approximately $69 million (or about 2.67%)." *Id.* PCC reported an EPS of $3.32 which was $0.03 below analyst expectations. *Id.*

PCC stock declined by 4.89% on July 24, 2014, or $12.23 a share. *Id.* at 73. Additionally, there "was heavy trading volume of 4.4 million shares on this day, which is more than six times greater than the average daily trading volume of 0.7 million shares during the Class Period." *Id.* at 74.

///

PAGE 43 – OPINION AND ORDER

### C.    October 23, 2014

On October 23, 2014, PCC announced its second quarter 2015 earnings before the market opened, and held a conference call with investors later that morning. *Id.* at 75. PCC reported $2.52 billion in sales, which missed analysts' consensus by $20 million. *Id.* PCC reported an EPS of $3.24, and missed analysts' expectations by $0.08. *Id.* "Even though [PCC] reported a year-over-year increase in sales and EPS, [its] results once again fell short of analysts' expectations[.]" *Id.*

On October 23, 2014, "negative earnings information caused [PCC common stock] to decline by 3.18%, or $7.20 per share[.]" *Id.* at 87. Additionally, "there was heavy trading volume of 2.8 million shares on this day, which is nearly four times greater than the average daily trading volume of 0.7 million shares during the Class Period." *Id.*

### D.    January 16-20, 2015

PCC announced its preliminary third quarter 2015 financial results after the market closed on January 15, 2015. *Id.* at 90. PCC "reported revenues of $2.42 billion to $2.47 billion and earnings per share of $3.05 to $3.10, which fell below analyst expectations of $2.56 billion in revenue and EPS of $3.40, respectively." *Id.*

On January 16, 2015, "the negative pre-announcement caused [PCC common stock] to decline by 10.24%, or $22.50 per share[.]" *Id.* at 95. Additionally, "there was heavy trading volume of 14.4 million shares on this day, which is nearly twenty times greater than the daily average daily trading volume of 0.7 million shares during the Class Period." *Id.* On January 22, 2015, PCC announced its third quarter earnings in full and held a conference call withdrawing its FY16 guidance. *Id.* at 97.

///

///

PAGE 44 – OPINION AND ORDER

## ANALYSIS

### I.    STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of that party. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted).

### II.    THE SAFE HARBOR

Defendants argue that the Court should grant their motion for summary judgment on the ground that forty-two of the forty-four statements are protected by one of the prongs of the Safe Harbor for forward-looking statements. *See* Defs.' Mot. Summ. J. at 30 (listing Statements 1-7, 11-17, 19-31, 34-36, 38-39, and 44) and 43 (listing Statements 9-10, 12, 14, 18, 25, 32-33, and 40-43.) The Court agrees in part.

#### A.    Legal Framework

Section 10(b) of the Exchange Act makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]" 15 U.S.C. § 78j(b). SEC Rule 10b–5, promulgated under the authority of Section 10(b), in turn, provides:

PAGE 45 – OPINION AND ORDER

It shall be unlawful for any person . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. The elements of a Rule 10b-5 claim are: (1) a material misrepresentation or omission of fact, (2) scienter, (3) in connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

 "Even where a plaintiff has properly pleaded all six elements of a Section 10(b) violation, the allegedly false or misleading statement may be shielded from liability by the 'safe harbor' provision of the PSLRA." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017). A defendant is not liable for any statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or if the plaintiff fails to prove the statement was made "with actual knowledge . . . that [it] was false or misleading." 15 U.S.C. § 78u-5(c)(1). In other words, a defendant is not liable for a statement that is forward looking that "*either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading." *In re Quality Sys.*, 865 F.3d at 1141.

Forward-looking statements include "'any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues.'" *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) (quoting *No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003)).

"[M]ixed" statements contain "non-forward looking statements about current and past facts as well as forward looking statements about projected growth and revenue in earnings." *In re Quality Sys.*, 865 F.3d at 1141. The Safe Harbor "is designed to protect companies and their officials from suit when optimistic projections of growth in revenues and earnings are not borne out by events[,]" but "'[t]he mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward looking aspects of the statements.'" *Id.* at 1142 (quoting *In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005)). Accordingly, when faced with a "mixed" statement, the Court must examine whether, "as a whole, the challenged statements relate[] to future expectations and performance." *Intuitive Surgical*, 759 F.3d at 1059.

Under the Safe Harbor, "'forward looking statements' are not actionable as a matter of law if they are identified as such and accompanied by 'meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the forward looking statement.'" *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 990 (N.D. Cal. 2017) (citing 15 U.S.C. §78u-5(c)(1)(A)(i)). The "cautionary language also must have consisted of non-boilerplate warnings that were tailored to the forward-looking statements." *Zaghian v. Farrell*, 675 F. App'x 719, 720 (9th Cir. 2017). A defendant's cautionary language is not meaningful if it does not sufficiently address the harm that resulted. *See id.* (holding that a "boilerplate warning [that] pertained to a discussion regarding potential product defects and supply chain disruption, neither of which occurred in this instance" was not meaningful cautionary language).

Importantly, "if a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement

is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010).

###### B.    Safe Harbor's First Prong

Defendants assert that forty-two of the forty-four statements are forward-looking (all but Statements 8 and 37), and that all but Statements 12, 18, and 19 were accompanied by meaningful cautionary language.

####### 1.    Forward-Looking Statements

######## a.    "On the Line" Statements

In its order denying Defendants' motion to dismiss, the Court examined whether the Safe Harbor protects certain statements regarding the FY16 Target, and concluded that some of those statements "do not fit within the PSLRA's definition of a forward-looking statement because they contain representations of present fact and omit material information." *Murphy v. Precision Castparts Corp.*, No. 3:16-cv-00521-SB, 2017 WL 3084274, at *13 (D. Or. June 27, 2017); *see also In re Quality Sys.*, 865 F.3d at 1142 (holding that "the safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts[,] [n]or is the safe harbor designed to protect them when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement"); *In re Apple Inc. Sec. Litig.*, No. 19-cv-02033-YGR, 2020 WL 2857397, at *12 (N.D. Cal. June 2, 2020) ("[S]tatements involving future predictions are actionable when they make representations about the past or present that 'can demonstrably be proven false.'") (citations omitted). The Court stands by its prior ruling with respect to all but one of those statements:

- We're pretty much on that drum beat. (Statement 11)

- [W]e have a line. If I go from where we were and blow my way out to that 2016 timeframe, I get a line. We hover around that line. (Statement 15)

- [T]he framework for our FY16 [EPS target] . . . is all intact. (Statement 22)

- Nothing has gone negative . . . in terms of the [EPS] framework, not at all. (Statement 24)

- I want to be clear in regards to FY16 targets. I want to reaffirm the target and the framework is in place. (Statement 34)

- [W]e remain fully committed to our FY16 framework and there is no change to the [2016 EPS] framework we laid out. (Statement 39)

*Murphy*, 2017 WL 3084274, at *13. The one exception is Statement 29, which the Court acknowledges is a forward-looking statement: "we obviously feel very, very, very solid about kind of what's out there." In context, Donegan said that he feels "solid" about the FY16 Target, which is merely a reaffirmation of the FY16 Target without a representation of current conditions, like the other mixed statements.

Although many of the mixed statements reaffirm the FY16 Target (which would qualify as forward-looking), each statement also suggests that PCC was *currently* positioned within the Framework, or on "the line," or on the "drumbeat," suggesting that PCC was currently meeting its anticipated benchmarks on the road to the FY16 Target. *See In re Quality Sys.*, 865 F.3d at 1142 (citing cases in which courts held that statements such as "[the company] has on hand and has access to sufficient sources of funds to meet its anticipated [needs]" and "sales [a]re 'still going strong'" were mixed statements not protected by the Safe Harbor) (quoting *In re Stone & Webster*, 414 F.3d at 211-13 and *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008)); *Kipling v. Flex Ltd.*, No. 18-CV-02706-LHK, 2020 WL 2793463, at *10 (N.D. Cal. May 29, 2020) (finding that challenged statements from earnings calls and investor conferences "constitute 'mixed statements'" that "contain forward-looking portions and non-

forward-looking portions"); *NECA-IBEW Pension Tr. Fund v. Precision Castparts Corp.*, No. 3:16-cv-01756-YY, 2017 WL 4453561, at *11-12 (D. Or. Oct. 3, 2017) (holding that although the challenged "statement relates to the forecasts, the statement is properly construed as a present assessment of the company's intentions at the time of the proposed merger" and was therefore not a forward-looking statement), *adopted*, 2018 WL 533912 (D. Or. Jan. 24, 2018).

Defendants compare Donegan's "on the line" statements to cases in which courts have held that the Safe Harbor protects statements that a company is "on track" to meet an anticipated future event. (Defs.' Mot. Summ. J. at 31-32.) In fact, courts are split on whether such "on track" statements are forward-looking. *See Szymborski v. Ormat Techs., Inc.*, 776 F. Supp. 2d 1191, 1198-99 (D. Nev. 2011) ("The authority on whether statements that a company is 'on track' are forward-looking statements is split[.]"); *compare Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543, 546-47 (9th Cir. 2018) ("'[O]n track' falls within the safe harbor of forward-looking statements. It discusses 'plans and objectives of management for future operations[.]'" (quoting *Intuitive Surgical, Inc.*, 759 F.3d at 1058)); *Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*, No. 15-07952 CASR, 2017 WL 114401, at *5-6 (C.D. Cal. Jan. 9, 2017) (holding that statement that company was "on track" to complete migration to a new platform was forward-looking); and *In re ECOtality, Inc. Sec. Litig.*, No. 13-3791 SC, 2014 WL 4634280, at *5-7 (N.D. Cal. Sept. 16, 2014) (holding that "on track to begin delivery in the third quarter" was a forward-looking statement); *with Bielousov v. GoPro, Inc.*, No. 16-cv-06654-CW, 2017 WL 3168522, at *5 (N.D. Cal. July 26, 2017) (holding that "[w]e believe we're still on track to make [our revenue guidance] as well" was a "statement of present opinion [that] is not forward-looking, and therefore is not covered by the PSLRA safe harbor provision"); *Mulligan v. Impax Labs, Inc.*, 36 F. Supp. 3d 942, 964-65 (N.D. Cal. 2014) (finding

that "on track" was a representation of current fact); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 880 (N.D. Cal. 2004) (holding that statement "on track" to meet future goals was not forward-looking "to the extent that such statement[] rested upon a characterization of the present state of the company"); *In re Secure Computing Corp. Sec. Litig.*, 120 F. Supp. 2d 810, 818 (N.D. Cal. 2000) ("on track to meet analysts' earnings expectations" was not forward-looking); *cf. In re Nimble Storage, Inc. Sec. Litig.*, 252 F. Supp. 3d 848, 854 n.8 (N.D. Cal. 2017) ("[A]lleged optimistic statements indicating that a company is 'on track' to meet a certain goal are, without more, inactionable puffery." (citing *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1168-69 (C.D. Cal. 2007) and *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d at 880)).

On the one hand, "on track" suggests that the company's current condition is as the company had anticipated when it issued the guidance. On the other hand, investors could also reasonably interpret "on track" merely to mean that the company continues to believe that it will reach its target in the future. But in any event, the "on track" cases present a closer call than the statements at issue here. Donegan's statements that PCC was "on the line," or "on the drumbeat," or that the "framework" is intact provide more specific information than "on track." The statements at issue here more forcefully suggest that PCC is currently positioned right where it anticipated it would be when it issued the guidance, i.e., that it had achieved an incremental benchmark. *See Cutler v. Kirchner*, 696 F. App'x 809, 814 (9th Cir. 2017) ("[T]he question is whether a reasonable investor would understand [the statements], in context, to communicate only a general optimism, or a factual representation about the actual condition of [the company's] business[.]").

Thus, the Court holds that the mixed statements excerpted above (Statements 11, 15, 22, 24, 34, and 39) are not forward-looking, and that Statements 26 ("the framework is intact") and

36 ("we've been able to stay on that continuum") also fall in this same category of mixed statements not subject to Safe Harbor protection.

### b.    Other Mixed Statements

Three other Challenged Statements contain present facts combined with forward-looking statements: Statement 9 (including statements about current as well as future destocking); Statement 14 ("we're seeing good demand from large commercial"); and 25 ("[M]y contracts are in place. I got share. I know what it is. The build rates are announced."). These statements similarly do not qualify for Safe Harbor protection. *See Rodriguez v. Gigamon, Inc.*, 325 F. Supp. 3d 1041, 1050-51 (N.D. Cal. 2018) (holding that where the defendant "made mixed statements containing forward-looking and non-forward-looking statements[,]" including "facts regarding the present state of the Company[,]" the "non-forward-looking portions of [his] statement are not protected by the Safe Harbor Provisions of the PSLRA" (citing *In re Quality Sys.*, 865 F.3d at 1141)).

### c.    Not Forward-Looking

Several of the Challenged Statements are not forward looking at all: Statement 7 ("We are achieving strong earnings growth on stable commercial aircraft schedules, gaining share on new airframe and engine development programs . . . ."); 23 ("[T]his I wouldn't even almost consider destocking. I think there was—kind of if I go through the course of mid-last year, there was probably a realignment and a balancing as the 787 started getting some drumbeat to it . . . this to me felt more like a year-end shift, moving product 2 to 3 weeks to the right versus what would have come into some customers' fiscal year end. So it did not feel like a destocking."); 28 ("We—typically we have a pattern that we will when we—we under-commit and over-deliver. That's pretty much kind of what our motto is from that standpoint."); and 42 ("[Y]es, we are seeing [destocking alleviating].").

In sum, the Court finds that Statements 7, 9, 11, 14-15, 22-26, 28, 34, 36, 39, and 42 are not forward-looking when viewed as a whole and are therefore not protected by the Safe Harbor.

### d.    Forward-Looking

The Court agrees with Defendants that the statements reaffirming the FY16 Target that do not also reflect PCC's current position, as well as the statements predicting that destocking was only temporary (i.e., will end in the future), are entitled to Safe Harbor protection as forward-looking statements, regardless of whether the speaker believed the statements to be true at the time. *See Intuitive Surgical*, 759 F.3d at 1058 ("The alleged misstatements in analyst calls are classic growth and revenue projections, which are forward-looking on their face." (citing *In re Cutera Sec. Litig.*, 610 F.3d at 1111)); *City of Hialeah Empls. Ret. Sys. v. FEI Co.*, 289 F. Supp. 3d 1162, 1173 (D. Or. 2018) ("Expressing confidence or lack thereof in a given projection is not different from making a projection. Every statement of a future projection carries at least the implicit assertion that the speaker or writer of that statement believes it."); *In re Leapfrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1046 (N.D. Cal. 2007) ("Here, each of the financial forecast statements identified by defendants as forward-looking falls squarely within 15 U.S.C. § 78u-5(i)(1)(A)-(D) as each is a statement predicting the company's future expected sales or other financial results."). The Court finds that the following statements are forward-looking when viewed as a whole: 1-6, 10, 13, 20-21, 27, 29-33, 35, 38, 40-41, and 43-44.[5]

### 2.    Meaningful Cautionary Language

Defendants argue that all of these forward-looking statements were accompanied by meaningful cautionary language. (Defs.' Mot. Summ. J. at 33.) Lead Plaintiffs respond that

---

[5] Of note, many of these statements are also nonactionable because they include only "puffery" type of language, such as "moving in the right direction" (Statement 6), "very, very, very solid" (Statement 29), and "solid" (Statement 31).

Defendants' cautionary language was boilerplate and not sufficiently meaningful. (Pls.' Opp. at 25.)

### a.    Forward-Looking Statements

The parties do not dispute that each earnings call began with a Safe Harbor warning, stating: "Information included within this presentation describing the projected growth and future results and events constitutes forward-looking statements, within the meaning of the [PSLRA] of 1995," and "[a]ctual results in future periods may differ materially from the forward-looking statements because of a number of risks and uncertainties." (Defs. Mot. Summ. J. at 7.) PCC's warning identified a wide array of risks:

> [I]ncluding but not limited to fluctuations in the aerospace, power generation, and general industry cycles; the relative success of our entry into new markets; competitive pricing; the financing viability of our significant customers; the concentration of a substantial portion of our business with a relatively small number of key customers; the impact on the Company of customer or supplier labor disputes; demand, timing, and market acceptance of new commercial and military programs, including the Boeing 787; the availability and cost of energy, raw materials, supplies, and insurance; the cost of pension and postretirement medical benefits; equipment failures; product liability claims; relations with our employees; our ability to manage our operating costs and to integrate acquired businesses in an effective manner, including the ability to realize expected synergies; misappropriation of our intellectual property rights; governmental regulations and environmental matters; risks associated with international operations and world economies; the relative stability of certain foreign currencies; the impact of adverse weather conditions or natural disasters; the availability and cost of financing; and implementation of new technologies and process improvements.

Russo Decl. Ex. 24 at Slide 2.

Courts have consistently held that similar cautionary language is sufficiently meaningful. *See, e.g., Intuitive Surgical*, 759 F.3d at 1059 (holding that warning that "[a]ctual results may differ materially from those expressed or implied, as a result of certain risks and uncertainties[,]" accompanied by "[t]hese risks and uncertainties are described in detail in the company's [SEC] filings" and "[p]rospective investors are cautioned not to place undue reliance on such forward-

looking statements" was sufficiently meaningful); *In re Solarcity*, 274 F. Supp. 3d at 993 (holding that the statement "[f]orward-looking statements should not be considered a guarantee of future performance or results, and reflect information that may change over time" with a cross-reference to the defendant's shareholder letter, slides, and SEC filings was sufficiently meaningful).

Consistent with this precedent, the Court concludes that PCC's cautionary language was sufficiently meaningful to qualify the forward-looking statements identified above for Safe Harbor protection. *See Empls. Teamsters Local Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*, 353 F. 3d 1125, 1133 (9th Cir. 2004) (holding that where "sufficient warnings accompanied the [statements at issue] . . . Clorox [was] protected from liability under the safe harbor provision"). Accordingly, the Court enters summary judgment in favor of Defendants with respect to Statements 1-6, 10, 13, 20-21, 27, 29-33, 35, 38, 40-41, and 43-44.

### b.    Mixed Statements

With respect to the mixed statement identified above, the Ninth Circuit has instructed that "[w]here a forward-looking statement is accompanied by a non-forward-looking factual statement that supports the forward-looking statement, cautionary language must be understood in the light of the non-forward-looking statement." *In re Quality Sys.*, 865 F.3d at 1146. Accordingly, "[i]f the non-forward-looking statement is materially false or misleading, it is likely that no cautionary language—short of an outright admission of the false or misleading nature of the non-forward-looking statement—would be 'sufficiently meaningful' to qualify for the safe harbor." *In re Quality Sys.*, 865 F.3d at 1146-47.

In *In re Quality Systems*, the Ninth Circuit held that "[w]here, as here, forward-looking statements are accompanied by non-forward-looking statements about current or past facts, that the non-forward-looking statements are, or may be, untrue is clearly an 'important factor' of

which investors should be made aware." *In re Quality Sys.*, 865 F.3d at 1148 (holding that "[t]he cautionary language used by Defendants failed to correct these materially false and misleading non-forward-looking statements").

Similarly here, if Defendants' statements about PCC's current state of affairs were materially false and misleading, the cautionary statements were not adequate to protect the forward-looking portions of those mixed statements. *See In re Quality Sys.*, 865 F.3d at 1148 ("Because Defendants made materially false or misleading non-forward-looking statements about the state of QSI's sales pipeline, virtually no cautionary language short of an outright admission that the non-forward-looking statements were materially false or misleading would have been adequate."). Therefore, the Safe Harbor provides no protection for the mixed statements.

## C.    Safe Harbor's Second Prong

Forward-looking statements that were not accompanied by meaningful cautionary language may nevertheless find protection under the Safe Harbor if Lead Plaintiffs fail to prove that any statement was made "with actual knowledge . . . that [it] was false or misleading." 15 U.S.C. § 78u-5(c)(1); *see also In re Cutera Sec. Litig.*, 610 F.3d at 1112 ("Those statements [unaccompanied by meaningful cautionary language] fall outside the safe harbor if the plaintiff can allege facts that would create a strong inference that the defendants made the forecast(s) at issue with 'actual knowledge . . . that the statement was false or misleading.'" (quoting 15 U.S.C. § 78u–5(c)(1)(B)(i))); *Azar v. Yelp, Inc.*, No. 18-cv-00400-EMC, 2018 WL 6182756, at *8 (N.D. Cal. Nov. 27, 2018) ("Actual knowledge is a higher standard than the deliberate recklessness standard applied to non-forward-looking statements. A company that makes forecasts knowing that a problem exists is not liable if it could still have believed that the problem was surmountable and the forecast could still be met.") (citations omitted).

Here, the parties agree that Donegan's statements at the Citi Global Industries Conference were not accompanied by any cautionary language: Statements 12, 18, and 19. Portions of those statements were forward-looking, and for those portions, Lead Plaintiffs must prove that Donegan made the statement with actual knowledge that it was false and misleading. These statements relate to whether PCC was tracking the anticipated FY16 Framework, or the "line" to its FY16 Target, and whether destocking would continue. As discussed below, disputed issues of material fact remain as to whether Donegan was aware when he made the statements that they were materially false or misleading, and therefore the Court cannot determine whether Statements 12, 18, and 19 are protected by the Safe Harbor's second prong. *See In re Stratosphere Corp. Sec. Litig.*, 66 F. Supp. 2d 1182, 1192 (D. Nev. 1999) (denying summary judgment on second prong of the Safe Harbor in light of "triable issues as to the existence of actual knowledge of falsity" with respect to the statement at issue).

## III. OTHER NONACTIONABLE STATEMENTS

Defendants move for summary judgment on Statements 1-7, 11-17, 19-31, 34-36, 38-39, and 44, arguing that they are nonactionable puffery or mere statements of opinion. (Defs.' Mot. Summ. J at 39.) Of those statements, the only that remain at issue are Statements 7, 11-12, 14-17, 19, 22-26, 28, 34, 36, and 39.

Non-actionable "puffery" involves "expressions of opinion, as opposed to knowingly false statements of fact[.]" *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014). Investors "do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *In re Cutera Sec. Litig.*, 610 F.3d at 1111 ("[P]rofessional investors, and most amateur investors as well, know how to devalue the optimism of corporative executives."). Generally, statements "that are capable of objective verification are not 'puffery' and can constitute material misrepresentations." *Or. Pub. Emps.*, 774 F.3d at 606. "Interpretation

PAGE 57 – OPINION AND ORDER

of the 'mere puffery' rule has distinguished cases of 'definitive positive projections' from statements projecting 'excellent results,' a 'blowout winner' product, 'significant sales gains,' and '10% to 30% growth rate over the next several years.'" *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005); *see also Stearns v. Select Comfort Retail Corp.*, No. 08-CV-02746 JF, 2009 WL 1635931, at *11 (N.D. Cal. June 5, 2009) ("'The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions.'" (quoting *Haskell v. Time, Inc.,* 857 F. Supp. 1392, 1399 (E.D. Cal. 1994))).

Nevertheless, what makes the "mere puffery" analysis particularly challenging, and its results inconsistent, is that "[i]t is true that 'optimistic statements, when taken in context, might constitute a basis for a claim under section 10(b) and rule 10b-5.'" *In re Cisco Sys. Inc. Sec. Litig.*, No. C 11-1568 SBA, 2013 WL 1402788, at *13 (N.D. Cal. Mar. 29, 2013) (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)). Even vague, "feel good" statements *may* be actionable if they "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp*., 280 F.3d 997, 1006 (9th Cir. 2002); *see also In re Quality Sys.*, 865 F.3d at 1143-44 (holding that statements such as "'[t]here is nothing drying up and there is nothing slowing down[,]'" "'[o]ur pipeline continues to build to record levels[,]'" and "'[o]ur pipeline is deep[,]'" "went beyond 'feel good' optimistic statements" because "[t]hey repeatedly reassured investors during the class period that the number and type of prospective sales in the pipeline was unchanged, or even growing, compared to previous quarters"); *Warshaw*, 74 F.3d at 959 (finding that reassuring investors that "everything [was] going fine" when the company knew otherwise was materially misleading); *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *14-15 (holding that "[t]he XS

PAGE 58 – OPINION AND ORDER

and XS Max got off to a really great start" was an actionable statement, and noting that "[a]lthough investors understand that corporate optimism may be unreliable, a party cannot affirmatively create a positive impression of an area it knows to be doing poorly" (citing *In re Quality Sys.*, 865 F.3d at 1143)).

District courts in this circuit have found the following statements to be nonactionable statements of corporate optimism:

- "'[T]here is very, very strong demand for our commercial business[.]'" *In re Sunpower Corp. Sec. Litig.*, No. 16-cv-04710-RS, 2018 WL 4904904, at *4 (N.D. Cal. Oct. 9, 2018).

- "'[W]e've got a strong brand, we've got a great product experience for consumers and businesses[.]" *Azar*, 2018 WL 6182756, at *10.

- "We are very pleased with the learning from our pilot launch," "so far we're getting really great feedback," and "we are very pleased with our progress to date[.]" *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012).

- "This is going to be a very big second half for us." *In re Leapfrog*, 527 F. Supp. 2d at 1050.

- "[S]trong demand metrics and good momentum[.]" *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012).

- "We are actually extremely bullish for the US markets"; "Our growth profile is going to be pretty darn big compared to most companies that are out there"; "I'm very happy with our continued ability to scale and [unbelievably] incredibly strong sales." *In re Solarcity*, 274 F. Supp. 3d at 995.

- "[C]onsumers love our service[.]" *In re Netflix, Inc. Sec. Litig.*, No. C04-2978 FMS, 2005 WL 1562858, at *7 (N.D. Cal. June 28, 2005).

*See also Intuitive Surgical*, 759 F.3d at 1060 (holding that statements "(i) that the opportunity for system placement at hospitals 'is still very, very large'; (ii) that there is potential for growth in the *dVP* market; (iii) that the company is 'reservedly optimistic' about sales; and (iv) wishing it had 'a crystal ball,' that Intuitive 'will come out stronger' and 'in a pretty good position' despite the economic crisis" are "the antithesis of facts" and "represent the 'feel good' speak that characterizes 'non-actionable puffing'" (quoting *In re Cutera Sec. Litig.*, 610 F.3d at 1111)).

Consistent with these holdings, the Court finds that of the remaining Statements, Statements 7, 14, and 16-17 contain statements that are sufficiently vague that they are not actionable as securities fraud. *See* Statement 7 (referring to "strong" growth); Statement 14 ("good demand"); Statement 16 ("there are elements in there that are outperforming what we originally thought"); and 17 ("When we say 'expect,' there [are] reasons as to why we expect. We got a history and we know what we should get."). *See Intuitive Surgical*, 759 F.3d at 1060 (holding that vague statements of optimism such as "solid" "confident" "committed" are non-actionable puffery); *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 835 (N.D. Cal. 2019) (holding that statements expressing general satisfaction with a company's financial condition without specific detail are nonactionable puffery); *In re Rackable Sys., Inc. Sec. Litig.*, No. 09-0222 CW, 2010 WL 199703, at *6 (N.D. Cal. Jan. 13, 2010) ("pretty strong" and "solid" not actionable); *In re Splash Tech Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1076-77 (N.D. Cal. 2001) (holding that statements about a company's "strong demand" and "solid" position are puffery).

///

Some of the Challenged Statements that are somewhat vague on their face take on a more specific meaning when viewed in context with the question that prefaced the statement. *See, e.g.,* Statement 28 (Q: "When we think about the comments you've made in the past, you've been very clear, Mark, that you've got lots of levers to get to your long term guidance range . . . . What do you need to have happen for you to update the guidance? What is the catalyst or the milestone that we should be looking for?" A: "You know typically we have a pattern that we will, when we under commit and over deliver. That's pretty much what our motto is from that standpoint."). Although "we under commit and over deliver" is vague in a vacuum, it takes on a more specific meaning when following a question about what catalyst or milestone would require PCC to update its guidance. *See Azar*, 2018 WL 6182756, at *12 (holding that statements are not puffery because "Defendants assured investors that 'the fundamentals are all in place and really strong' in the context of responding to a specific question about the local advertising program"); *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728 (CM), 2018 WL 6167889, at *12 (S.D.N.Y Nov. 26, 2018) (holding that statements are not puffery when "in response to direct questions about Signet's credit portfolio").

Similarly, "we are a linear-thinking group of people" and "it's not a hope and a prayer" (Statement 19) are vague statements, but in the context of the question asking Donegan where analysts should be focused over the next few quarters, and in the context of Donegan's answer also stating that the financial model "breaks itself down to the core components," that he "didn't shirk when [PCC] didn't get the acceleration from—because of the destocking[,]" and that PCC can "pull the other levers," the statement as a whole in response to the question provided reassurances that were misleading if false.

///

PAGE 61 – OPINION AND ORDER

The Court finds that Statements 7, 14, and 16-17 are so vague that they are nonactionable, and therefore the Court enters summary judgment for Defendants on those statements. The remaining statements contain sufficiently specific factual information that is capable of objective verification. *See Or. Pub. Emps.*, 774 F.3d at 606 ("Statements by a company that are capable of objective verification are not 'puffery[.]'").

## IV.    FALSITY, MATERIALITY, AND SCIENTER

Of the eighteen Challenged Statements that remain at issue (Statements 8-9, 11-12, 15, 18-19, 22-26, 28, 34, 36-37, 39, and 42), Lead Plaintiffs argue that there are no material issues of disputed fact with respect to the falsity, materiality, or scienter relating to Statements 11, 15, 19, 22, 24, 26, 28, 34, and 39, and Defendants argue that Lead Plaintiffs have not established falsity, materiality, or scienter with respect to any of the statements at issue.

The Court finds that there remain disputed factual issues with respect to the FY16 Target, pull-in sales, and destocking, and therefore a jury must determine falsity, materiality, and scienter with respect to the remaining eighteen statements.

### A.    Legal Standards

To establish falsity, a plaintiff "must demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression." *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1216 (S.D. Cal. 2010).

"[M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic*, 485 U.S. at 240. "For an omission to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information

made available.'" *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1189 (D. Or. 2015) (quoting *Petrie v. Elec. Game Card, Inc.*, 761 F.3d 959, 970 (9th Cir. 2014)).

Plaintiffs can prove the scienter element with evidence that "defendants knew their statements were false, or by showing that defendants were reckless as to the truth or falsity of their statements." *Gebhart v. S.E.C.*, 595 F.3d 1034, 1041 (9th Cir. 2010) (citations omitted). Courts "may analyze falsity and scienter together, even though they are separate elements, because they generally depend upon the same set of facts." *In re REMEC*, 702 F. Supp. 2d at 1216.

"Materiality and scienter are both fact-specific issues which should ordinarily be left to the trier of fact." *In re Apple Comput. Sec. Litig.*, 886 F.2d at 1113 (citing *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) and *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984) (per curiam)). "[O]nly if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law." *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) ("[W]hether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact.").

### B.    Challenged Statements

#### 1.    "On the Line"

Lead Plaintiffs assert that the "on the line" statements were objectively false when made because PCC was never on the "line" but instead was always below PCC's own linear trajectory to the FY16 Target. *See, e.g.,* Hagel Dep. at 301:5-7 (responding that PCC fell below the "line" for each quarter during the Class Period). According to Lead Plaintiffs, Defendants' references to a "line" referred to the specific trajectory required to achieve the FY16 Target. *See* Russo Decl. Ex. 32 (email from Khetani to Hagel titled "FY16 progression" showing a "TOC approach to

$16/sh in FY16" and assuming a "constant rate of [sequential growth] in EPS from Q413 onward"); Russo Decl. Ex. 35 (showing Donegan's handwritten notes on the FY16 trajectory suggesting that Donegan knew PCC was not meeting the quarterly targets). Defendants respond that Donegan's "line" statements merely referred to a general upward trajectory, or a steady incline toward the FY16 Target, and none of Donegan's statements about the "line" were false. (Defs.' Mot. Summ. J. at 37.)

The Court finds that a reasonable juror could conclude that the statements referencing PCC on "the line" or performing consistent with the "Framework" meant that PCC's actual performance was consistent with the "line" to the FY16 Target that Donegan referenced, and that therefore the Statements were false. However, a reasonable juror could also conclude that Donegan was simply using the "line" language to describe a general upward trajectory, and therefore his statements were not false. Thus, whether Donegan's statements were materially false, and whether he knew they were false, is an issue that this Court may not resolve on summary judgment.[6] See Azar, 2018 WL 6182756, at *13 ("In this case, once Defendants chose to tout Yelp's local advertising model as 'fairly proven,' omitting any mention of the churn issues that would likely significantly and negatively impact revenue 'affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually

---

[6] With respect to materiality, the Court agrees with Defendants that the "test for materiality . . . is not whether the subject matter of the statements was important to investors[,]" but "[r]ather, it is whether the alleged fraudulently misrepresented or concealed information 'significantly altered to the total mix of information' available to investors at the time the statements was made.'" (Defs.' Opp. at 9.) Lead Plaintiffs emphasize the inherently material nature of the earnings guidance, but materiality is established when the omitted facts—not the general subject matter of the statement—would tend to alter the total mix of information available to investors. See Basic, 485 U.S. at 231-32 ("[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available.'") (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

exist[ed]." (quoting *Brody*, 280 F.3d at 1006)); *In re Cooper Sec. Litig.*, 691 F. Supp. 2d 1105, 1116 (C.D. Cal. 2010) (finding that when the defendant stated that the corporation looked "pretty strong[]" the court could not enter summary judgment on the falsity element of the statement because "what [the declarant of the statement at issue] meant is an issue of fact").

Although not asserting a "truth on the market" defense, Defendants also argue that the "on the line" statements could not have been misleading because all of PCC's relevant financial information was publicly available. (Defs.' Mot. Summ. J. at 36.) For context, a "truth-on-the-market" affirmative defense provides that "a defendant's failure to disclose material information may be excused where information was made credibly available to the market by other sources." *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008). However, to avoid liability, "any material information which insiders fail to disclose must be transmitted to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by insiders' one-sided representations." *In re Apple Comput. Sec. Litig.*, 886 F.2d at 1116.

Defendants have not established that PCC disclosed sufficient financial information to allow investors to conclude where PCC was situated on its "line" in any given quarter. For example, Defendants have not pointed to evidence that PCC disclosed its quarter-over-quarter organic growth each quarter of the Class Period. Further, Khetani acknowledged at the time PCC withdrew its guidance that PCC had failed to disclose the "sensitivities and assumptions" underlying the guidance, and the market reaction to the withdrawal of guidance supports Lead Plaintiffs' theory that the market was not aware of the relevant metrics. In any event, the Court cannot conclude on this record that PCC disclosed information sufficient to show its position vis-à-vis the "line" with the same intensity and credibility to counteract the alleged falsity of

Donegan's statements that PCC remained on the "line" each quarter. *See In re Amgen Sec. Litig.*, No. CV 07-2536 PSG (PLAx), 2014 WL 12585809, at *15 (C.D. Cal. Aug. 4, 2014) (holding that the "mere fact that the FDA posted its briefing book on its website, or that the briefing book was made public, is not enough to shield Defendants from liability"); *cf. Nguyen v. Radient Pharms. Corp.*, 946 F. Supp. 2d 1025, 1039 n.18 (C.D. Cal. 2013) ("To the extent that Defendants' discussion of prior statements and press releases is a truth-on-the-market affirmative defense, that defense fails at the summary judgment stage because such an 'intensely factual' defense requires a showing that any corrective statements were made with intensity and credibility as any false statements.").

### 2. Omission of Internal Projections

Lead Plaintiffs also allege that the Statements relating to the FY16 Target were materially misleading because Donegan never disclosed that PCC's "internal consensus" contradicted the FY16 Target, nor that anticipated "dismal economic data" was not reflected in the FY16 Target. Lead Plaintiffs present evidence that before announcing the FY16 Target, Defendants reached an "internal consensus" that EPS could only reach $13.30 to $13.80 for FY16, but nevertheless announced that it could achieve $15.50 to $16.50 EPS. (Pls.' Mot. Summ. J. at 24.) Lead Plaintiffs also present evidence that Defendants knew that the assumptions underlying the FY16 Target "'would not be achievable' given the 'dismal economic data'" discussed in an email between Khetani and Hagel before Defendants announced the FY16 Target. (*Id.*)

Defendants respond that there was no such "internal consensus" and that Donegan, Hagel, and Khetani collaborated and ultimately concluded that the FY16 Target of $15.50 to $16.50 EPS was reasonable. (Defs.' Opp. at 16-20.) Defendants point out that no senior executives testified in support of the "internal consensus," and the only support for such a consensus is from Phillips, who was a junior analyst. (Defs.' Opp. at 19.) Defendants also

contend that the email in question, when read in context, demonstrates that Khetani was discussing dismal market rates but emphasized that PCC would outperform the market. *See* Russo Decl. Ex. 20 at 1 ("So we may find that dismal market view is bailed out by a strong view on PCC unique outperf issues. And that is just fine to me and makes the case for peer/market outperf[.]").

There is a genuine dispute of material fact as to the existence of an "internal consensus" that contradicted PCC's earnings guidance, and if the "dismal economic data" known to PCC was appropriately reflected in the guidance. Accordingly, the Court denies the parties' motions for summary judgment on the falsity, materiality, and scienter elements with respect to statements about the FY16 Target.

### 3.    Pull-In Sales

Lead Plaintiffs' theory of liability includes the allegation that PCC relied on the practice of pulling in sales to meet its quarterly targets, and Defendants' failure to disclose PCC's reliance on pull-ins rendered their statements materially false and misleading. Defendants argue that they are entitled to summary judgment because: (1) Lead Plaintiffs cannot prove that PCC's pull-in practice was an unsustainable practice that temporarily inflated sales only to create a "massive hole" in future demand, and (2) even if the Lead Plaintiffs "could prove that pull-ins distorted PCC's publicly reported financial results . . . [Lead] Plaintiffs could not prove materiality." (Defs.' Mot. Summ. J. at 27.)

The parties present conflicting evidence on the financial impact of PCC's practice of pulling in sales. Defendants submit evidence that the percentage ranged from -0.55% to 0.78% net impact on reported sales companywide during the Class Period. (Defs.' Mot. Summ. J. at 17.) Lead Plaintiffs present evidence that pulling in sales impacted PCC's largest plants on the order of 16.67% to 27.65% of sales. (Pls.' Opp. at 10.) Lead Plaintiffs also point to an email from a

Vice President of Finance stating that pull-ins accounted for 20.5% of sales company-wide. (Pls.' Opp. at 10.)

In light of these disputed facts, a jury must determine which figure more accurately reflects the impact of PCC's pull-in practices, and whether Defendants' statements were materially false and misleading in light of PCC's practice of pulling in sales. *See Anderson*, 477 U.S. at 255 ("[T]he weighing of the evidence, and the drawing of a legitimate inferences from the facts are jury functions, not those of a judge[.]"). Accordingly, the Court denies Defendants' motion for summary judgment on the ground that Lead Plaintiffs cannot prove their pull-in theory. *See Azar*, 2018 WL 6182756, at *12 ("Given the importance of local advertising revenue to Yelp's financial health, Defendants' omission was material because there was 'a substantial likelihood that the disclosure of the [churn issues] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." (quoting *Basic*, 485 U.S. at 231-32)); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1139 (N.D. Cal. Oct. 16, 2017) ("In the absence of [daily average user] data, investors interpreted Defendants' statements are reassurances that the Company had experienced and would continue to experience positive growth and engagement trends.").

### 4.    Destocking

Defendants also seek summary judgment with respect to the Challenged Statements about destocking (Statements 12, 18-19, and 37 of those that remain at issue), because Lead Plaintiffs cannot establish a genuine issue of material fact with respect to falsity or scienter of those statements. (Defs.' Mot. Summ. J. at 41.) Lead Plaintiffs disagree. (Pls.' Opp. at 38.)

Plaintiffs' theory of falsity with respect to the destocking statements is that Donegan repeatedly assured investors that Rolls-Royce's destocking of inventory was only a temporary setback, when in fact he was aware that PCC was experiencing a decline in demand from Rolls-

PAGE 68 – OPINION AND ORDER

Royce. (Pls.' Opp. at 38.) Based on the parties' conflicting evidence about what information

Rolls-Royce shared with Donegan, there are disputed material facts as to whether Donegan's

statements about the impact of destocking were materially false and misleading. Accordingly, the

Court denies Defendants' motion for summary judgment on the elements of falsity, materiality,

and scienter with respect to the destocking statements. *See In re REMEC*, 702 F. Supp. 2d at

1216 (explaining that courts "may analyze falsity and scienter together, even though they are

separate elements, because they generally depend upon the same set of facts"); *cf. S.E.C. v.

Platforms Wireless*, 559 F. Supp. 2d 1091, 1102 (S.D. Cal. 2008) ("In light of the holding that a

genuine issue of material fact exists as to whether Martin's statement was materially false, the

court need not address whether Martin possessed the requisite scienter.").

## V.    LOSS CAUSATION

Defendants also seek summary judgment on the ground that Lead Plaintiffs cannot prove

loss causation or quantify damages. (Defs.' Mot. Summ. J. at 46.) Lead Plaintiffs counter that

"[t]o prevail at summary judgment, Defendants must establish that, as a matter of undisputed

fact, the depreciation in the value of [PCC stock] could not have resulted from the alleged false

statement or omission of the defendant[,]" and "Defendants do not even attempt to prove that

stock declines on the corrective disclosure dates were unrelated to their misstatements." (Pls.'

Opp. at 43) (citations and quotation marks omitted).

### A.    Legal Standards

#### 1.    Loss Causation

Loss causation "refers to the causal relationship between a material misrepresentation and

the economic loss suffered by an investor." *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir.

2014) (citing *Dura Pharm.*, 544 U.S. at 342). To establish loss causation, a plaintiff must show

"proximate" or "legal" cause. *Nuveen Mun. High Income Opportunity Fund v. City of Alameda,*

*Cal.*, 730 F.3d 1111, 1118 (9th Cir. 2013); *see also* 15 U.S.C. § 78u–4(b)(4) ("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."). "Put another way, a plaintiff can satisfy loss causation by showing that 'the defendant misrepresented or omitted the *very facts* that were a substantial factor in causing the plaintiff's economic loss.'" *Nuveen,* 730 F.3d at 1120 (citing *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425 (3d Cir. 2007)).

"Loss causation is established if the market learns of a defendant's fraudulent act or practice, the market reacts to the fraudulent act or practice, and a plaintiff suffers a loss as a result of the market's reaction." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) (citing *Metzler Inv. GMBH v. Corinthian Colls.*, 540 F.3d 1049, 1063 (9th Cir. 2008)). In addition, "[a] plaintiff may . . . prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *Mineworkers' Pension Scheme v. First Solar Inc.,* 881 F.3d 750, 754 (9th Cir. 2018) (citing *Berson v. Applied Signal Tech.*, 527 F.3d 982, 989-90 (9th Cir. 2008) and *In re Daou Sys. Inc.*, 411 F.3d 1006, 1026 (9th Cir. 2005)). "The 'ultimate issue' . . . 'is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *First Solar*, 881 F.3d at 754 (citing *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016)). However, "[a] plaintiff is not required to show that a misrepresentation was the *sole* reason for the investment's decline in value in order to establish loss causation." *In re Daou*, 411 F.3d 1025. "'[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery[.]'" *Id.* (quoting *Robbins v. Koger Props., Inc.,* 116 F.3d 1441, 1447 n. 5 (11th Cir. 1997)).

Typically, at the summary judgment stage, "defendants must prove, as a matter of law, that the depreciation value of [the stock] resulted from factors other than the alleged false and misleading statements." *Provenz v. Miller*, 102 F.3d 1478, 1492 (9th Cir. 1996); *see also In re REMEC*, 702 F. Supp. 2d at 1266 ("[P]laintiff can survive the motion if the defendant is unable 'to establish that, as a matter of undisputed fact, the depreciation in the value of the [stock] could not have resulted from the alleged false statement or omission of the defendant.'") (citation omitted). However, here Defendants move to exclude the expert testimony of Chad Coffman, Lead Plaintiffs' loss causation expert (ECF No. 230), and argue that because Coffman's expert report and testimony is Lead Plaintiffs' only evidence on loss causation, Defendants are entitled to summary judgment on all claims because Lead Plaintiffs cannot establish loss causation if the Court excludes Coffman's report and testimony. (Defs.' Mot. Summ. J. at 47-48.) Thus, the Court must evaluate Defendants' *Daubert* motion to determine if Lead Plaintiffs have adduced sufficient admissible evidence to create a genuine issue of material fact on loss causation. *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("Because plaintiffs bear the ultimate burden of proof on causation, Merrell had only to point to the absence of a genuine issue of material fact; it wasn't required to produce any evidence at all."); *see also Nuveen*, 730 F.3d at 1123 (affirming district court's entry of summary judgment where the plaintiff failed to establish "a triable issue on loss causation"); *In re REMEC*, 702 F. Supp. 2d at 1275 ("Without [the expert's] report and testimony, Plaintiffs are left with only their allegations and cannot withstand Defendants' motion for summary judgment as to loss causation. Because loss causation is an element Plaintiffs must prove to succeed on either of their two causes of action, dismissal of both claims is appropriate.").

///

2.    *Daubert*

Federal Rule of Evidence 702 provides that expert testimony is admissible if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue[.]" FED. R. EVID. 702(a). Expert testimony under Rule 702 must be both relevant and reliable. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The Supreme Court has provided a list of factors that courts may consider: (1) whether the theory or technique is generally accepted within a relevant scientific community, (2) whether the theory or technique has been subjected to peer review and publication, (3) the known or potential rate of error, and (4) whether the theory or technique can be tested. *Daubert*, 509 U.S. at 593-94.

The Ninth Circuit recently articulated the reliability standards to determine the admissibility of expert testimony. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036 (9th Cir. 2014). As explained by the Ninth Circuit:

> The test of reliability is flexible. The court must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance. But these factors are 'meant to be helpful, not definitive, and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case.' The test 'is not the correctness of the expert's conclusions but the soundness of his methodology,' and when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony. Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury.

*Id.* at 1044 (citations and quotation marks omitted).

B.    **Analysis**

In their motion to exclude Coffman's expert testimony, Defendants argue that Coffman's opinions do not "fit" Lead Plaintiffs' claims, and that his methodologies for determining loss causation and damages are unreliable. The Court disagrees.

The Court agrees with Lead Plaintiffs that courts have consistently accepted the general methodologies Coffman applies here—including the "event study," statistical regression, and "out of pocket" damages models—as reliable methods to determine loss causation and damages. *See, e.g., Baker v. Seaworld Ent'mt, Inc.*, 423 F. Supp. 3d 878, 901-09 (S.D. Cal. 2019) (denying the defendant's motion to exclude the testimony of Coffman in a securities fraud class action and rejecting many of the same arguments Defendants raise here, the Court held that "Coffman's testimony regarding the alleged corrective disclosure will be helpful to a jury and exclusion of his testimony on this basis is improper"; "Coffman's analysis of the market's reaction to the . . . statements is not subject to exclusion under *Daubert*"; and "Defendants' challenges to Coffman's [Constant Dollar Inflation] method do not support exclusion under *Daubert*"); *In re Novatel Wireless Sec. Litig.*, No. 08cv1689 AJB (RBB), 2013 WL 12144150, at *5 ("Event studies are crucial to demonstrate loss causation, and indeed some courts describe them as 'almost obligatory.'" (citing *In re Vivendi Universal, S.A. Sec. Lit.*, No. 02 Civ. 5571 (RJH)(HBP), 2009 WL 1066254, at *10 (S.D.N.Y. Apr. 21, 2009))).

Although the Court agrees with Defendants that Coffman's opinion does not fit squarely with Lead Plaintiffs' theories specific to pull-in sales and destocking standing alone, his opinion is consistent with Lead Plaintiffs' primary theory of liability that Defendants falsely assured investors that PCC was hitting benchmarks along the way to reaching the FY16 Target while omitting material information about PCC's organic growth, reliance on pull-in sales, and the impact of destocking.

In addition, Coffman's methodology of evaluating analyst reports to identify corrective disclosures is consistent with Ninth Circuit guidance. *See, e.g., First Solar,* 881 F.3d at 754 ("A plaintiff may . . . prove loss causation by showing that the stock price fell upon the revelation of

an earnings miss, even if the market was unaware at the time that fraud had concealed the miss."); *Baker*, 423 F. Supp. 3d at 901-02 ("Contrary to Defendants' assertion that Coffman simply lists and summarizes these reports and articles, Coffman's opinion of how the market interpreted SeaWorld's statements from the August 13, 2014 press release will assist the trier of fact in determining loss causation."); *In re Novatel Wireless*, 2013 WL 12144150, at *7 ("As the financial results, press releases, conference calls from the Company's officers, and analyst reports clearly concern revenue and guidance shortfalls due to Novatel's inability to meet the demands of its customers and loss of market share; Plaintiffs have shown the requisite link between those disclosures and earlier alleged misrepresentations to survive a *Daubert* motion.").

To the extent that Coffman's method of identifying analyst skepticism could have been more sophisticated, or to the extent he failed to account for all potentially confounding information, those are issues that go to the weight of Coffman's opinions, not admissibility. *See Daubert,* 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987))); *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013) ("The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury.").

Finally, although Defendants disagree with Coffman's application of constant dollar inflation ("CDI") here, that disagreement does not undermine the reliability of Coffman's analysis but rather takes issue with the amount of damages, which the jury will evaluate at trial. *See Baker*, 423 F. Supp. 3d at 908 (noting that "the jury is ultimately responsible for deciding whether CDI, or another calculation, is a reasonable measurement of damages" and therefore

holding that "Coffman's decision to use the CDI method in this case is sufficiently reliable for purposes of *Daubert*") (citation omitted); *In re Novatel Wireless*, 2013 WL 12144150, at *11 ("To the extent that Defendants suggest there is the possibility that Plaintiffs would recover losses that are non-fraud related [pursuant to the expert's out-of-pocket damages calculation], Defendants have not shown the risk undermines the reliability of the analysis as a whole. This argument tends to go towards the probative value of the testimony to be addressed at trial for the jury to consider.").

Coffman's methodologies and opinions are consistent with proof of loss causation and damages requirements set by the Supreme Court and the Ninth Circuit, and the Court finds that Coffman's testimony will be helpful to the jury. The Court therefore denies Defendants' motion to exclude Coffman's testimony. Accordingly, there remains a genuine dispute of material fact regarding whether Defendants' alleged misrepresentations were the proximate cause of the decline in PCC's stock price and, if so, the amount of damages the class members suffered. *See Nguyen*, 946 F. Supp. 2d at 1040 ("A[t] the summary judgment stage, a defendant would need to show that depreciation of a stock was the result of factors other than alleged false and misleading statements to prevail." (citing *Provenz,* 102 F.3d at 1492)). As a result, the Court denies Defendants' motion for summary judgment on the issues of loss causation and damages.

## VI.    HAGEL'S LIABILITY

Both Lead Plaintiffs and Defendants move for summary judgment on Hagel's Rule 10b-5(b) and Section 20(a) liability. Lead Plaintiffs argue that "Hagel has admitted that she had ultimate authority or control over Defendants' statements concerning the FY16 Target[,]" and therefore Hagel was a "maker" of the statements on which Lead Plaintiffs move for partial summary judgment. (Pls.' Mot Summ. J. at 34.) Defendants respond that because "[e]ach of the FY16 Statements was an unscripted, oral statement by Donegan[,]" and Lead Plaintiffs have not

established that "Hagel somehow used Donegan as a mouthpiece to deliver her own messages to the market[,]" Hagel is not a "maker" under Rule 10b-5(b). (Defs.' Opp. at 32-33.)

Important to the Court's analysis of Hagel's liability, all of the eighteen statements that remain at issue (Statements 8-9, 11-12, 15, 18-19, 22-26, 28, 34, 36-37, 39, and 42), are Donegan's oral statements on quarterly earnings calls or at investor conferences.

### A.    Maker Liability

Lead Plaintiffs argue that Hagel had ultimate authority over Donegan's oral statements, pointing to Hagel's testimony that her job was to ensure that Donegan did not misstate "whether [Defendants] were on track to hit the fiscal '16 target or not," and that she "absolutely" had the authority to correct Donegan's statements. (Pls.' Mot. Summ. J. at 34.) At her deposition, Hagel described the process to prepare for the quarterly earnings calls:

> Each quarter, as part of our process to getting our slide deck prepared and our press release, we would revisit whether or not we still believed that we were on track to hit the target. And then we would put into the slide deck the things that were driving our performance which were a lot of the main reasons why we concluded we were still on track during the time period that we did. And then Mark would communicate that during the investor call, that we were on track.

(Pls.' Reply at 34.) According to Lead Plaintiffs, Donegan's statements were "far from being off-cuff-statements[,]" and were instead the "memorializ[ation] of a carefully crafted (and false) narrative that was collectively developed by Donegan, Khetani and Hagel." (Pls.' Reply at 34.)

The "maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Although Hagel helped prepare Donegan for earnings calls, the Supreme Court in *Janus* rejected the argument that a Rule 10b-5(b) "maker" is someone significantly involved in preparing a statement. See *Janus*, 564 U.S. at 148

("Although JCM, like a speechwriter, may have assisted Janus Investment Fund with crafting what Janus Investment Fund said in the prospectuses, JCM itself did not 'make' those statements[.]"). Even if Hagel assisted in developing the message that Donegan shared during earnings calls, the content of Donegan's statement was entirely within his control. *See Janus*, 564 U.S. at 143 ("Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said."); *see also M & M Hart Living Tr. v. Global Eagle Entm't, Inc.*, No. CV 17-1479 PA (MRWx), 2017 WL 5635424, at *12 (C.D. Cal. Aug. 20, 2017) ("[O]ral statements in earnings calls are not 'group-published,' and therefore can be attributed to the speaker only."); *In re CytRx Corp. Sec. Litig.*, No. CV 14-1956-GHK (PJWx), 2015 WL 5031232, at *6 (C.D. Cal. July 13, 2015) ("Courts since *Janus* have applied [*Janus*] to disallow Rule 10b-5(b) claims against defendants who merely requested, influenced, helped create, or supplied information for the relevant false or misleading statements."); *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1092 (C.D. Cal. May 19, 2008) ("In seeking to attribute Mr. Tomkinson's oral statements regarding solid loan acquisition to the other individual Defendants, Plaintiffs ignore the well-established rule that even under the 'group published doctrine,' oral statements cannot be attributed to a group.").

Accordingly, the Court grants Defendants' motion for summary judgment, and denies Lead Plaintiffs' motion for partial summary judgment, on the issue of whether Hagel is a "maker" subject to liability under Section 10(b) or Rule 10b-5(b).

///

///

///

B.    **Control Person Liability**

Lead Plaintiffs also argue that they are entitled to summary judgment as to Hagel's control person liability.[7] (Pls.' Mot. Summ. J. at 35.) Lead Plaintiffs argue that Hagel's interrogatory responses establish her "knowledge of and involvement in PCC's day-to-day operations[,]" and identify "regular reports generated by or distributed to . . . Hagel." (Pls.' Mot. Summ. J. at 35) (citing Russo Decl. Ex. 15 at 10-12, Ex. 71 at 8-9.)

Defendants also move for summary judgment on Lead Plaintiffs' Section 20(a) claim against Hagel, arguing that Hagel is not a control person under Section 20(a) because "statements attributable to a specific individual are presumed to be actions of that individual only." (Defs.' Mot. Summ. J. at 49.) Lead Plaintiffs counter that "control over the individual who uttered the statement (as opposed to PCC itself) is not required under Section 20(a)." (Pls.' Opp. at 48.) Lead Plaintiffs argue that "[a]ll that is required is proof of a primary violation and that defendant exercised actual power or control over the primary violator." (Pls.' Opp. at 49) (citation and quotation marks omitted).

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under . . . this chapter . . . shall also be liable . . . to the same extent as such controlled person." 15 U.S.C. § 78t(a). "In order to prove a prima facie case under § 20(a), plaintiff must prove: (1) a primary violation of federal securities laws . . . ; and (2) that the defendant exercised actual power or control over the primary violator[.]" *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (citing *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990)).

---

[7] Defendants do not oppose Lead Plaintiffs' argument that Donegan is a "control person" relative to PCC.

Although the record supports a conclusion that Hagel, as CFO, exercised control over certain aspects of PCC's operations, here the only statements that remain at issue are Donegan's oral statements. *See Howard*, 228 F.3d at 1067 (affirming district court's grant of summary judgment on Section 20(a) claim where "Plaintiff [] points to [the defendant's] general level of control but provides no specific indication that [the defendant] supervised or had any responsibility for preparation of the [challenged] financial statements").

Although Hagel assisted Donegan in preparing for the earnings calls, the evidence does not support a conclusion that she had any meaningful control over what words came out of Donegan's mouth during those calls.[8] Accordingly, the Court denies Lead Plaintiffs' motion for partial summary judgment, and grants Defendants' motion for summary judgment, with respect to Hagel's Section 20(a) liability.

## VII.    DEFENDANTS' STOCK SALES

Defendants seek summary judgment on the issue of whether their stock sales during the Class Period support an inference of scienter. (Defs.' Mot. Summ. J. at 44-46.) Lead Plaintiffs argue that a reasonable jury could find that Defendants' stock sales support Lead Plaintiffs' theory of scienter here. (Pls.' Opp. at 41-42.)

"[T]hree factors that must be considered to determine whether stock sales raise a strong inference of [scienter]: '(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009) (citation omitted).

---

[8] The Court's conclusion would be different if the statements in PCC's press releases remained at issue. *See* Hagel Decl. ¶ 23 (explaining that Hagel conducted a final review of PCC's quarterly press releases); Hagel Dep. 322:12-323:4 (explaining that after various PCC employees collaborated on quarterly press releases, Hagel was the one to "sign[] off on it").

"[T]he court must compare pre-class period activity to activity during the class period in order to decide if, in fact, trading in the latter period is suspicious." *Okla. Firefighters Pension & Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1367 (C.D. Cal. 2014); *see also Zucco Partners*, 552 F.3d at 1005 (same).

Donegan sold 90,000 shares at the allegedly inflated price during the Class Period, out of a total of 750,000 he owned at the time (i.e., approximately 12%).[9] (Defs.' Mot. Summ. J. at 45.) Standing alone, the percentage of shares Donegan sold is not suspicious. *See Rodriguez*, 325 F. Supp. 3d at 1057 ("'The Ninth Circuit has held that typically 'larger sales amounts' than 37% of a defendant's holdings are necessary to support scienter.'" (quoting *Wozniak v. Align Techs., Inc.*, No. 09-3671 MMC, 2011 WL 2269418, at *14 (N.D. Cal. June 8, 2011))); *cf. In re Galena Biopharma*, 117 F. Supp. 3d at 1167 (finding that the defendant's stock sales of 87% of his shares during the class period supported an inference of scienter). Furthermore, Defendants contend (and Lead Plaintiffs do not appear to refute) that Donegan "sold less stock during the 20 months of the Class Period than [he] did during the 20 months preceding it." (Defs.' Mot. at 45.)

In light of this evidence, Donegan's trading history does not support an inference of scienter, and will therefore be excluded at trial.[10] *See In re Apple Comput. Sec. Litig.*, 886 F.2d at 1117 ("[T]he pattern of stock trading by Apple's insiders is insufficient to raise an issue for the jury. The defendants collectively sold a slightly greater number of shares during an equal period of time just before the class period than they did during the class period."); *In re Apple Inc. Sec.*

---

[9] In light of the entry of summary judgment on Lead Plaintiffs' claims against Hagel, the Court does not address Hagel's stock sales.

[10] Nevertheless, there remains a genuine dispute of material fact regarding whether Donegan acted with scienter in connection with the eighteen allegedly materially false and misleading statements.

*Litig.*, 2020 WL 2857397, at *21-22 (finding that where defendants "sold more shares during the Control Period than during the Class Period" the evidence of stock sales did not evidence scienter); *cf. Provenz*, 102 F.3d at 1491 (finding that the trading history of the defendants supported an inference of scienter where defendants sold approximately six times more stock in the twelve month class period than they had during the preceding twelve months).

## CONCLUSION

For the reasons set forth above, the Court DENIES Lead Plaintiffs' Motion for Partial Summary Judgment (ECF Nos. 224 and 225), GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment (ECF Nos. 233 and 234), GRANTS Defendants' Requests for Judicial Notice (ECF Nos. 242 and 290), and DENIES Defendants' Motion to Exclude Expert Testimony of Chad Coffman (ECF No. 230).

**IT IS SO ORDERED.**

DATED this 3rd day of July, 2020.

_____
STACIE F. BECKERMAN
United States Magistrate Judge