IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KEVIN MURPHY, Individually and On
Behalf of All Others Similarly Situated,

               Plaintiff,

      v.

PRECISION CASTPARTS CORP., MARK
DONEGAN, and SHAWN R. HAGEL,

               Defendants.

Case No. 3:16-cv-00521-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

This matter comes before the Court on Defendants Precision Castparts Corporation

("PCC"), Mark Donegan ("Donegan"), and Shawn Hagel's ("Hagel") (together, "Defendants")

bill of costs. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and all

parties have consented to the jurisdiction of a U.S. Magistrate Judge pursuant to 28 U.S.C. §

636(c). For the reasons explained below, the Court grants in part and denies in part Defendants'

bill of costs.

///

///

PAGE 1 – OPINION AND ORDER

## BACKGROUND

On March 25, 2016, AMF Pensionsförsäkring AB and the Oklahoma Firefighters Pension and Retirement System (hereinafter, "Lead Plaintiffs" or "Plaintiffs") filed this securities action as a putative class action on behalf of those who purchased or otherwise acquired the publicly traded securities of PCC between May 9, 2013 and January 15, 2015 (hereinafter, the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Lead Plaintiffs alleged that Defendants violated Sections 10(b) and 20(a) of the Exchange Act and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.

On September 26, 2016, Lead Plaintiffs filed an amended complaint alleging, *inter alia*, that Defendants made forty-four statements during the Class Period that were materially false and misleading, primarily with respect to PCC's earnings guidance for Fiscal Year 2016 ("FY16"). Lead Plaintiffs' theory of liability was that Defendants always knew the FY16 earnings guidance was unattainable because their financial projections were based on unrealistic assumptions, and Defendants knew throughout the Class Period that PCC was failing to achieve the organic growth necessary to meet the target, in part because PCC's practice of pulling in sales to earlier quarters was unsustainable and a large customer was continuing to destock its inventory. Lead Plaintiffs alleged that Defendants nevertheless made statements throughout the Class Period misrepresenting that PCC was achieving anticipated benchmarks en route to its FY16 target, which created an impression of a state of affairs materially different from the one that existed.

In an Opinion and Order dated July 3, 2020, the Court concluded that (1) the PSLRA's Safe Harbor for forward-looking statements protected twenty-two of the forty-four statements at issue; (2) four additional statements were not actionable because they were vague statements of

puffery; (3) with respect to the remaining eighteen statements, all were Donegan's unscripted oral statements, which absolved Hagel of liability; and (4) there were disputed issues of fact regarding whether Donegan's statements were materially false and misleading, whether he knew his statements were false and misleading, and whether his statements caused economic loss to class members. The Court therefore granted in part, and denied in part, Defendants' motion for summary judgment.

On February 17, 2021, Defendants moved for reconsideration of the Court's July 3, 2020 Opinion, in light of the Ninth Circuit's recent opinion in *Wochos v. Tesla, Inc.*, 985 F.3d 1180 (9th Cir. 2021). On May 24, 2021, the Court granted Defendants' motion for reconsideration, explaining that Elon Musk's statements in *Tesla* that the Ninth Circuit found were non-actionable (e.g., "it's coming in as expected"; "getting pretty close to the bull's-eye"; "there are no issues"; "preparations are progressing"; "we are on-track") were indistinguishable from Donegan's FY16 target statements (e.g., "we're on that slope"; "we're pretty much on that drum beat"; "we hover around that line"; "the framework . . . is all intact"; "nothing has gone negative"; "we've been able to stay on that continuum"; and "there is no change to the . . . framework we laid out"). The Court further explained that although it previously held that the Safe Harbor did not protect Donegan's "on the line" statements because they contained facts about PCC's current circumstances, it was clear from the Ninth Circuit's reasoning in *Tesla* that Donegan's relatively generic statements did not include sufficiently "concrete descriptions" of present facts to fall outside the protection of the Safe Harbor. Additionally, the Court explained that it read *Tesla* to instruct that a company must disclose that it reached a *specific* benchmark for the statement to be actionable, not that it reached an undisclosed or non-specific benchmark; Donegan's statements about PCC's current circumstances were just as vague as

Musk's statements in *Tesla*; under *Tesla*'s reasoning, Donegan's statements that "the framework is intact" cannot be false unless there was no longer any part of the framework intact; and Donegan's statements about being on or near the "line" or "slope" could not be false unless he was clear regarding the specifics of the line or slope to which he was referring.

Following entry of final judgment, Defendants filed a bill of costs seeking to recover $339,775.25. (ECF No. 329.)

## DISCUSSION

### I.    LEGAL STANDARDS

Federal Rule of Civil Procedure 54(d)(1) provides that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party."[1] FED. R. CIV. P. 54(d)(1); *see also* LR 54-1(a) (requiring that the prevailing party's bill of costs must "provide[] detailed itemization of all claimed costs" and include an "affidavit or declaration and appropriate documentation"). By its terms, this rule "creates a presumption in favor of awarding costs to a prevailing party, but vests in the district court discretion to refuse to award costs." *Ass'n Mexican-Am. Educators v. California ("AMAE"), 231 F.3d 572, 591 (9th Cir. 2000)*. "That discretion is not unlimited. A district court must 'specify reasons' for its refusal to award costs." *Id.* (quoting *Subscription Television, Inc. v. S. Cal. Theatre Owners Ass'n, 576 F.2d 230, 234 (9th Cir. 1978)*).

Section 1920 lists the specific items a prevailing party may recover as costs, including, as relevant here: "(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case; (3) Fees and disbursements for printing and witnesses; [and] (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily

---

[1] The parties do not dispute that Defendants are the prevailing parties here.

obtained for use in the case[.]" 28 U.S.C. § 1920. The Ninth Circuit has approved the following

reasons for refusing to award costs to a prevailing party: (1) the losing party's limited financial

resources; (2) the chilling effect on future civil rights litigants; (3) misconduct on the part of the

prevailing party; (4) the closeness and difficulty of the issues in the case; (5) the merit of the

plaintiff's case; and (6) the public importance of the issues in the case. *See Darensburg v. Metro.*

*Transp. Comm'n*, No. 05-cv-01597, 2009 WL 2392094, at *2 (N.D. Cal. Aug. 4, 2009) (citations

omitted).

## II.    ANALYSIS

Defendants seek costs in the amount of $75,582.52 for deposition and court transcripts;

$41.16 for witness fees; and $264,151.57 in reproduction charges (Mem. in Supp. of Defs.' Bill

of Costs ("Defs.' Mem. Supp.") at 4, 6, ECF No. 332), for a total award of $339,775.25. As

explained below, the Court grants in part and denies in part Defendants' bill of costs.

### A.    Plaintiffs' Threshold Objections

Plaintiffs argue that the Court should deny Defendants' cost bill in its entirety based on

(1) the likely availability of insurance to cover Defendants' costs; (2) the potential chilling effect

on future securities class action plaintiffs; (3) the public importance of the issues in the case; (4)

the merits of Plaintiffs' claims; and (5) the closeness and difficulty of the issues in the case.

(Lead Pls.' Objs. to Defs.' Bill of Costs ("Pls.' Objs.") at 2-6, ECF No. 333.) The Court

disagrees.

#### 1.    The Availability of Insurance

With respect to insurance, Plaintiffs have failed to cite any Ninth Circuit case law that

would support denying costs based on the availability of insurance proceeds to cover the costs at

issue. (*See* Pls.' Objs. at 4-5) (emphasis added). Even if binding authority existed to deny costs

based on insurance coverage, Plaintiffs have failed to demonstrate that insurance proceeds are

available to cover all or part of Defendants' costs here. The Court therefore concludes that

Plaintiffs have failed to overcome the presumption in favor of awarding costs to Defendants. *See*

*Choi v. Reed Inst.*, No. 3:17-cv-2064-MO, 2019 WL 8301675, at *1 (D. Or. Mar. 5, 2019) ("The

district court . . . 'needs no affirmatively expressed reason to tax costs. Rather, it need only

conclude that the reasons advanced by the party bearing the burden—the losing party—are not

sufficiently persuasive to overcome the presumption.'") (citation omitted).

### 2.   The Potential Chilling Effect on Future Securities Class Action Plaintiffs and the Public Importance of the Issues

Plaintiffs argue that granting Defendants' bill of costs would "strongly discourage future

plaintiffs from asserting meritorious claims on behalf of investor classes," noting that "private

securities class actions play an essential role in enforcing federal securities laws." (Pls.' Objs. at

6.) Although the Court shares Plaintiffs' concerns about discouraging future plaintiffs from filing

meritorious claims, the Court finds that the potential for discouraging other securities class

actions does not justify denying costs here.

As an initial matter, Plaintiffs fail to point to any statute or rule that provides an

exemption from costs for class action plaintiffs generally, or securities class action plaintiffs

more specifically. *See Whiteway v. FedEx Kinkos Off. & Print Servs., Inc.*, No. 05-cv-2320, 2007

WL 4531783, at *3-4 (N.D. Cal. Dec. 17, 2007) ("[D]efendant correctly points out that neither a

statute nor the Federal Rules provides any exemption from costs for named plaintiffs in a class

action. . . . It is no secret that the class action mechanism is used not only to uphold the rights of

those similarly situated, but is also a mechanism for gaining greater leverage in a plaintiff's

pursuit of maintaining his own claims. . . . Thus, a plaintiff choosing to sue on behalf of others

not only faces the possibility of greater costs, but also may receive greater benefits from the class

action procedure[.]"); *cf. Pierce v. Santa Maria Joint Union High Sch. Dist.*, No. 2:11-CV-

09463-SVW, 2013 WL 12174404, at *4 (C.D. Cal. Jan. 29, 2013) ("[I]n civil rights cases, a court abuses its discretion when it awards costs against a losing plaintiff without considering . . . 'the chilling effect of imposing such high costs on future *civil rights* litigants.'" (quoting *AMAE, 231 F.3d at 593*) (emphasis added)).

Even if there was authority for denying costs to the prevailing defendants in a securities class action due to the relative financial disparity between the parties or the potential chilling effect of requiring individual investors to foot the bill, the record here includes a contingency fee agreement reflecting that Lead Plaintiffs are not responsible for any fees, costs, or expenses associated with this litigation. *Cf. Tibble v. Edison Int'l*, No. 07-cv-5359, 2011 WL 3759927, at *3 (C.D. Cal. Aug. 22, 2011) ("[T]he chilling effect on future litigants is low under the circumstances of this case. As part of their contingency fee arrangement, Plaintiffs' counsel represented that Plaintiffs would not be liable for Plaintiffs' counsel's costs during the litigation.").

For these reasons, the Court concludes that denying costs based on the public importance of the issues, or on the ground that taxing costs will deter future securities class actions, is not warranted here.

### 3.    The Merits of Plaintiffs' Claims and the Closeness and Difficulty of the Issues

Plaintiffs argue that the Court should deny Defendants' bill of costs given the merits of Plaintiffs' claims and the closeness and difficulty of the issues presented. (Pls.' Objs. at 2.) The Court disagrees.

Plaintiffs' argument is premised on the fact that before the Court granted Defendants' motion for reconsideration, Plaintiffs prevailed at the motion to dismiss and summary judgment stages. Notably, however, awarding costs to the prevailing party is routine, including following

trial and in cases that involve difficult issues. *See Emad v. Boeing Co.*, No. 14-cv-01233-RSM, 2016 WL 9227712, at *2 (W.D. Wash. Mar. 4, 2016) (awarding costs to the prevailing party in a case that proceeded to a jury trial); *Jardin v. DATAllegro, Inc.*, No. 08-cv-01462, 2011 WL 4835742, at *3 (S.D. Cal. Oct. 12, 2011) (holding that the closeness and difficulty of the issues did not overcome the presumption in favor of awarding costs even though the district court "acknowledged that understanding the technology at issue in [the] case required significant effort," and emphasizing that the cases on which the plaintiff "relie[d] were not decided on summary judgment but [instead] involved long and complicated trials"); *see also Saberi v. BFS Retail & Com. Operations, LLC*, No. 08-cv-04232, 2011 WL 13258236, at *5 (N.D. Cal. May 23, 2011) (rejecting an objection to a cost bill and explaining that "parties seeking to show close and difficult issues [typically] cite the fact that the case could *not* be resolved on summary judgment").

Accordingly, the Court concludes that denying costs based on the merits of Plaintiffs' claims, or the closeness and difficulties of the issues presented, is not warranted here.

## B.    Defendants' Requested Costs

### 1.    Deposition Costs and Court Transcripts

Defendants seek $75,582.52 in costs for depositions and court transcripts. (Defs.' Mem. Supp. at 1-4.) Defendants' request includes the costs of stenographic transcription and video recording of thirty-five depositions, as well as "shipping and delivery costs." (*Id.* at 2.)

#### a.    Applicable Law

Taxable costs include "[f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case." 28 U.S.C. § 1920(2); *see also Frederick v. City of Portland*, 162 F.R.D. 139, 142 (D. Or. 1995) ("Costs related to depositions are generally available to a prevailing party under 28 U.S.C. § 1920."). It is well settled that depositions relied on at

summary judgment are "necessarily obtained for use in the case." *Yasui v. Maui Elec. Co., Ltd.*, 78 F. Supp. 2d 1124, 1128 (D. Haw. 1999) ("[Plaintiff's] deposition was relied on to determine when [plaintiff] knew or should have known about his causes of action. The other depositions were examined to determine whether genuine issues of fact existed. Accordingly, [the defendant] is entitled to $3,367.44 in costs for its deposition transcripts."). However, "[t]he fact that the deposition transcripts were not ultimately used in dispositive-motion practice or at trial is not sufficient to automatically render the transcripts unnecessary." *Apantac, LLC v. Avitech Int'l Corp.*, No. 3:11-01507-BR, 2014 WL 12788974, at *2 (D. Or. Nov. 26, 2014) (quoting *Jansen v. Experian Info. Sols., Inc.*, No. 05-cv-00385-BR, 2011 WL 846876, at *15 (D. Or. Mar. 9, 2011)). Indeed, "[a] deposition need not be absolutely indispensable to justify an award of costs; rather, it must only be reasonably necessary at the time it was taken, without regard to later developments that may eventually render the deposition unneeded[.]" *Frederick*, 162 F.R.D. at 143 (citation omitted).

### b.    Court Transcripts

Plaintiffs do not dispute that costs incurred in obtaining court hearing transcripts are taxable costs. *See generally United States v. Metro. Disposal Corp.*, 622 F. Supp. 1262, 1267 (D. Or. 1985) ("Expenses . . . for transcribing arguments, pretrial proceedings and the like are allowable costs."); *see also Haney v. Timesavers, Inc.*, No. 92-270-FR, 1994 WL 377741, at *1 (D. Or. June 22, 1994) ("Pretrial transcripts are especially necessary when the case is unusually involved and complex."). Thus, Defendants are entitled to the $2,379.45 in costs they incurred to obtain court hearing transcripts (*see* Decl. of Brad Daniels in Supp. of Defs.' Bill of Costs ("Daniels Decl.") Ex. 1 at 1-9, ECF No. 330; Decl. of Christin Hill in Supp. of Defs.' Bill of Costs ("Hill Decl.") Ex. 1 at 1-2, ECF No. 331), some of which included oral rulings or were cited during a discovery dispute. (*See* Defs.' Mem. Supp. at 3 n.2.)

### c.    Deposition Costs

Plaintiffs dispute whether Defendants are entitled to recover the costs for the deposition transcripts they purchased, or the costs related to the expedited delivery of deposition transcripts. (Pls.' Objs. at 9.) As to the expedited delivery of deposition transcripts, Defendants explain that such costs were necessary "to prepare witnesses for upcoming depositions or to prepare for taking depositions during . . . periods when multiple deponents often sat for depositions within the same week." (Defs.' Resps. to Pls.' Objs. to Defs.' Bill of Costs ("Defs.' Reply") at 8, ECF No. 336.) Given this justification, the Court concludes that Defendants are entitled to the costs related to expedited delivery of deposition transcripts. *See Adidas Am., Inc. v. Herbalife Int'l, Inc.*, No. 3:09-cv-00661-MO, 2012 WL 13051118, at *2 (D. Or. Sept. 5, 2012) (awarding costs for the expedited delivery of transcripts insofar as the court found "merit in the . . . [plaintiff's] proffered justifications" for doing so).

As to deposition costs, Plaintiffs assert that Defendants have failed to "demonstrate[] that the deposition transcripts they purchased were 'necessarily obtained for use in the case.'" (Pls.' Objs. at 9.) Plaintiffs also assert that Defendants cannot recover (1) "$3,808.90 in costs associated with deposing Lead Plaintiffs because, as they conceded, they did not rely on those transcripts in their summary judgment or *Daubert* motions," or (2) "$14,533.36 related to the deposition of PCC employees or $6,243.13 related to the deposition of their own experts," because Defendants "could have obtained whatever information it desired from [the] PCC employees and experts without the need for a formal deposition." (Pls.' Objs. at 9-10) (footnotes omitted).

As discussed above, "[t]he fact that the deposition transcripts were not ultimately used in dispositive-motion practice or at trial is not sufficient to automatically render the transcripts unnecessary." *Apantac*, 2014 WL 12788974, at *2 (citation omitted). In fact, a deposition need

"only be reasonably necessary at the time it was taken, without regard to later developments that may eventually render the deposition unneeded[.]" *Frederick*, 162 F.R.D. at 143 (citation omitted).

Here, Defendants represent that the depositions they "took—Plaintiffs' experts Chad Coffman, Harris Devor, and Michael Dreikorn, and Rule 30(b)(6) depositions of the Lead Plaintiffs—were either cited in the summary judgment or *Daubert* motions briefing or, in the case of the Lead Plaintiffs' depositions, necessary for discovery and trial preparation." (Defs.' Mem. Supp. at 2.) Defendants also emphasize that although they seek to recover costs for thirty-five depositions, Plaintiffs noticed thirty of these depositions. (Defs.' Mem. Supp. at 2; Defs.' Reply at 9.)

Given the complexity of securities class actions, the large volume of discovery involved, the number of depositions that Plaintiffs noticed, and Defendants' proffered justifications, the Court concludes that Defendants are entitled to recover the costs for the transcription of the thirty-five depositions at issue. *See Confederated Tribes of Chehalis Rsrv. v. Thurston Cnty. Bd. of Equalization*, No. 08-cv-5562, 2010 WL 11462846, at *2 (W.D. Wash. July 1, 2010) ("[T]he Court considers the complexity of this case, the large amount of discovery involved, and the large number of depositions taken by both parties, and concludes that Defendants' costs[, including $19,494.37 for deposition transcripts,] were reasonably necessary."); *Cervantes v. San Diego Police Chief Shelley Zimmerman*, No. 17-cv-1230, 2021 WL 424278, at *2 (S.D. Cal. Feb. 8, 2021) ("Expense of a copy of a party's own depositions taken by an adversary should be allowed as costs because it might be used to impeach the party at trial and thus was clearly necessary for use in the case.").

///

The remaining question, then, is whether Defendants are entitled to recover the costs of the video recording of depositions. Plaintiffs assert that Defendants have not demonstrated that they are entitled to recover the costs for video recordings of "each deposition taken in this case," and note that this Court declined to award such costs in *Simons v. Costco Wholesale Corp.*, No. 3:18-cv-00755-SB, 2021 WL 1244309, at *4-5 (D. Or. Feb. 22, 2021). (Pls.' Objs. at 10.) Defendants respond by noting that it is within the Court's discretion to award costs for video recordings of depositions, and that other courts have found that such costs are taxable. (Defs.' Reply at 10.)

The Court concludes that Defendants are not entitled to recover the costs for the video recording of depositions. As this Court explained in *Simons*, a party seeking costs for the video recording of a deposition must explain why the deponent's "deposition demeanor was such an important issue that the video version, in addition to the written version, of [his] deposition was necessary." *Simons*, 2021 WL 1244309, at *4 (quoting *Pullela v. Intel Corp.*, No. 08-cv-01427-AC, 2010 WL 3361089, at *3 (D. Or. Aug. 25, 2010)); *see also Rhodehouse v. Ford Motor Co.*, No. 2:16-cv-01892-JAM-DMC, 2019 WL 699947, at *2 (E.D. Cal. Feb. 20, 2019) (excluding the cost of videotaping a deposition from a cost bill where the defendant had "not explained why it needed to videotape the depositions"). Defendants have failed adequately to explain why the video recording of any deposition was necessary here, and therefore the Court declines to award such costs. *See Pullela*, 2010 WL 3361089, at *3 ("The demeanor of any witness . . . is important in any case. That general principle, however, should not automatically convert a videographer's fee into a recoverable item of cost where a court reporter also attended and transcribed the deposition and the party seeking to recover the videographer's cost does not offer one or more reasons specific to the case to justify an award of costs for both items. Routinely allowing

recovery of the cost incurred for both the court reporter's transcript and a separate videographic record of depositions duplicates deposition costs without purpose.").

For these reasons, the Court grants in part and denies in part Defendants' request for $73,203.07 in deposition costs (*see* Daniels Decl. ¶ 3; Hill Decl. ¶ 3, referring to deposition-related costs of $35,120.08 and $38,082.99, respectively), and declines to award $7,080.26 in video recording-related costs.[2]

### 2. Witness Fees

Defendants request $41.16 in costs for "the payment of witness deposition fees and mileage." (Daniels Decl. ¶¶ 3, 6.) The Court grants Defendants' request for $41.16 in witness fees because they are taxable costs (*see, e.g.*, *Kibbee v. City of Portland*, No. 98-cv-675-ST, 2000 WL 1643535, at *3 (D. Or. Oct. 12, 2000) (explaining that witness fees, including a daily attendance fee and travel expenses, are taxable costs)), and Plaintiffs do not appear to argue otherwise.

### 3. Blowbacks

Plaintiffs object to Defendants' bill of costs to the extent it seeks "nearly $2,200 in charges for 'Blowbacks'—hard-copy printouts of scanned documents, *see* ECF No. 330-4 at 5—which are not recoverable." (Pls.' Objs. at 9.) Plaintiffs, however, fail to cite any supporting authority.

Courts in this circuit have recognized that blowback copies are recoverable costs. *See Pet Food Express Ltd. v. Applied Underwriters, Inc.*, No. 2:16-cv-01211, 2020 WL 5017615, at *1

---

[2] If the five $70.00 charges for "Reporter Appearance Fee/Session – Videotaped" and the $65.00 charge for "Reporter Appearance Fee/Evening Session – Videotaped" are excluded, Defendants seek $7,080.26 in video recording-related expenses. (*See* Daniels Decl. Ex. 2 at 1; Hill Decl. Ex. 2 at 1-6, setting forth itemizations of Defendants' requested video recording-related costs).

(E.D. Cal. Aug. 25, 2020) (stating that "[b]lowbacks . . . clearly constitute copies under the meaning of the statute and plaintiff does not appear to seriously dispute this point," and noting that other courts have found that blowbacks are recoverable costs) (citation omitted). Accordingly, Defendants are entitled to recover the costs of blowbacks. *See generally Tranxition, Inc. v. Novell, Inc.*, No. 3:12-cv-01404-HZ, 2015 WL 7195337, at *1 (D. Or. Nov. 16, 2015) ("[There is] a heavy burden on the non-prevailing party to show why taxable costs are not recoverable.") (simplified).

### 4.    Data Hosting/Storage

Plaintiffs object to Defendants' request for $168,069 in "document hosting costs," noting that other courts in this circuit have routinely denied such costs. (Pls.' Objs. at 7.) Defendants acknowledge that judges in this district have not "uniformly taxed data storage costs," but argue that the Court should do so here because the "parties' protocol governing discovery requires, among other things, documents to be produced as 'Tagged Image File Format (.TIFF or .TIF) images with an image load file (.OPT file and/or .LFP file) and a delimited database load file (.DAT),'" and because "[s]pecified metadata were also required as part of production."[3] (Defs.' Mem. Supp. at 5 n.5.)

### a.    Applicable Law

There is authority that supports Plaintiffs' position that data storage/hosting costs are not taxable. *See, e.g.*, *Left Coast Wrestling, LLC v. Dearborn Int'l LLC*, No. 3:17-cv-00466, 2018

---

[3] On page six of their reply, Defendants note that in *Nelson v. Fiskars Brands, Inc.*, No. 3:14-cv-00685-SB, 2015 WL 7306426, at *1-2 (D. Or. Nov. 19, 2015), this Court granted a bill of costs that included costs for "storing discovery materials on a database." *Id.* Notably, however, the defendant in *Fiskars* requested only "$50 in costs incurred in storing discovery materials on a database," and the plaintiff did not specifically object to the $50 charge. *Id.* By contrast here, Defendants seek $168,069 in data storage/hosting costs and Plaintiffs have lodged a specific objection.

WL 2948532, at *2 (S.D. Cal. June 12, 2018) (stating that "courts have not allowed recovery of costs for the hosting of electronic data" (citing *eBay Inc. v. Kelora Sys., LLC*, No. 10-4947, 2013 WL 1402736, at * 7 (N.D. Cal. Apr. 5, 2013))); *Tomas v. Dep't of Emp't Sec.*, No. 07-cv-04542, 2019 WL 10378261, at *1 (N.D. Ill. Oct. 10, 2019) ("Although the Seventh Circuit held that costs for converting computer data into a readable format in response to plaintiffs' discovery requests are recoverable, the Seventh Circuit has not yet provided guidance related to which electronically stored information services are taxable. Courts in the Seventh Circuit consistently find that electronic data hosting is not a recoverable cost under 28 U.S.C. § 1920. . . . This Court finds the reasoning of its sister courts persuasive and holds that data hosting is not a recoverable cost.") (simplified); *Balance Point Divorce Funding, LLC v. Scrantom*, 305 F.R.D. 67, 76 (S.D.N.Y. 2015) ("[J]ust as rental costs for storage of paper documents or housing and leasing photocopying equipment are not taxable as 'making copies,' costs for 'Hosting Active–Data' are not costs for making copies.").

There is also authority that supports Defendants' position that data storage/hosting costs are taxable. *See, e.g.*, *Pacificorp v. Nw. Pipeline GP*, No. 3:10-cv-00099-PK, 2012 WL 6131558, at *7-8 (D. Or. Dec. 10, 2012) (stating that "courts have allowed recovery for electronic storage of documents generally," and noting that the "storage of electronic data throughout [the review, marking, stamping, and conversion stages was] required to prepare and produce the requested electronic discovery, requires no intellectual efforts, and may be properly taxed" (citing *Adidas Am., Inc. v. Payless Shoesource, Inc.*, No. 01-1655-KI, 2009 WL 302246, at *4 (D. Or. Feb. 9, 2009))).

The District of Columbia Circuit's decision in *United States v. Halliburton Co.*, 954 F.3d 307 (D.C. Cir. 2020), and the Ninth Circuit's decision in *In re Online DVD-Rental Antitrust*

*Litig.*, 779 F.3d 914, 927 (9th Cir. 2015), are instructive on the issue of taxing electronic

discovery ("e-discovery") and data management costs.

In *Halliburton*, the prevailing party "compiled over 2.4 million potentially responsive

pages, ultimately producing over 171,000 of those pages," and "used an e-discovery software

called Introspect to 'host, review, and export data for production.'" *Id.* at 309. The prevailing

party's "2.4 million potentially responsive pages were loaded into Introspect, which required

scanning hard copies of certain documents into electronic form and converting preexisting

electronic files into the hosting platform's format," and "[w]ithin the platform, documents were

organized, keyword-searched, indexed, screened, and otherwise processed—tasks familiar to any

law-firm associate who has survived 'doc review.'" *Id.* As a last step, the prevailing party

"converted the 171,000 responsive documents into TIFF or PDF files, transferred them onto

USB drives, and produced the materials to [opposing] counsel." *Id.*

On appeal, the District of Columbia Circuit addressed whether the district court erred in

awarding the prevailing party all of its e-discovery costs. *Id.* at 312. Those costs stemmed from

five different stages of processing e-discovery:

> (1) initial conversion, i.e., converting files from their native formats into a format
> compatible with an e-discovery hosting platform; (2) subscribing to a hosting
> platform, in this case Introspect, that facilitates the various steps of e-discovery;
> (3) processing documents, e.g., organizing, keyword-searching, and Bates
> stamping; (4) conversion for production, i.e., converting documents into shareable
> formats for production to opposing counsel, and, where necessary, transferring
> those files onto portable media, e.g., USB drives; and (5) production processing,
> i.e., drafting production cover letters and shipping discovery materials to
> opposing counsel.

*Id.*

The District of Columbia Circuit concluded that "the only e-discovery costs that [the

prevailing party could] recover [were] those incurred in step (4)—converting electronic files to

the production formats (in this case, PDF and TIFF) and transferring those production files to

portable media (here, USB drives)." *Id.* The District of Columbia Circuit concluded that the

prevailing party was not entitled to recover the e-discovery costs incurred at the other stages:

> [The prevailing party] may not collect the . . . initial file conversion
> expenses (stage (1)) because the record demonstrates that those costs were
> incurred solely for the company's convenience. [The prevailing party] offers no
> other reason for converting the files into Introspect's proprietary format before
> later converting them to PDF or TIFF for sharing with opposing counsel. In other
> words, [the prevailing party] has failed to demonstrate that the intermediate
> Introspect files were 'necessarily obtained for use in the case.'

> The remaining e-discovery costs (stages (2), (3), and (5)) are likewise
> untaxable. . . . [T]hese e-discovery tasks are comparable to the steps that law-firm
> associates took in the pre-digital era in the course of 'doc review'—identifying
> stacks of potentially relevant materials, culling those materials for documents
> containing specific keywords, screening those culled documents for potential
> privilege issues, Bates-stamping each screened document, and mailing discovery
> materials to opposing counsel. Because none of the steps that preceded or
> followed the actual act of making copies in the pre-digital era would have been
> considered taxable, such tasks are untaxable now, whether performed by law-firm
> associate or algorithm.

*Id.* (simplified); *see also id*. at 311 (agreeing with the Federal Circuit that "'[a]pplying section

1920(4) . . . calls for some common-sense judgments guided by a comparison with the paper-

document analogue,'" and noting that the Ninth Circuit has "compar[ed] certain e-discovery

activities to their analog analogues" (citing *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at

927)).

The Ninth Circuit addressed similar e-discovery and data management costs in *In re*

*Online DVD-Rental Antitrust Litigation*. In that case, the plaintiffs required that the defendants

produce most of the electronic information at issue in the static TIFF format; that images contain

searchable text and relevant metadata; and that the defendants number the produced documents

sequentially and include certain identifying information. *See In re Online DVD-Rental Antitrust*

*Litig.*, 779 F.3d at 925. The defendants enlisted e-discovery vendors to assist with responding to

the plaintiffs' discovery requests, and ultimately produced almost 15 million pages of responsive

materials. *Id.* On appeal, the plaintiffs asserted that the district court erred by awarding charges that were not taxable, including "data upload" charges. *Id.* at 927-28.

The "data upload" charges included (1) charges of "Data Upload" and "Catalyst Data Upload," which referred to "the reproduction of documents for potential production into a database where they could be viewed"; and (2) charges for "Upload Production Documents," which referred to the "process of reproducing the collection of documents actually being produced for viewing after all the processes necessary to prepare the documents in the required formats and with the required labels have been completed." *Id.* (quotation marks omitted). The Ninth Circuit determined that the defendant's "data upload" charges were non-taxable under § 1920:

> [The vendor's] description of the 'data upload' and 'catalyst data upload' charges indicates the uploading process created new copies of documents inside a database. Assuming, without deciding, that the specific uploading task constituted 'making copies,' the further determination is required whether the copies were necessarily obtained for use in the litigation. [The vendor] declared that 'the reproduction of documents was a necessary step in the document production process because it facilitated a selection of documents for production from the set of documents for potential production.' This description establishes only that the copies were essential to the document production process, and fails to establish the copies were necessarily obtained for use in the litigation.

> A narrow construction of § 1920(4) requires recognition that the circumstances in which a copy will be deemed 'necessarily obtained' for use in a case will be *extremely limited*. That a chosen 'document production process' requires the creation of a copy does not establish that the copy is necessarily obtained for use in the case. A lawyer may review electronically stored information for privilege either by viewing the original documents on the client's computer or, alternatively, by viewing copies uploaded to the lawyer's computer. Although the latter method of review requires the creation of a copy, the ability to conduct the review by looking at the original document establishes that the uploaded copy was not necessarily obtained for use in the case.

> Similarly, [the vendor's] description of the charges for 'Upload Production Documents' indicates that the copies were created as a 'necessary step in the document production process in order to view the documents as they appeared in the actual production being made.' As with [the defendant's] description of the other 'uploading' charges, this description establishes only that the copy is

essential to the document production process that [the defendant] (or its litigation support vendor) elected to employ, and fails to establish the copies were necessarily obtained for use in the case. Accordingly, these charges are non-taxable under § 1920(4).

*Id.* at 929-30 (simplified) (emphasis added).

### b.    Disposition

Consistent with the authorities above, the Court concludes that Defendants are not entitled to recover the $168,069 they request for "Active Hosting" services.[4] (*See* Hill Decl. Ex. 3 at 1-2, referring only to "Active Hosting" as a "Discovery Service[]"; Supp. Decl. of Christin Hill in Supp. of Defs.' Resps. to Lead Pls.' Objs. to Defs.' Bill of Costs ("Supp. Hill Decl."), Ex. 3 at 1, ECF No. 338-3) (explaining that "active hosting" includes "database setup, text, native & image access to data in an active state within a KLDiscovery review platform")).

Based on Defendants' e-discovery vendor's invoices, it appears that the costs Defendants incurred for "active hosting" do not include "the costs of creating the produced duplicates," but rather include only "preparatory or ancillary costs commonly incurred leading up to, in conjunction with, or after duplication[,]" which the Ninth Circuit has deemed not taxable. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 928-29 ("[I]t may be that extensive 'processing' of electronically stored information is essential," but that "does not mean that the services leading up to the actual production [are taxable costs].") (simplified). Accordingly, the Court concludes that Defendants are not entitled to recover $168,069 in "Active Hosting" costs.

///

///

---

[4] Defendants also request $150 for "Hosted Services – Technical Time." (Hill Decl. Ex. 3 at 2.) Plaintiffs do not appear to object to this request, as the "Active Hosting" charges alone amount to $168,069. (*See* Pls.' Objs. at 7, objecting to the request for "$168,069 in document hosting fees").

### 5.    Processing Responsive Data for Production

Defendants assert that $65,750 in e-discovery costs for "Selective ESI Processing – Processing Responsive Data" (Hill Decl. Ex. 3) are taxable because those costs were incurred for the "identification and OCR ['optical character recognition'] of all non-full text documents and breaking of passwords and password protected files,'" and such costs "were necessary to comply with the parties' discovery protocol: 'In the event a document is scanned into TIFF format, the text file should contain that document's OCR text. The OCR software should maximize text quality over process speed.'" (Defs.' Reply at 7) (citation omitted).

The Court agrees that the costs of duplicating responsive discovery in the particular format agreed upon by the parties are generally taxable. *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 927 ("To the extent that a party is obligated to produce (or obligated to accept) electronic documents in a particular format or with particular characteristics intact (such as metadata, color, motion, or manipulability), the costs to make duplicates in such a format or with such characteristics preserved are recoverable as the costs of making copies necessarily obtained for use in the case.") (simplified); *see also Halliburton*, 954 F.3d at 312 (explaining that the costs a party incurs in converting electronic files to the production formats "resemble the final stage of 'doc review' in the pre-digital age: photocopying the stack of responsive and privilege-screened documents to hand over to opposing counsel").

However, Defendants' e-discovery vendor grouped together both taxable costs (OCR) with non-taxable costs (breaking of passwords and password protected files, as well as potentially other "processing" tasks) under its billing entries for "Selective ESI Processing – Processing Responsive Data." (*See* Supp. Hill Decl., Ex. 3 at 1, describing its "Selective ESI Processing – Processing Responsive Data" service as "Process data responsive to the filters applied" and "Includes identification and OCR of all non-full text documents and breaking of

PAGE 20 – OPINION AND ORDER

passwords for password protected files"; Hill Decl. Ex. 3, e-discovery vendor's invoices reference only "Selective ESI Processing – Processing Responsive Data," without breaking down each entry between OCR and other tasks). As a result, the Court cannot determine what proportion of the $65,750 in Defendants' data processing costs are taxable, and therefore denies Defendants' request to tax those costs. *Cf. In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 929 (holding that the e-discovery vendor's description of the service provided "establishes only that the copy is essential to the document production process that [the defendant] (or its litigation support vendor) elected to employ, and fails to establish the copies were necessarily obtained for use in the case").

## CONCLUSION

For the reasons stated, the Court GRANTS IN PART and DENIES IN PART Defendants' bill of costs (ECF No. 329), and awards Defendants their costs in the amount of $98,875.99 (i.e., $339,775.25 minus $7,080.26 in video recording costs, $168,069 in data hosting costs, and $65,750 in data processing costs).

**IT IS SO ORDERED.**

DATED this 4th day of October, 2021.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge